**UNITED STATES DISTRICT**
**DISTRICT OF CONNECTICUT**
**Bridgeport**

STUART & SONS, L.P.,                    :

                 *Plaintiff,*          :          **SECOND AMENDED**
                                 :          **COMPLAINT AND JURY**
                                 :          **DEMAND**
      -against-          :

THE CURTIS PUBLISHING COMPANY, INC.,   :
THE SATURDAY EVENING POST SOCIETY, A :     Case No. 301 CV 1580 AHN
DIVISION OF THE BENJAMIN FRANKLIN       :
LITERARY AND MEDICAL SOCIETY, and THE :
BENJAMIN FRANKLIN LITERARY AND          :
MEDICAL SOCIETY, INC.,                  :
                                 :
               *Defendants.*          :

      Plaintiffs Stuart & Sons, L.P., Kenneth Stuart, Jr., Executor of the Estate of Kenneth Stuart, Sr., Kenneth Stuart, Jr., Trustee of the Kenneth J. Stuart, Sr. Trust, and the individuals, Kenneth Stuart, Jr., William Stuart and Jonathan Stuart, (the "Plaintiffs") for their complaint against defendants The Curtis Publishing Company, Inc. ("Curtis") and The Saturday Evening Post Society, a Division of the Benjamin Franklin Literary and Medical Society (the "Division"), and The Benjamin Franklin Literary and Medical Society, Inc. (the "Society") (collectively, "Defendants"), state:

      1.     Through this action, the Plaintiffs seek to remedy Defendants' wrongful interference with ownership by the plaintiffs of three paintings painted by the highly renowned American painter Norman Rockwell.

## PARTIES

2.      Stuart & Sons is a family-owned Connecticut limited partnership with its principal place of business in Wilton, Connecticut.

3a.      Kenneth Stuart, Jr. ("Ken Jr.") is the General Partner of Stuart & Sons, and  is a citizen of Connecticut and a son of Kenneth Stuart, Sr.

3b.      On April 19, 1994 Kenneth Stuart, Jr. was appointed Executor of the Estate of Kenneth Stuart, Sr. by the Probate Court for the District of Wilton (a copy of said appointment is attached hereto as Exhibit A).

3c.      William Stuart is a citizen of the Commonwealth of Massachusetts and a son of Kenneth Stuart, Sr.

3d.      Jonathan Stuart is a citizen of the State of New York and a son of Kenneth Stuart, Sr.

3e.      Kenneth Stuart, Jr. is the Trustee of The Kenneth J. Stuart Living Trust, hereinafter referred to as the "Trust".

3f.      William Stuart, Jonathan Stuart and Kenneth Stuart, Jr. are designated beneficiaries of the Estate of Kenneth Stuart, Sr. and the above described Trust.

4.      The above plaintiffs have ownership claims to the paintings which are the subject of this action.  All said claims are adverse to the Defendants, as further alleged herein.

5.      Kenneth Stuart, Sr. ("Ken Sr.") was the Art Director of a magazine known as *The Saturday Evening Post* (the "Post") between 1944 and 1962.

6.      Curtis is an Indiana corporation with its principal place of business in Indianapolis, Indiana that was formerly known as SerVaas Interests, Inc.

7.       Upon information and belief, Curtis is a privately held corporation that is

2

principally owned and controlled by members of the SerVaas family.

8.      Upon information and belief, Curtis merged with a Pennsylvania corporation that originally bore the name The Curtis Publishing Company and which published the Post until January 10, 1969 (the merge4 corporation is referred to as "Curtis").

9.      The Division purports, upon information and belief, to be an unincorporated "division" of the Society and the assignee of certain rights purportedly once held by Curtis in connection with the Post.

10.     The Society is, upon information and belief, an Indiana not-for-profit corporation with its principal place of business in Indiana.

11.     Upon information and belief, Defendants are transacting business in Connecticut and have committed tortious acts in the State to further their business in Connecticut, including interfering with Stuart & Son's title to property owned in Connecticut, sending writings with false statements into Connecticut that have interfered with Stuart & Sons' efforts to sell property from Connecticut, and by having acted and having failed to act to give Stuart & Sons timely notice of their claims, all of which Stuart & Sons relied upon in taking actions in Connecticut to its detriment.

**JURISDICTION**

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(l) because it is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2).

## FACTS UNDERLYING THE CLAIMS FOR RELIEF

**Norman Rockwell**

13.    Norman Rockwell ("Rockwell") is a widely recognized American artist.

24.    Between 1916 and 1963, Rockwell delivered more than 300 paintings to the Post for use on its covers.

15.    Rockwell never signed a contract delivering title to any of the Paintings to either Defendant.

16.    In the Afterword of the first illustrated edition (published in 1988) of the autobiography of Rockwell, *My Adventures As An Illustrator* (Doubleday 1960) *("Adventures"),* Rockwell's son, Tom, quotes from a memorandum dated August 7, 1963, written by Bob Sherrod (the Post's Editor-in-Chief after Ben Hibbs) to Clay Blair, Jr. (the Post's Editor-in-Chief in 1963, following Sherrod) in connection with Rockwell's relationship with the Post:

> I told you last week that Norman Rockwell is getting offers from other magazines. He phoned this morning to say that he had decided he wants to free-lance, but he is anxious to have the *Post's* blessing (Norman has a horror of doing anything awkwardly or surreptitiously.)
>
> Specifically, he has been approached by Herb Mayes of *McCall's* and Dan Mich of *Look* Both have promised to let him paint anything he wants to, in whatever way he wants to paint it, anywhere in the world....
>
> He would still be able to do a portrait now and then for the *Post....*
>
> I take it that all Norman wants is our approval, and I don't see how we can refuse to let him take on other work—particularly since no contractual agreement exists between hint and the *Post....*

*(Adventures* at 420.)

4

**The Paintings**

17. Among the paintings Rockwell delivered to the Post for use on its covers were:

    a.    *The Gossips* (1948) (33 x 31 inches);

    b.    *Saying Grace* (1951) (42 x 40 inches); and

    c.    *Walking to Church* (1953) (18% x 17% inches); (collectively, the "Paintings").

18. Defendants have never produced to Smart & Sons any documentation reflecting Rockwell's transfer of title to any of the Paintings to either Defendant.

20. Upon information and belief, Defendants have no documents specifically concerning either (a) payments made in connection with the Paintings, or (b) the transfer of any rights related to the Paintings to either Defendant. Rockwell's Relationship with Ken Sr.

21. Ken Sr. began working as the Art Director for the Post in 1944.

22. Ken Sr. worked directly for the then-Editor of the Post, Ben Hibbs ("Hibbs").

23. Hibbs was the successor to a highly regarded, but domineering, editor whom Rockwell, even in his 60's, referred to as "Mr. Lorimer."

24. Rockwell distinguished "Ben" Hibbs from Mr. Lorimer, among other ways, by the great latitude that Hibbs allowed his Art Director.

25. In his autobiography, *Adventures,* Rockwell described the authority vested in Ken Sr. by Hibbs:

> Ben Hibbs was a different sort of man. He was neither domineering nor ruthless. He could delegate responsibility. He didn't feel that he had to do everything himself. (Bob Fuoss, who had the title of executive editor, was virtually coeditor of the magazine, and Kenneth Stuart was art editor in fact as well as in name. Ken was given great latitude in everything having to do with the physical appearance of the magazine.) In fact I'd always thought of Ben Hibbs as the archetype of the easygoing, good-natured Midwesterner. But there was iron in his soul. And something rarer. I once asked Bob Fuoss what Ben had that set him apart. "He's got that rare thing," said Bob, "Integrity, absolute integrity."

*(Adventures* at 311.)

26.    One of Rockwell's diary entries reflects similar sentiments:

> In Mr. Lorimer's day the art editors of the *Post* made relatively few final decisions. They had to get his okay on most major work—and so, in the end, the decision to accept a cover or illustration was usually Mr. Lorimer's rather than the art editor's. It's all different now. Ken runs the art department. He makes the decisions. He is, in function as well as title, the art editor.

*(Adventures* at 375.)

27.    Rockwell had tremendous respect for Ken Sr., and also wrote in that excerpt from his diary:

> To Philadelphia for lunch with editors of *Post*. Showed sketches to Ken Stuart. My favorite art editor. Lets me do my own work, doesn't hold me back or try to paint the picture himself (some art editors want to get in on every brush stroke). But Ken's helpful. Always arranging things for me. Makes valuable suggestions. He gives me the feeling that he believes in me and only wants to help me realize my own ideas. Ben Hibbs once said that an editor's job is to create an atmosphere in which artists and writers can do their best creative work. That's what Ken does. To perfection.

* * *

> And I think he does a tremendously creative job.  For one thing, he has transformed the cover.

* * *

> So now Ken has to get fifty-two separate, untitled, storytelling pictures every year. A very, very difficult task. If he had stuck to the old formula his job would have been much simpler. Illustrators who can paint dogs or pretty girls are relatively easy to find; illustrators who can paint storytelling pictures, who have a feeling for people, are scarce. But Ken somehow manages to get the fifty-two covers every year. And he's done it for sixteen years; that's 832 covets in all. Moreover, he's responsible for all the illustrations and the layouts and photographs inside the *Post*. Yet Ken never hurries me, doesn't call up every other day to ask, "Where's the picture? Where's the picture?" as some art editors do. And when I call him up he's always ready to help.

> Ken was a successful illustrator before he became art editor of the *Post*. He had studied abroad, where he knew Brancusi, Pascin, and other modem painters and sculptors. In other words, he has a thorough artistic background. No wonder he

6

understands illustrators. Just as there is no better way to understand the 1-lottentots than to go and be one, so there is no better way to understand illustrators than to be one.

> I often marvel that along with his artistic talent Ken has the executive ability and detachment not only to run his department but to handle a stable of highly temperamental illustrators as well. Artistic talent and executive ability don't often go together, but Ken has both. The *Post* cover is my best and only opportunity to express myself fully. And Ken lets me do it. *He* doesn't impose any restrictions. He has created for me the atmosphere in which I can do my best work.

*(Adventures* at 375-76.)

28.     Rockwell's professional respect for Ken Sr. is also reflected in the following

diary entry:

> Ken Stuart called to tell me that the National Educational Association is awarding me a medal for my cover of the boy graduate. James Conant, Jacques Barzun, Margaret Mead, and several others are to receive medals too. I'm very pleased and proud, though I can't help thinking it's slightly ridiculous. James Conant belabored his brains for two or three years (and what a set of brains, too!) writing a book and then I get the same medal for a *Post* cover. Well.

> I told Ken he should get half the medal. After all, he designed the background of the cover: the newspaper headlines screaming disaster on which the figure of the boy is superimposed. That's why the boy is looking bewildered. All these problems, he's thinking, juvenile delinquency, atomic fallout, strikes, Communism; is that the sort of world I'm entering?

*(Adventures* at 388.)

29.     Rockwell also had a genuine friendship with Ken Sr.

30.     Rockwell painted portraits of Ken Sr. and his wife, Katharine.

31.     Rockwell's deep affection for Ken Sr. is reflected in letters, including one dated

May 1, 1957, in which Rockwell states:

> I just want to put down in a letter what I have been feeling so long—and that is how wonderfully cooperative you have been.

> The encouragement and freedom you give me in my work shows what a great impresario you are. It is great to feel your art editor is one hundred percent for you, and is a real friend.

This may sound a bit flowery, but it is completely sincere, and I do want to express my thanks to you.

Sincerely,

*Norman*

32.    Rockwell wrote another letter to Ken Sr. dated May 19, 1959, in which he states:

I just have to put this in writing.

This whole amazing project of my so-called autobiography is all due one hundred percent to you. It was your original conception, you have done all the negotiating, and furnished the initiative to carry it through. Without your creative thinking and hard work it just wouldn't have been.

I have realized this all along but now I have to write it down. Of course it is all unbelievably pleasing to me, and you have my undying gratitude. You are a great impresario.

Sincerely,

*Norman*

33.    Rockwell's gratitude is also expressed in an inscription he wrote to Ken Sr. in a copy of *Adventures* that Rockwell presented to him in 1961:

Everything I am, everything
I have ever done, everything
I hope to be I owe to

Ken

lovingly.
Norman
Rockwell

**Ken Sr.'s Acquisition of the Paintings**

34.    The majority of art commissioned by Ken Sr. for the Post was returned to the artists, including much of Rockwell's artwork.

8

35.    Ken Sr. understood that Rockwell was not particularly interested in saving his paintings and that, if a painting were returned to Rockwell, he often sold it for a relatively modest price or gave it away.

36.    Ken Sr. was himself authorized and encouraged by Curtis to give artwork that had appeared in the Post (including work produced by Rockwell and other artists, such as John Falter) to, among others, important advertisers, editors, politicians and executives of Curtis as well as other companies.

37.    Upon information and belief, Ken Sr. first discussed these gifts with both Hibbs and the artists (including Rockwell), albeit informally.

38.    Curtis was fully aware of Ken Sr.'s authority to distribute, and the fact that he did personally distribute artwork that had appeared in the Post to a variety of people and institutions, including at least one President of the United States.

39.    Because Post artwork did not have significant economic value to Curtis during Ken Sr.'s tenure as Art Director, the distributions took place in the ordinary course of business and without any formal corporate action, such as a resolution of Curtis's board of directors.

40.    In a 1979 article he wrote for READER'S DIGEST, Ken Sr. described the process by which, in about 1952, he received the first of the Paintings, *Saying Grace,* as follows:

> "Don't you want one?" he [Rockwell] asked reproachfully. I said, "Yes, I'd love to have one." "Which?" Norman asked. J was flustered by his directness. Since *"Saying Grace"* was on the wall, I said, "How about this one?" So he gave it to me as casually as another might bestow a cigar.

"Unforgettable Norman Rockwell," READER'S DIGEST (July 1979), at 108-09.

41.    Upon information and belief, Ken Sr. came to own the other two Paintings, *The Gossips* and *Walking to Church,* in or about 1953.

9

42.     During his relationship with Rockwell, Ken Sr. received other artwork from Rockwell, including the portraits described above, sketches, etc.

43.     In the early 1950's and 1960's, the Paintings and other artwork distributed by Ken ST. did not have great economic value.

44.     In the 1970's, Rockwell's artwork began to become of interest to art dealers, collectors, and auction houses, and the value of Rockwell's artwork increased correspondingly.

**Defendants' Awareness of Ken Sr.'s Ownership of the Paintings**

45.     Ken Sr. did not hide his ownership of the Paintings from Defendants.

46.     Other Curtis employees and freelance staffers also received Rockwell artwork, including Hibbs (a. man recognized in Rockwell's autobiography for his "absolute integrity"); Bob Fuoss (the Post's Managing Editor); Don McNeil (a President of Curtis); Ted Key (a Post contributor who created "Hazel" and originated many Post cover ideas—including many executed by Rockwell); Pete Martin (the Post Hollywood gossip columnist); Don Trachte; Harry Abrams (the legendary art book publisher); and Arthur Guptill (publisher of one of the first art books about Rockwell in the 1940's).

47.     Upon information and belief, Hibbs (or his heirs or transferees) and many others (or their heirs or transferees) who received Rockwell artwork under Ken Sr.'s tenure still possess the artwork.

48.     Upon information and belief, Defendants had, through and including August 2001, made little or no effort to obtain any of the thousands of works of art that graced the Post covers.

49.     Ken Sr. kept *Saying Grace* in his office at Curtis for some time but eventually moved it to his home, which was ultimately located in Connecticut.

50.    *Saying Grace* and other Rockwell artwork were prominently displayed in Ken Sr.'s home as Ken Jr. and his brothers grew up.

51.    Curtis executives, including Messrs. Hibbs, McNeill, Fuoss, as well as Rockwell himself, were frequent guests in Ken Sr.'s home.

52.    Upon information and belief, Philip Strubing ("Strubing"), Curtis's principal outside corporate counsel for approximately 30 years, dined in Hibbs's home, and saw Rockwell artwork on display there and did not suggest to Curtis's then management that there was anything even remotely inappropriate about Hibbs having obtained the works.

53.    At no time during his tenure at Curtis did Strubing ever complain to Curtis's management or Board of Directors that Ken Sr. had improperly assumed ownership of *Saying Grace* or the other Paintings, although he later claimed knowledge that Ken Sr. had allegedly wrongfully removed at least 20 pieces of Rockwell artwork from Curtis's premises.

**The Public Declarations of Ken Sr.'s
Ownership of the Paintings Over Decades**

54.    Ken Sr.'s ownership of the Paintings was a matter of public record for most of the second half of the last century.

55.    The Paintings were publicly exhibited by Ken Sr. and publicly identified as being part of the "Ken and Katharine Stuart Collection" or a similar variant thereof.

56.    The Paintings were reproduced in numerous published and widely distributed books, videotapes, and educational television programs, and were usually identified as being the property of the "Ken and Katharine Stuart Collection."

57.    At least some of the Paintings appeared on a televised documentary and were identified as the property of the "Ken and Katharine Stuart Collection."

58.    In the early 1990's, Stuart & Sons contracted with the Norman Rockwell

11

Museum in Stockbridge, Massachusetts (the "Rockwell Museum") to display the works, again, as the property of the "Ken and Katharine Stuart Collection."

59.    The Paintings were, and are currently, on display at the Rockwell Museum and identified as the property of the "Ken and Katharine Stuart Collection."

60.    The Rockwell Museum's web site identifies the Paintings as part of the "Ken and Katharine Stuart Collection."

61.    The Paintings are presently part of a national tour (now stopping at the Rockwell Museum) that has traveled to a number of prominent museums and have always been identified in that tour as part of the "Ken and Katharine Stuart Collection."

62.    The catalogue for this tour, *Norman Rockwell: Pictures for the American People* (Harry N. Abrams 1999) (the "Tour Catalogue"), expresses gratitude to, among others, "the family of Ken and Katharine Stuart" for having "lent their Norman Rockwell original artwork."

**Defendants' Long-Held, Actual Knowledge
Of Stuart's Ownership of the Paintings**

63.    As described above, the most senior executives of Curtis, as well as at least one outside counsel representing Curtis, were well aware of Ken Sr.'s ownership of the Paintings prior to his departure from Curtis in 1963.

64.    Upon information and belief, after the acquisition of Curtis by members of the SerVaas family, Curtis began to license Rockwell artwork extensively and was aware that Ken Sr. identified the Paintings as his own many times over in, among other things, credit lines in millions of copies of books reproducing Rockwell images.

65.    Curtis has recently claimed that, many years ago, Strubing and others (including an investment banker, other Post artists, and Curtis employees who were formerly working in the Philadelphia offices of Curtis) pointedly advised the company and members of the SerVaas

12

family that Ken Sr. was wrongfully in possession of Rockwell artwork, including *Saying Grace*.

66.    Upon information and belief, Curtis was extensively engaged in licensing Rockwell artwork shortly after the SerVaas family acquired control and was well aware of the publications of Post cover art, including the Paintings.

67.    In July 1979, Ken Sr. wrote about his ownership of *Saying Grace* in READER' S DIGEST, then the largest~cirCUlati0n periodical in the world.

68.    Upon information and belief, in years past Curtis hired sophisticated copyright counsel in New York to examine its rights with respect to Rockwell artwork and engaged in litigation with Rockwell's heirs over certain intellectual property rights.

69.    Upon information and belief, in or about 1986, Strubing told Curtis that he believed that Ken Sr. had wrongfully removed *Saying Grace* and other Rockwell artwork from the Post's offices.

70.    On May 13, 1986, Beurt SerVaas wrote directly to Ken Sr. and explicitly stated that it had come to the attention of Curtis that Ken Sr. was "in the possession of some of the original artwork including *'Saying Grace."*

71.    On June 2, 1986, a letter was sent to Beurt SerVaas confirming that Ken Sr. was then the owner of *Saying Grace* and other works by Rockwell.

72.    At or about the same time, Dr. Cory SerVaas called the Stuart home to inquire about the Paintings.

73.    On at least one other occasion following the death of Ken Sr. in 1993, employees reporting to members of the SerVaas family contacted Ken Jr. to inquire about Rockwell artwork in Stuart's possession.

74.     There have been many open sales of artwork that Rockwell did for the Post that Defendants knew or should have known of and to which they made no objection.

75.     For a number of years, a member of the SerVaas family sat on the Board of Directors of the Rockwell Museum, which had contracted to have Stuart & Sons loan the Paintings to the Rockwell Museum and which displayed the Paintings as the property of the Ken and Katharine Stuart Collection.

76.     The 1999-2001 Tour Catalogue, available nationally (as well as, in a modified form, on the Internet), and distributed as part of a tour (sponsored in part by Curtis) that includes the Paintings, lists the Paintings as the property of the "Ken and Katharine Stuart Collection" and was, upon information and belief, reviewed by Defendants in or before 2000.

**Despite Their Knowledge of Stuart's**
**Open Ownership of the Paintings, Defendants**
**Never Claimed Any Interest In the Paintings**

**Until Stuart & Sons Sought to Sell Them at Auction**

77.     Curtis never claimed ownership of the Paintings during Ken Sr.'s employment at Curtis or advised Ken Sr. that it believed that his acquisition of the Paintings was wrongful.

78.     Curtis experienced serious financial difficulties in the late 1960's, years after Ken Sr. had left the Post.

79.     At no time after Ken Sr.'s departure from the Post, even in January 1969 when Curtis teetered on the edge of bankruptcy and stopped publishing the Post, did Curtis contact Ken Sr. and identify any of the Paintings as an asset of Curtis.

80.     Although Beurt SerVaas claims to have gone into debt to buy a controlling interest in Curtis in or about 1970, neither he nor anyone else at Curtis ever contacted Ken Sr. to claim ownership of the Paintings.

81.     The SerVaases were interested in developing Curtis into a media company that would promote health and fitness, a special interest of Dr. Corey SerVaas, the spouse and business associate of Beurt SerVaas, and, upon information and belief, consciously decided not to pursue any questions that they had concerning original Rockwell artwork.

82.     Upon information and belief, Defendants and members of the SerVaaS family have some sophistication in art-related matters, particularly where Rockwell artwork is concerned, having been involved in the creation of a museum and having retained professional archivists and a museum staff.

83.     Upon information and belief, neither Defendant nor any member of the SerVaas family has ever reported any Rockwell artwork missing to (a) any insurance carrier, (b) any law enforcement authorities, or (c) any organization, such as the Art Loss Register, that assists in the identification of lost, missing and stolen art.

**Stuart's Reliance**

84.     In the last 20 or so years of his life, Ken Sr. and his family did financial planning and took other actions based upon their ownership of the Paintings and the Defendants' conduct.

85.     Monies were paid to maintain and insure the Paintings as well as to satisfy tax obligations arising out of the ownership of the Paintings.

86.     Ownership of the Paintings was ultimately transferred to Stuart & Sons under Connecticut law before Ken Sr. passed away in February, 1993.

87.     Stuart & Sons loaned the Paintings to the Rockwell Museum and offered them a first opportunity to purchase the Paintings at less than the market price for the Paintings.

88.     Stuart & Sons entered into and all but completed negotiations with Sotheby's to

15

sell the Paintings at auction in 2001.

89.     Sotheby's contacted Curtis in July 2001 to obtain information concerning the Paintings for its catalogue.

## FIRST CLAIM FOR RELIEF
### (For Tortious Interference With Business Expectancies)

90.     Paragraphs I through 89 are restated as though fully set forth herein.

91.     Stuart & Sons had a business relationship with Sotheby's.

92.     Defendants were aware of Stuart & Sons' business relationship with Sotheby's in August 2001.

93.     As of August 1, 2001, Defendants had long had actual and constructive knowledge of Ken Sr.'s and Stuart & Son's ownership of the Paintings.

94.     Defendants had legal counsel and the benefit of legal advice in and before August 2001.

95.     Upon information and belief, Defendants were aware that they had no colorable legal claim to the Paintings in August, 2001.

96.     On August 1, 2001 and August 3, 2001, Defendants nonetheless wrote to Sotheby's to claim ownership of the Paintings.

97.     Upon information and belief, Defendants knew or should have known on August 1, 2001 and August 3, 2001 that the claims to ownership of the Paintings made in letters to Sotheby's bearing those dates were long barred by the applicable statute of limitations.

98.     Upon information and belief, Defendants have, since no later than 1986, contemplated making some claim to the Paintings and attempted, albeit Unsuccessfully, to record testimony related to the Paintings in legally admissible form.

99.     Upon information and belief, Defendants and the SerVaas family knowingly and intentionally withheld advising Ken Sr., Ken Jr., or Stuart & Sons of any interest that Defendants had in pursuing a claim to the Paintings in an attempt to prejudice Stuart & Sons' ability to defend against such a claim and to avoid the embarrassment that would have attended the public denunciation of so frivolous a claim by those who had actual knowledge of the relevant facts and circumstances, most of whom are now deceased.

100.     Defendants misrepresented their ownership of the Paintings to Sotheby's in bad faith with the intention of interfering with Stuart & Son's business relationship with Sotheby's.

101.     As of August 2001, Stuart & Sons had a business relationship with the Rockwell Museum.

102.     Upon information and belief, Defendants have maliciously and wrongfully informed the Rockwell Museum that Ken Sr. had, in words or substance, "stolen" the Paintings and that Stuart & Sons did not own them.

103.     On August 16, 2001, attorneys for Defendants contacted the Director of the Rockwell Museum and at least one of the Museum's board members to defame Ken Jr. through an assertion that he has improperly claimed ownership of the Paintings and to prevent the lawful delivery of the Paintings to Sotheby's for sale.

104.     On August 16, 2001, attorneys for Defendants also wrote to Sotheby's to direct that Sotheby's proceed no further without "the express written consent of Curtis" and that obtaining such consent was a condition to avoiding "immediate litigation."

105.     Prior to August 16, 2001, Stuart & Sons had the reasonable expectation of entering into a business relationship with one or more potential purchasers of the Paintings.

17

106.    Upon information and belief, prior to August 16, 2001, Defendants or a member of the SerVaas family communicated with at least one extraordinarily wealthy collector of Rockwell artwork to wrongfully inform him that Ken Sr. had, in words or substance, "stolen" the Paintings and that Stuart did not own them.

107.    As a result of Defendants' wrongful claim to ownership of the Paintings, Stuart & Sons, the Trust and/or the Estate of Kenneth Stuart, Sr., Kenneth Stuart, Jr., Jonathan and William Stuart have suffered actual economic losses, including but in no way limited to lost capital through value diminution, suppressed liquidity, interest, and attorneys' fees.

## SECOND CLAIM FOR RELIEF
### (For a Judgment Declaring Stuart & Son's Ownership of the Paintings)

108.    Paragraphs 1 through 107 are restated as though fully set forth herein.

109.    There exists a real and immediate controversy between Stuart & Sons and Defendants and declaratory relief is necessary to adjudicate the rights of the parties to the Paintings and to put an end to this actual controversy between the parties.

110.    As a result of Defendants' wrongful claim to ownership of the Paintings, Stuart & Sons, the Trust and/or the Estate of Kenneth Stuart, Sr., Kenneth Stuart, Jr., Jonathan and William Stuart are entitled to a judgment declaring that Plaintiffs, either individually or through their respective interests in Stuart & sons or the Trust have clear title to the Paintings and can retain or transfer ownership of the Paintings as they wish.

## THIRD CLAIM FOR BELIEF
### (In the Alternative: Abandonment of Title by Defendants)

111.    Paragraphs 1 through 110 are restated as though fully set forth herein.

112.    Following the alleged wrongful taking of the Paintings by Ken Sr. claimed by Defendants, Defendants abandoned any claim of title to the Paintings.

113. As detailed above, Defendants abandoned any rights they might have had in the Paintings by having failed to take any steps to recover possession of the Paintings or to provide notice to Stuart & Sons or to the public of Defendants' alleged claim to the Paintings.

114. As a result of the foregoing acts and omissions, claim of title to the Paintings by Stuart & Sons, the Trust and/or the Estate of Kenneth Stuart, Sr., or Kenneth Stuart, Jr., Jonathan and William Stuart is superior to that of Defendants.

WHEREFORE Plaintiffs respectfully request a judgment:

A. On its First Claim for Relief, awarding Plaintiffs damages, including punitive damages, in an amount to be proven at trial;

B. On its second and Third Claims for Relief, declaring that Plaintiffs are the true and sole owners of the Paintings all rights to retain or transfer ownership of the Paintings as they wish without interference by Defendants; and

C Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims that may be tried by a jury.

Dated:    Stamford, Connecticut
          November 2, 2004

                                      PLAINTIFFS,
                                      STUART & SONS, L.P.

By:        _____

                                      Mary E. Sommer, Esq. (ct04345)
                                      Jay Sandak, Esq. (ct06703)
                                      SANDAK HENNESSEY & GRECO LLP
                                      707 Summer Street
                                      Stamford, Connecticut 06901
                                      203-425-4200
                                      203-325-8608 Fax

*Of Counsel*

Peter R. Stern, Esq.
McLAUGHLIN & STERN, LLP
*Attorneys for Plaintiff Stuart & Sons, L.P.*
260 Madison Avenue
New York, NY 10016
212-448-1100
212-448-0066 Fax

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, on this 2nd day of November, 2004 to the following counsel of record:

Sandra Akoury, Esq.
Law Offices of Sandra Akoury
Talbot House
426 Danbury Road
Wilton, CT  06897

William M. Bloss, Esq.
Koskoff Koskoff & Bieder, P.C.
350 Fairfield Avenue
Bridgeport, CT  06604

Anthony F. Lo Cicero, Esq.
Amster, Rothstein & Ebenstein, LLP
90 Park Avenue
New York, NY  10016

Paul J. Pacifico, Esq.
965 Post Road East
Westport, Ct  06880-5355

Peter L Truebner, Esq.
100 Prospect Street
South Tower
Stamford, CT 06901

Kenneth Stuart, Jr. (Pro Se)
5 High Ridge Road
Wilton, CT  06897

_____
Mary E. Sommer

**FIDUCIARY'S PROBATE CERTIFICATE**
PC-450  REV. 8/02

**STATE OF CONNECTICUT**

**COURT OF PROBATE**

| FROM: **COURT OF PROBATE, DISTRICT OF Norwalk** | **DISTRICT NO. 103** | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>Kenneth James Stuart  (93-0164) | | DATE OF CERTIFICATE<br><br>*November 1, 2004*<br><br>*Valid for one year from this date. C.G.S. §45a-200* |
| FIDUCIARY'S NAME AND ADDRESS<br><br>Kenneth James Stuart, Jr., 434 Hurlbutt Street, Wilton, CT 06897 | FIDUCIARY'S POSITION OF TRUST<br><br>Executor | DATE OF APPOINTMENT<br><br>April 19, 1994 |

*The undersigned hereby certifies that the fiduciary of the above-named estate has accepted appointment, has executed bond according to law or has been excused from executing bond by will or by statute, and is legally authorized and qualified to act as such fiduciary on said estate because said appointment is unrevoked and in full force as of the above date of certificate.*

*Limitation, if any, on the above certificate:*

_____

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this court on the above date of certificate.

Judge, Ass't Clerk

**Court
Seal**

**NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED**

FIDUCIARY'S PROBATE CERTIFICATE
PC-450