FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
Bridgeport

2005 JUN 14  P 12: 41

U.S. DISTRICT COURT
BRIDGEPORT, CONN

STUART & SONS, L.P.,
THE ESTATE OF KENNETH J. STUART
THE KENNETH J. STUART LIVING TRUST
KENNETH J. STUART JR.
WILLIAM A. STUART, M.D.
JONATHAN STUART
           *Plaintiffs,*

- against -

THE CURTIS PUBLISHING COMPANY, INC.
THE SATURDAY EVENING POST SOCIETY, A
DIVISION OF THE BENJAMIN FRANKLIN
LITERARY AND MEDICAL SOCIETY, and THE
BENJAMIN FRANKLIN LITERARY AND
MEDICAL SOCIETY, INC.

           *Defendants*

Case No. 301 CV 1580 AHN

June 10, 2005

**MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFFS'
MOTION FOR
JUDGMENT ON THE PLEADINGS**

Law Offices of Sandra Akoury
426 Danbury Road
Wilton, Connecticut 06897
203-563-9230

On the brief:
    Sandra J. Akoury, Esq. (ct21279)
    Peter R. Stern, Esq. (ct23260)

# TABLE OF CONTENTS

|  |  | PAGES |
|---|---|---|
| TABLE OF AUTHORITIES | | i |
| I. | INTRODUCTION | 1 |
| II. | PRELIMINARY STATEMENT | 1 |
| III. | FACTUAL BACKGROUND | 5 |
| IV. | ARGUMENT – PLAINTIFF IS ENTITLED TO JUDGMENT ON THE PLEADINGS | 15 |
| | A. The Legal Standards for the Motion | 15 |
| | B. The Law Applicable to this Case | 17 |
| | C. The Law as Applied to this Case | 20 |
| |    1. Plaintiffs' Claim for a Judgment Declaring that the Stuart Family is the Owner of the Paintings | 21 |
| |    2. The Defendants' Counterclaims | 23 |
| |       a. The Statute of Limitations Bars the Defendants' Counterclaims | 25 |
| |       b. The Doctrine of Laches Bars the Defendants' Counterclaims | 29 |
| V. | CONCLUSION | 34 |

# TABLE OF AUTHORITIES

**CASES**     **PAGES**

*Adler v. Taylor*, CV-04-8472-RGK (FMOx)(C.D. Cal. Feb. 2, 2005) ........... 30, 31

*Aetna Life and Casualty Co. v. Union Trust Co.*, 230 Conn. 779, 646 A.2d 799 (1994) ................................................. 23

*Armetta v. Wheelabrator Technologies, Inc.*, 2001 WL 822434 (Conn. Super. June 26, 2001) ........................................................ 18

*AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266 (2d Cir. 1992) ..................... 17

*Arrigoni v. Adorno*, 129 Conn. 673 (1943) ......................................... 28

*Baram v. Farugia*, 606 F.2d 42 (3d Cir. 1979) ....................................... 20

*Baxter v. Sturm, Ruger and Co., Inc.*, 230 Conn. 335, 644 A.2d 1297 (1994), answer to certified question conformed or, 32 F.3d 48 (2d Cir. 1994) .......... 19

*Blue Cross of California v. SmithKline Beecham Clinical Labs., Inc.*, 108 F. Supp. 2d 116 (D. Conn. 2000) ............................................. 27

*Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998 (2d Cir. 1969), cert. denied, 397 U.S. 1064 (1970) ............................................... 20

*Cablevision of Conn., L.P. v. Sollitto*, 109 F. Supp.2d 84 (D. Conn. 2000)... 19

*Campbell v. New Milford Bd. Of Educ.*, 36 Conn. Supp. 357, 423 A.2d 900 (1980) ........................................................................ 27

*City of Harrisburg v. Bradford Trust Co.*, 621 F. Supp. 463 (M.D. Pa. 1985) ..... 20

*Clark v. Auto Recovery Bureau Conn., Inc.*, 889 F. Supp. 543 (D. Conn. 1994) ... 23

*Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734 (2d Cir. 1992) ........... 20

*Crittendon v. Brainard*, 2 Root 485 (Conn.)(1796) ..................................... 28

*DeCorso v. Watchtower Bible and Tract Soc'y of NY*, 46 Conn. Supp. 386, 752 A.2d 102 (2000) ........................................................... 17, 25, 28

*D'Occhio v. Conn. Real Estate Comm'n*, 189 Conn. 162, 455 A.2d 833 (1983) ... 17, 19, 25

*Dowling v. Finley Assoc., Inc.*, 49 Conn. App. 330 (1998), cert. granted, 247 Conn. 907 (1998), reversed on other grounds, 248 Conn. 364 (1999) ......... 28

*Dubern v. Girard Trust Bank*, 454 F.2d 565 (3d Cir. 1972) ........................... 20

*Federal Ins. Co. v. Ayers*, 772 F. Supp. 1503 (E.D. Pa. 1991) .......................... 20

*Feldt v. Sturm, Ruger & Co., Inc.*, 721 F. Supp. 403 (D. Conn. 1989) ................ 19

*Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212 (1988) ............................................. 18, 25

*Ganino v. Citizens Util. Co.*, 228 F.3d 154 (2d Cir. 2000) ............................... 16

*George v. Celotex Corp.*, 914 F.2d 26 (2d Cir. 1990) ...................................... 17

*Gilbert v. City of Cambridge*, 932 F.2d 51 (1st Cir. 1991),
cert. denied, 502 U.S. 866 (1991) ................................................................... 24

*In re Colonial Ltd. Partnership Litigation*, 854 F. Supp. 64, 90 (D. Conn. 1994) .... 19

*Kent v. AVCO Corp.*, 849 F. Supp. 833 (D. Conn. 1994) ................................ 17, 28

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) .......................... 17

*Leary v. Stylarama of New Haven, Inc.*, 174 Conn. 217 (1978) ........................ 30

*Luciani v. Stop & Shop Cos.*, 15 Conn. App. 407, 544 A.2d 1238,
cert. denied, 209 Conn. 809, 548 A.2d 437 (1988) ....................................... 18

*Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241,
602 A.2d 1277 (1992) ..................................................................................... 20

*Moore v. Waterbury Tool Co.*, 124 Conn. 201, 209, 199 A. 97 (1938) ................ 23

*On-Line Technologies v. Perkins Elmer Corp.*, 141 F. Supp. 2d 246 (D. Conn. 2001) ... 15

*Order of R.R. Telegraphers v. Railway Exp. Agency*, 321 U.S. 342 (1944)............... 29

*Papcun v. Papcun*, 181 Conn. 618 (1980) ........................................................ 30

*Phelps v. McClellan*, 30 F.3d 658 (6th Cir. 1994) ............................................ 16

*Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. (7 Wall.) 386 (1868) ...................... 29

*Saturday Evening Post Co. and Curtis Publishing Co. v. Rumbleseat Press, Inc.*,
816 F. 2d 1191 (7th Cir. 1987) ....................................................................... 22

*Shepard v. Beerman*, 18 F.3d 147 (2d Cir.), cert. denied, 513 U.S. 816 (1994) ........ 15

*Shonberger v. Oswell*, 365 Pa. Super. 481, 530 A.2d 112 (1987) ....................... 20

*Slekis v. Nat'l R.R. Passenger Corp.*, 56 F. Supp. 2d 202 (D. Conn. 1999)............ 17

*Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y. 2d 311,
567 N.Y.S. 2d 623 (1991) ............................................................................... 30

*Steiner v. Shawmut Nat'l Corp.*, 766 F. Supp. 2d 1236 (D. Conn. 1991) ............... 16

*Town of Orangetown v. Gorsuch,* 718 F.2d 29 (2d Cir. 1983),
cert. denied, 465 U.S. 1099 (1984) ......................................................... 23

*Walt Disney Productions v. Basmajian,* 600 F. Supp. 439 (S.D.N.Y. 1984) ............. 30

*Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.,* 752 N.Y.S.2d 295,
2002 WL 31819634 (N.Y.A.D. 1st Dept. Dec. 17, 2002) ............................. 30, 31

*Williams v. Walsh,* 558 F.2d 667 (2d Cir. 1977) ............................................. 27

*Wilton v. Seven Falls Co.,* 515 U.S. 277 (1995) ............................................. 20

*Wood v. Carpenter,* 101 U.S. 135 (1879) ..................................................... 27, 28

*Zanoni v. Hudon,* 48 Conn. App. 32, 708 A.2d 222 (1998),
cert. denied, 244 Conn. 928, 711 A.2d 730 (1998) ........................................ 18

**STATUTES**

28 U.S.C. § 1332 ................................................................................. 17

28 U.S.C. § 2201 ................................................................................. 20

Conn. Gen. Stat. § 52-577 ..................................................................... 17, 18, 25, 28

Fed. R. Civ. Proc. 12 (b), (c) .................................................................. 1, 15, 16

Fed R. Evid. 201(b), (c), (d), (f) .............................................................. 16

Fed. R. Evid. 803(16) ........................................................................... 16

**OTHER AUTHORITIES**

Jeremy G. Epstein, *The Laches Defense in Art Theft Litigation,* N.Y.L.J.,
October 20, 2000, at 1 ........................................................................... 31

Note, *Developments in the Law: Statutes of Limitations,*
63 Harv. L. Rev. 1177 (1950) ................................................................. 29

Restatement (Second) of Torts § 233 (1965) ............................................... 20

5A C. Wright and A. Miller, *Federal Practice and Procedure: Civil § 1367*
at 511 (1990) ...................................................................................... 16

## I. INTRODUCTION

Plaintiffs respectfully submit this memorandum of law in support of their Motion for Judgment on the Pleadings ("Motion"), dated June 10, 2005, pursuant to Federal Rule of Civil Procedure 12(c). Plaintiffs' Motion seeks a declaratory judgment that the Stuart family is owner of three paintings, described below, and that Defendants' two counterclaims, are barred as a matter of law by the statute of limitations and the doctrine of laches.

## II. PRELIMINARY STATEMENT

This case concerns the Stuart family's ownership of three original oil paintings created by Norman Rockwell ("Rockwell") between 1948 and 1953. The paintings have been in the Stuart family's possession and under its control for decades, and remain so to this day. The three paintings were among more than 300 that Rockwell created and delivered to *The Saturday Evening Post* ("*Post*") over the course of 47 years for use in connection with images that appeared on that weekly magazine's covers. Specifically, the paintings at issue are as follows:

a. *The Gossips* (1948)(33" x 31");

b. *Saying Grace* (1951)(42" x 40"); and

c. *Walking to Church* (aka *Silver Slipper Grill*) (1953)(18¾ x 17¾);

(collectively, the "Paintings"). Reproductions of the Paintings are annexed to the accompanying Declaration of Sandra J. Akoury, dated June 10, 2005 ("Akoury Decl."), at Exhibits G, J, R, U at 189 – 193, and AA.

After the *Post* had used the Paintings' images for its covers, the Paintings were returned to Rockwell and he, in or about 1952 and 1953, gave the Paintings to Kenneth Stuart Sr. ("Mr. Stuart Sr.") The Paintings in fact, "were not intended to be seen except in reproduction. The originals were expendable." (See Exhibit U to Akoury Decl. at xxv.) Mr. Stuart Sr. was the art director of the *Post*

1

from 1944 to 1962, and was described by Rockwell as "a great impresario" and "a real friend," and to whom Rockwell expressed his "undying gratitude." (See Exhs. D and E to Akoury Decl.; Exh. A at ¶¶ 30 and 31; portraits by Rockwell of Mr. Stuart Sr. and of his wife are annexed to the Akoury Decl. as Exh. U at 1029 – 31.) Mr. Stuart Sr. was the father of Kenneth J. Stuart Jr., William A. Stuart, M.D., and Jonathan Stuart, all of whom are beneficiaries of Mr. Stuart Sr.'s Estate and plaintiffs in this action.

Throughout the last half-century, the Stuart family held themselves out as, and were publicly recognized as, the owners of the Paintings. Despite having constructive, as well as actual knowledge of the Stuarts' acts of ownership of the Paintings during that extended period, the Defendants continually failed to assert any claim to the Paintings. It was not until the summer of 2001 that the Defendants, for the first time in almost 50 years, belatedly asserted a claim to the Paintings; this action was commenced immediately by Stuart Jr. to quiet title to the Paintings.

There is no clear evidence that Curtis Publishing Company ("Curtis"), which published the *Post* at the time the Paintings were created, ever owned the original Paintings at issue. Rather, Curtis may own the copyrights (which are not at issue in this lawsuit) to the images of the Paintings. Indeed, numerous publications list the Stuart family as the owners of the Paintings and Curtis as the owner of the copyrights. In fact, it was Curtis's regular practice, once an original painting had been reproduced in the *Post*, to return the original to the artist or to otherwise dispose of it. These actions were taken by Curtis in the ordinary course of its business, as the originals at that time had little monetary value, and Curtis had no interest in using its limited storage space to retain paintings.[1] However, whether Curtis or the other Defendants once owned the Paintings is irrelevant in light of the parties' respective conduct during the last 50 years.

On the one hand, the Stuart family has possessed the Paintings and has acted publicly as the owner for decades. The public record is replete with references to the Stuarts as owners of the

---

[1] As a reminder, the *Post* was published weekly. Each issue contained, in addition to the cover art, several articles with accompanying pictures reproduced from original oil paintings. During Mr. Stuart Sr.'s tenure as art editor from 1944 to 1962, the covers alone would have required well over 900 original oil paintings.

2

Paintings, as noted below. Mr. Stuart Sr. and his successors-in-interest, the beneficiaries of his Estate, held themselves out and were publicly recognized as, the owners of the Paintings during the last three decades. This recognition is documented in prominent books and catalogues and at least one commercial videotape concerning Rockwell's paintings and his relationship with the *Post*.

On the other hand, the Defendants have neither possessed the Paintings nor acted as their owner during the last 50 years. In fact, the Defendants acted in a manner that is entirely inconsistent with their current claim of ownership. The Defendants never reported the Paintings as missing or stolen to any law enforcement agency, such as the local police, the Federal Bureau of Investigation, or the International Criminal Police Organization (Interpol), or to any relevant art agency – such as the Art Dealers Association of America (ADAA), International Foundation for Art Research (IFAR), or the Art Loss Register (ALR). The Defendants have never filed any claim of loss with any insurance carrier. Moreover, the Defendants repeatedly failed to assert any claim of ownership to the Paintings during the last half-century, despite having several specific opportunities to do so. In fact, as further described below, the Defendants waited:

- more than 48 years after Mr. Stuart Sr. was given the Paintings by Rockwell;

- more than 39 years after Mr. Stuart Sr. left the *Post*, already in physical possession of the Paintings, which were prominently displayed in his home;

- more than 31 years after Mr. Stuart Sr.'s ownership of the Paintings was credited in *Norman Rockwell: Artist and Illustrator*, which Dr. Cory SerVaas relied on "a great deal" in preparation for her meeting with Rockwell;

- more than 29 years after Mr. and Mrs. Stuart Sr.'s ownership of the Paintings was credited in *Norman Rockwell: A Sixty Year Retrospective*;

- more than 25 years after Mr. and Mrs. Stuart Sr.'s ownership of the Paintings was credited in the Reader's Digest Edition of *Norman Rockwell's America*;

- more than 22 years after Mr. Stuart Sr. wrote an article published in *Reader's Digest* and explicitly stated that Rockwell had given him *Saying Grace* in 1952;

- more than 21 years after the first publication of *Norman Rockwell Faith of America*, in which author Fred Bauer recounts the manner in which Mr. Stuart Sr. acquired *Saying Grace* from Rockwell;

3

- more than 15 years after Mr. and Mrs. Stuart Sr.'s ownership of the Paintings was credited in *Norman Rockwell: A Definitive Catalogue*, referenced on the very same page that Curtis's ownership of a charcoal and pencil study of *Saying Grace* was referenced;

- more than 15 years after Mr. Stuart Sr. displayed and discussed the Paintings in his home in connection with an hour-long commercially promoted videotape entitled *Norman Rockwell and The Saturday Evening Post with Ken Stuart*;

- more than 15 years after Philip Strubing, a lawyer who worked for Curtis from 1936 to 1967, stated under oath, to another lawyer representing Curtis, that he knew that Mr. Stuart Sr. possessed *Saying Grace* "at his home, now" that such possession "would never have been authorized," and that he first became aware "in the late fifties" that Curtis's employees possessed original paintings used for *Post* covers;

- more than 15 years after Beurt SerVaas, President of Curtis, wrote directly to Mr. Stuart Sr. at his Connecticut home regarding Stuart Sr.'s possession of *Saying Grace* and other original Rockwell paintings and, promptly thereafter, Mr. Stuart Sr.'s attorney, Arthur Abelman, wrote a response letter to Mr. SerVaas informing him that Mr. Stuart Sr. was the owner, and in possession, of *Saying Grace*, and was referred to the numerous books published concerning Rockwell works for a compilation of Rockwell works owned by Mr. Stuart Sr.

There is no evidence, either direct or circumstantial, that at the time Mr. Stuart Sr. left the *Post* in 1962, he had any intention other than to keep the Paintings as his own. Curtis knew, or should have known, at the time that Mr. Stuart Sr. left the employ of the *Post* that he had no intention of returning the Paintings to Curtis. It is the Plaintiffs' position that Mr. Stuart Sr.'s first act of asserting dominion and control of the Paintings took place in 1962. Therefore, the applicable statute of limitations as to the alleged conversion of the Paintings expired three years later, in 1965.

As noted, Dr. Cory SerVaas had actual knowledge of Mr. Stuart Sr.'s claim of ownership of the Paintings as early as 1970. According to letters obtained from the Defendants through discovery, Dr. SerVaas relied "a great deal" on *Artist and Illustrator* in preparation for her meeting with Rockwell. That book clearly identifies Mr. Stuart Sr. as the owner of the Paintings. (See Exh. G to Akoury Decl.)

Later, in July 1973, Curtis received a letter dated July 9, 1973 from Rodger Dean Duncan requesting permission to reprint certain Rockwell paintings. (See Exhs. L, M to Akoury Decl.) Attached to the letter was a list of Rockwell paintings, with the owner's name identified with each painting. This list included both *Saying Grace* and *Walking to Church*, with "Ken Stuart" listed as the

owner of each. Curtis responded to this letter on July 25, 1973, but failed to raise any question as to why Mr. Stuart Sr. was listed as the owner, or to pursue in any way a claim of ownership at that time. Thus, the statute of limitations could arguably have commenced in July 1973 as Curtis had actual knowledge of Mr. Stuart Sr.'s claim of ownership of the Paintings. However, in that case, the time period within which Curtis should have asserted its claim would have expired in 1976, 25 years prior to the time they first made such a claim.

Another date on which the statute of limitations could have commenced is July 1979, the date that Mr. Stuart Sr. described, in an article published in *Reader's Digest* entitled "Unforgettable Norman Rockwell," exactly how he had acquired *Saying Grace* from Rockwell as a gift. This article was published with the full knowledge of Curtis, as it gave permission for *Reader's Digest* to use reprint copies of certain Rockwell paintings with it. (See Exh. Q to Akoury Decl.) However, assuming *arguendo* that this act of Mr. Stuart Sr. was his first act of exercising dominion and control over the Paintings, the statute of limitations would still have expired in 1982.

Therefore, even assuming for purposes of this Motion, that Curtis owned the Paintings when Rockwell gave them to Mr. Stuart Sr. in the 1950's, which the Plaintiffs dispute, Plaintiffs have acquired title to the Paintings by reason of the parties' conduct during the last five decades. By any measure, the Defendants waited far too long to assert a claim of ownership of the Paintings, even assuming that one of them owned the original Paintings in the first place. Consequently, Plaintiffs are entitled to a judgment declaring that the Stuart family is the owner of the Paintings and that any counterclaim by the Defendants to the Paintings is barred as a matter of law by the statute of limitations and the doctrine of laches, as described below.

### III. FACTUAL BACKGROUND

Between 1916 and 1963, Rockwell created 322 paintings for use in connection with generating images that would appear on the *Post's* covers. (See Exhs. A and B to Akoury Decl., at ¶ 14; Exh. T at 106.) Over the years, other artists delivered several thousand more paintings to the

5

weekly magazine for use in generating images that would appear on its covers and on the inside of the magazine.

After original paintings had been used by the *Post* for reproduction in a portion of a particular issue of the magazine, the paintings were no longer needed. The paintings were not particularly valuable and, given the large number of such works that were continually being created, they presented obvious storage problems. The paintings were customarily returned to the artists or given away to advertisers, politicians, editors, executives at Curtis, and other persons. (See Exhs. T at 107, U at xxv to Akoury Decl.) In *Norman Rockwell: A Definitive Catalogue* ("*Definitive Catalogue*"), which was published in 1986 in two volumes by the Norman Rockwell Museum at Stockbridge, Inc. ("Rockwell Museum"), the Museum's Director explained what happened to Rockwell's works that were used for magazines: "The paintings and drawings were not intended to be seen except in reproduction. The originals were expendable, and over the years many of them simply disappeared from sight." (*Id.* at xxv.)[2] The deliberate and regular dispersal of the vast majority of such artwork is demonstrated by reference to a number of Rockwell catalogs, books, and other relevant sources that have been publicly available for decades. In nearly all instances, the owners of such paintings are persons *other than* the Defendants, and the Stuarts are explicitly listed as the owners of the Paintings. (See Exhs. J, U, and AA to Akoury Decl.) These and other publications submitted by Plaintiffs with this Motion are historical facts of which this Court may take judicial notice.

As noted above, in or about 1952 and 1953, Rockwell gave the three Paintings to Mr. Stuart Sr., Rockwell's "real friend" and "great impresario." Nearly a half-century passed between the time that the Paintings were given to Mr. Stuart Sr. and the time that the Defendants asserted any claim with respect to their ownership.

---

[2] Similarly, works of other prominent illustrators whose work appeared in the *Post*, such as Mead Schaeffer, John Leyendecker, Steven Dohanos and John Clymer, were disposed of by the *Post* in the ordinary course of the *Post's* business. There is no evidence that the Defendants have made any attempt to recover these original oil paintings.

6

From the 1950's through the 1980's, Mr. Stuart Sr. displayed the Paintings first in his office and then openly in his home, where Curtis executives frequently were guests. (See Exh. A to Akoury Decl. at ¶¶ 48-51.) Curtis never objected to Mr. Stuart Sr.'s open display of the Paintings in either his office or his home; neither did they make any claim to ownership of the Paintings. More than four decades have passed since Mr. Stuart Sr. began openly displaying the Paintings as his own.

In 1961, Rockwell expressed his gratitude to Mr. Stuart Sr. through an inscription he wrote in a copy of *The Norman Rockwell Album* (Doubleday 1961) that Rockwell presented to him in 1961. (See Exh. F to Akoury Decl.)

In 1962, when Mr. Stuart Sr. left the *Post*, Curtis knew, or should have known, that it did not possess the Paintings and that Mr. Stuart Sr. still did. Nevertheless, the company did not request that Mr. Stuart Sr. return the Paintings when he left the employ of the *Post*, more than 40 years ago.

In 1968, *Saying Grace* was prominently displayed in the window of the Danenberg Gallery on Madison Avenue in New York City[3], and 40 other Rockwells were on display inside that gallery, in an exhibition that was "immensely popular and launched the Rockwell revival." (See Preface, *Norman Rockwell, A Sixty Year Retrospective* ("*Sixty Year Retrospective*"), published by Harry N. Abrams, Inc. in 1972.)(Exh. J to Akoury Decl.) The Danenberg Gallery would host a "major retrospective exhibition" of Rockwells in 1972 as well. (See Exh. U to Akoury Decl., Definitive Catalogue, at xiv and xviii.) Moreover, in the *Sixty Year Retrospective*, *Saying Grace* and *Walking to Church* are reproduced and their ownership is explicitly credited to "Mr. and Mrs. Ken Stuart." (See *id*.) Thirty-five years have passed since *Saying Grace* hung in the window of Danenberg Gallery, and more than 30 years have passed since the publication of the Stuart family's ownership was credited in the *Sixty Year Retrospective*.[4]

---

[3] Upon information and belief, Curtis maintained offices in New York City at the time.

[4] Upon information and belief, Dr. Cory SerVaas was shown a copy of this book in meetings at Curtis. (See Exh. N to Akoury Decl.)

7

In 1970, Harry N. Abrams, Inc., published a book entitled *Norman Rockwell, Artist and Illustrator* ("*Artist and Illustrator*")(Exh. G to Akoury Decl.), in which *Saying Grace* and *Walking to Church* are reproduced and their ownership is credited to "Ken Stuart." (See *id.*) More than 31 years passed after *Artist and Illustrator* was published with explicit reference to Mr. Stuart Sr.'s ownership of the Paintings, and before Curtis asserted its ownership claim. Significantly, Dr. Cory SerVaas relied "a great deal" on *Artist and Illustrator*, in which Mr. Stuart Sr. is identified as the owner of *Saying Grace* and *Walking to Church*. Thus, the Defendants had actual knowledge of the public claims of ownership asserted by the Stuart family as early as 1971. (See Exh. H to Akoury Decl.)

In 1971, Beurt SerVaas was the Editor and Publisher, and Dr. Cory SerVaas was the Executive Editor of *The Saturday Evening Post*, which was published by Curtis. In the early 1970s, the SerVaas family purchased Curtis, yet they never made claim to the Paintings or sought their return from Mr. Stuart Sr. during his lifetime. In fact, in 1985, in connection with the *Rumbleseat* matter discussed herein, counsel for Curtis took Mr. Stuart Sr.'s deposition. However, during the deposition Mr. Stuart Sr. was never asked about his public assertions of ownership of the Paintings. Curtis simply failed to ask Mr. Stuart Sr. these questions, which could readily have been answered by the person with the most first-hand knowledge of the transactions. Other than the May 13, 1986 letter (Exh. W to Akoury Decl.), at no time did anyone associated with Curtis seek to discuss the Paintings with Mr. Stuart Sr. Furthermore, no one from Curtis ever sought to ensure that the Stuart family was properly storing, maintaining, or insuring any of the Paintings, despite their specific knowledge that Mr. Stuart Sr. had them in his possession.

In 1976, a Reader's Digest Edition of *Norman Rockwell's America* was published ("*Norman Rockwell's America*"; see Exh. R to Akoury Decl.). In that book, *Saying Grace* and *Walking to Church* are reproduced and their owners are listed, once again, as "Mr. and Mrs. Ken Stuart." (See *id.*)

8

In 1979, the year after Rockwell died, Mr. Stuart Sr. recounted his long friendship with Rockwell in an article published in *Reader's Digest* (then the periodical with the largest circulation in the world) and wrote about Rockwell's giving him *Saying Grace*.

> Norman often gave away paintings to friends who admired his work. "Don't you want one?" he [Rockwell] asked reproachfully. I said, "Yes, I'd love to have one." "Which?" Norman asked. I was flustered by his directness. Since *Saying Grace* was on the wall, I said, "How about this one?" So he gave it to me as casually as another might bestow a cigar.

"Unforgettable Norman Rockwell," *Reader's Digest* (July 1979), at 107 – 108. (See Exh. Q to Akoury Decl.) More than 26 years have now passed since Mr. Stuart Sr. described to a vast national audience how Rockwell had given *Saying Grace* to him. The Defendants' Indiana counsel in the present action, Gene R. Leeuw (see Exh. B to Akoury Decl. at 18), admitted during his deposition of Philip Strubing in 1985 that he had previously read the *Reader's Digest* article; (see Exh. T to Akoury Decl. at 17; Mr. Leeuw also litigated on the Defendants' behalf from 1984 through 1987 in the Rockwell related *Rumbleseat* matter discussed below at fn. 8, at 32; see Exh. Y to Akoury Decl.)

In 1980, in *Norman Rockwell Faith of America* (Abbeville Press), author Fred Bauer repeated the story of Mr. Stuart Sr.'s acquisition of *Saying Grace* from Rockwell. (See Exh. S to Akoury Decl.)

In 1986, the *Definitive Catalogue* was published in two volumes by the Rockwell Museum. (See Exh. U to Akoury Decl.). The *Definitive Catalogue*, which runs more than 1,100 pages, was the result of considerable effort. In the catalogue, *Saying Grace* is reproduced and its ownership is listed as "Mr. and Mrs. Kenneth Stuart," and *Walking to Church* is reproduced and its ownership is listed as Mr. Kenneth Stuart.[7] Significantly, just below the space where the Stuarts' ownership of the original oil painting of *Saying Grace* is confirmed, Curtis is listed as the owner of a charcoal and pencil study of *Saying Grace* – not the original oil painting. (See *id*. at 189.) And, attesting to the close personal relationship between Rockwell and the Stuart family, six portraits by Rockwell of Mr. Stuart Sr. and his wife, Katharine Stuart, are included in the *Definitive Catalogue*, with ownership by the Stuarts.

9

(See *id.* at 1029 – 31.) More than 19 years have now passed since the *Definitive Catalogue* was published.

Also in 1986, Mr. Stuart Sr. displayed and discussed the Paintings in his home during a 60-minute commercial videotape, entitled *Norman Rockwell and the Saturday Evening Post with Ken Stuart*, produced by Video Arts, Inc. ("Videotape"; see Exh. V to Akoury Decl.) The image of *Saying Grace* appears on the back of the Videotape's case, where it is also noted that "[c]ertain art reproduced herein with the permission of the copyright owner, Curtis Publishing Company." (See *id.*; emphasis added.) During the one-hour production, Mr. Stuart Sr. sits beside *Gossips* in his home as he describes the many faces contained in the work. He also stands in front of *Saying Grace* hanging on a wall in his home as he describes that particular work. The Videotape was produced in 1986 and has been available to the public in both VHS and DVD format at, among other places, the Rockwell Museum. Curtis obviously gave its permission to use the copyrights associated with the Paintings, and was credited in the Videotape. Clearly, it was aware the Videotape was made at the time of its production in 1986.

And, if there were any remaining doubt concerning the untimeliness of the Defendants' current assertion of an ownership claim with respect to the Paintings, it is laid to rest by two letters written by the parties to each other in 1986.

The first letter, dated May 13, 1986, was from Beurt SerVaas, Chairman of the Board of Curtis, to Mr. Stuart Sr. at his home in Connecticut. (See Exh. W to Akoury Decl.) In his letter, Mr. SerVaas stated that Curtis was in the process of attempting to locate original Rockwell artwork, including *Saying Grace*, and requested Mr. Stuart Sr. to provide a list of all such works possessed by him. (See *id.*)

The second letter, dated June 2, 1986, was sent via certified mail by Arthur Abelman, an attorney representing Mr. Stuart Sr., to Mr. SerVaas. It reads as follows:

> I represent Mr. [Stuart Sr.] who asked me to respond to your letter of May 13, 1986. **Mr. [Stuart Sr.] is the owner and in possession of the original Norman Rockwell painting entitled *"Saying Grace."* This painting was given to him by Mr.**

10

> Norman Rockwell in 1952. The gift was given with the full knowledge of the President of Curtis Publishing Company at the time and the editors of the Saturday Evening Post.
>
> In as much as there are numerous books published and, no doubt, still to be published concerning the works of Norman Rockwell, there would seem to be little point in Mr. [Stuart Sr.] compiling a list of works owned by him by Norman Rockwell, especially since certain of these works have nothing whatever to do either with Curtis or The Saturday Evening Post.

(See Exh. X to Akoury Decl.; emphasis added.)

Despite having directly contacted Mr. Stuart Sr. at his Connecticut home in 1986, and having been promptly and explicitly notified of Mr. Stuart Sr.'s ownership and possession of *Saying Grace* and other original Rockwell works, and that various publications confirmed the Stuarts' ownership of such works, the Defendants failed to commence an action contesting the Stuarts' ownership of any works, let alone make any response challenging the statements made in the letter from the Stuarts' attorney.[5] Rather, the Defendants consciously chose not to take any action for 15 additional years, long after the individuals involved in the actual transactions were deceased and therefore unable to explain the events that occurred almost 50 years ago.

In 1988, Rockwell's autobiography, *My Adventures As An Illustrator* (Doubleday 1960) ("*Adventures*") was reprinted with a Forward and Afterward by Rockwell's son, Tom Rockwell. (See Exh. Z to Akoury Decl.) In *Adventures*, Rockwell recounts his relationship with, and respect for, Mr. Stuart Sr. (See Akoury Decl., ¶¶ 44 – 46.)

Starting in 1994, the Paintings were loaned by the Stuart family to the Rockwell Museum in Stockbridge, MA for public display. The Paintings were, and are, as the Defendants admit, identified as the property of the Stuart family at the Rockwell Museum and on its web site. (See Exhs. A and B to Akoury Decl. at ¶¶ 58-59; see also Exhs. AA and BB to Akoury Decl.)

---

[5] Defendants have recently alleged that they never received the letter sent by Attorney Abelman in response to the letter from Beurt SerVaas, despite that the copy indicates that it was sent by certified mail. However, even if Defendants' assertion is to be believed, it does not excuse their failure to pursue their claims of ownership at that time because as stated in SerVaas's letter, they had actual knowledge that Mr. Stuart Sr. possessed *Saying Grace* and possibly other Rockwell works.

11

For a number of years, as the Defendants admit, a member of the SerVaas family, Joan SerVaas Durham, the daughter of Beurt SerVaas and Dr. Cory SerVaas, sat on the Board of Directors of the Rockwell Museum. (See Exhs. A and B to Akoury Decl. at ¶74.) During that time, the Rockwell Museum purchased a right of first refusal to purchase the Paintings from Stuart & Sons, L.P., Stuart Jr.'s company. In connection with that right of first refusal, the Rockwell Museum loaned Stuart & Sons $140,000. (See Exh. CC to Akoury Decl.)

In 1999, *Norman Rockwell: Pictures for the American People* was published in connection with a national tour of Rockwell works, which was directly supported and assisted by both Curtis and the Stuart family (the "Tour Catalogue"; see Exh. AA to Akoury Decl.). In fact, in the Directors' Acknowledgement section of the Tour Catalogue, the following statements appear:

> Joan SerVaas Durham and the SerVaas family of the Curtis Publishing Company have been most gracious in providing in-kind assistance for the reproduction rights of works originally presented in The Saturday Evening Post. With their support, we have been able to share images from the exhibition more broadly, through educational materials, a web site, and other promotional efforts.
>
> \*   \*   \*   \*
>
> We owe a special debt of gratitude to the individuals and institutions that lent their Norman Rockwell original artwork, particularly for a tour of this length. We are grateful to . . . the family of Ken and Katherine Stuart, as well as those private collectors who wish to remain anonymous.

(*Id.* at 12, emphasis added.) Despite the stark juxtaposition of the Defendants' assistance in connection with "reproduction rights" and the Stuart family's having "lent their Norman Rockwell original artwork," the Defendants failed, yet again, to assert their purported claim of ownership to the Paintings. And, in the Checklist of the Exhibition section of the Tour Catalogue, the three Paintings are explicitly listed as the property of "Ken and Katherine Stuart." (See *id.* at 195.)

Moreover, as recently as 2004, *Yankee Magazine* published an article entitled "His Father's Son" in its December 2004 issue. The *Yankee Magazine* website, www.yankeemagazine.com, includes an image of *Saying Grace*, printed with permission of Curtis Publishing, that attributes