ownership of the painting to the "Ken and Katharine Stuart Collection." (See Exh. DD to Akoury Decl.)

The major dates and events are summarized for the Court's convenience as follows:

| Year | Event |
|------|-------|
| 1944 | Mr. Stuart Sr. becomes art director of the *Post* |
| 1948 – 53 | Rockwell creates the Paintings |
| 1948 – 53 | Curtis returns the Paintings to Rockwell |
| 1952 – 53 | Rockwell gives the Paintings to Mr. Stuart Sr. |
| late 1950's | Curtis' counsel knows that Curtis employees personally possess original paintings used for *Post* issues |
| 1962 | Mr. Stuart Sr. leaves the *Post* |
| 1968 | Danenberg Gallery displays *Saying Grace* in window of Manhattan gallery and 40 other Rockwell paintings inside |
| 1970 | *Norman Rockwell: Artist and Illustrator* is published, with ownership of *Saying Grace* and *Walking to Church* attributed to Ken Stuart |
| 1971 | Beurt SerVaas is Editor and Publisher, and Dr. Cory SerVaas is Executive Editor of the *Post*, published by Curtis; SerVaas family has purchased Curtis |
| 1972 | *Sixty Year Retrospective* is published; and Danenberg Gallery hosts major Rockwell exhibition |
| 1975 | Letter from Curtis to Paul Anbinder regarding *Norman Rockwell, Artist and Illustrator*, in which Curtis acknowledges that Dr. Cory SerVaas relied on that book in preparation for meeting Rockwell |
| 1976 | *Norman Rockwell's America* is published |
| 1978 | Norman Rockwell dies |
| 1979 | Mr. Stuart Sr.'s article, "Unforgettable Norman Rockwell," is published in *Reader's Digest* |
| 1980 | *Norman Rockwell Faith in America* is published; recounts Mr. Stuart Sr. receiving *Saying Grace* from Rockwell |

| 1984-87 | Defendants litigate Rockwell-related *Rumbleseat* matter regarding copyrights to Rockwell's works |
|---------|---------------------------------------------------------------------------------------------------|
| 1985 | Mr. Strubing testifies to Defendants' counsel that he knew that Mr. Stuart Sr. possesses *Saying Grace* "at his house, now," that such possession "would never have been authorized," and that he first became aware "in the late fifties" that Curtis employees possessed original paintings used for *Post* issues |
| 1985 | Mr. Stuart Sr. is deposed in connection with the *Rumbleseat* matter; counsel for Curtis fails to question him as to his publicly documented claims of ownership of the Paintings |
| 1986 | *Definitive Catalogue* is published;<br><br>60-minute commercial videotape "*Norman Rockwell and the Saturday Evening Post with Ken Stuart*," is released; and<br><br>Defendants and Mr. Stuart Sr.'s counsel exchange letters regarding *Saying Grace* and other original Rockwell works |
| 1993 | Mr. Stuart Sr. dies |
| 1999 | *Norman Rockwell: Pictures for the American People* is published in connection with a national tour assisted by Curtis and the Stuarts |
| 2001 | This action is commenced |
| 2005 | *Yankee Magazine* article appears on its website, including image of *Saying Grace*, with ownership attributed to "Ken and Katharine Stuart Collection," printed with permission of Curtis |

As demonstrated below, in light of the Defendants' admissions and the documented public statements of ownership of the Paintings by the Stuarts throughout the last four decades, the Defendants waited far too long to assert a claim with respect to their purported ownership of the Paintings. Any claim by the Defendants would have arisen when Rockwell gave the Paintings to Mr. Stuart Sr. in the 1950's or, at the latest, when Mr. Stuart Sr. left the *Post* with the Paintings in 1962. In light of the public pronouncements of the Stuarts' ownership of the Paintings during the last 40 years, and the 1986 correspondence between the parties on the very subject at issue, the Defendants' counterclaims are barred by the applicable statute of limitations.

14

In addition, the Defendants' counterclaims are barred by the doctrine of laches. During the Defendants' half-century of indifference, persons with first-hand knowledge of the underlying facts of the 1940's, 1950's and 1960's have died, including Rockwell (1978), Mr. Stuart Sr. (1993), and prior management of Curtis. Therefore, all of the individuals with personal knowledge of the specific events of the distant past cannot be examined and cross-examined under oath in this case. Relevant documentation has necessarily been lost due to the Defendants' inordinate and inexcusable delay in asserting a claim. Because the Defendants waited an unreasonable period of time before asserting a claim and their delay has prejudiced Plaintiffs, the Defendants' counterclaims are barred by the doctrine of laches. There simply can be no equitable basis to award the Defendants title to the Paintings in light of the Defendants continually having failed to act on their purported rights for over 50 years. The Defendants admitted in 1985 that they knew Mr. Stuart Sr. possessed *Saying Grace* and other original Rockwell paintings at his home, and that they believed that such possession was unauthorized. Moreover, having raised the issue themselves with Mr. Stuart Sr. by letter in 1986, only to abandon it, the Defendants cannot now be heard to complain about the Stuarts' ownership of the Paintings.

Therefore, the Plaintiffs respectfully request that the Court confirm the Stuart family's ownership of the Paintings and hold that any claim by the Defendants to ownership of the Paintings is barred by the statute of limitations and by the doctrine of laches.

## IV.    ARGUMENT

### A.    The Legal Standards For The Motion

The standard applicable to Rule 12(c) motions for judgment on the pleadings is identical to that applicable to Rule 12(b)(6) motions to dismiss. See *Shepard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), cert. denied, 513 U.S. 816 (1994); *On-Line Technologies v. Perkin Elmer Corp.*, 141 F. Supp. 2d 246, 255 (D. Conn. 2001).

15

Judgment on the pleadings is "uniquely suited to disposing of a case in which a statute of limitations provides an effective bar" to a party's claim. See *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994) (citing 5A C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 1367 at 511 (1990)).

In deciding Rule 12(c) motions, as with deciding Rule 12(b) motions, courts consider the factual allegations in the pleadings, documents that are annexed to the pleadings or which underlie them, matters of which judicial notice may be taken and, in fact, "a wide range of material." *Steiner v. Shawmut Nat'l Corp.*, 766 F. Supp. 2d 1236, 1241 (D. Conn. 1991)(Nevas, J.) (citing 5A C. Wright and A. Miller, § 1364 at 475-81).

> A wide range of material may be introduced in conjunction with a Rule 12(b) motion, subject, of course, to the court's discretion to reject the evidence if it feels that it is not substantial or comprehensive enough to facilitate the disposition of the action. Illustrative of the type of evidence that has been used on a Rule 12(b)(6) motion are the following:  admissions of counsel, affidavits, answers to interrogatories, collective bargaining agreements, contracts, copyrighted material, depositions, exhibits, hearsay, issues of a magazine, court judgments and orders, judicial notice of prior pleadings, transcripts of prior court proceedings and matters of public record.

5A C. Wright and A. Miller, § 1364 at 475-81.

A court may take judicial notice "at any stage of the proceeding," Fed. R. Evid. 201(f), and may do so without converting a Rule 12 motion to a summary judgment motion. See, e.g., *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).  A court may take judicial notice "whether requested or not," Fed. R. Evid. 201(c), and "shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d).  Judicial notice may be taken of, among other things, public documents and other matters within Fed. R. Evid. 201, including matters "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Documents in existence for 20 or more years are admissible: (a) under the "ancient document" hearsay exception, embodied in Fed. R. Evid. 803(16), for the truth of the statements asserted in the documents, and (b) as non-hearsay statements, to demonstrate that a person had actual or constructive

16

notice of documents containing such statements. See *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) (20-year-old unpublished scientific report concerning asbestos was admissible as "ancient document" hearsay exception pursuant to Fed. R. Evid. 803(16); court noted that report also could have been admissible as non-hearsay statement, offered not for its truth, but as to defendant's having been put on notice of statements in report, if defendant had seen, or should have seen, report).

Plaintiffs respectfully request that the Court take judicial notice of the documents annexed to the Akoury Declaration, including but not limited to the catalogues, articles and books concerning Rockwell and the Paintings referenced in the Amended Complaint.

## B.    The Law Applicable To This Case

Because the Court's subject matter jurisdiction is premised on the diversity of citizenship statute, 28 U.S.C. § 1332 (see Exh. A to Akoury Decl., ¶ 12), the Court must apply the substantive law, including its choice of law rules, of the state in which it sits, Connecticut. See *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269-70 (2d Cir. 1992).

Under Connecticut law, Connecticut's statutes of limitations are considered procedural and usually govern claims asserted in federal diversity cases in Connecticut. See *Slekis v. National R.R. Passenger Corp.*, 56 F. Supp. 2d 202, 204 (D. Conn. 1999).

Connecticut has a three-year statute of limitations for common law torts, including conversion and breach of fiduciary duty. Conn. Gen. Stat. § 52-577 ("Action founded upon a tort. No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."); see, e.g., *D'Occhio v. Connecticut Real Estate Commission*, 189 Conn. 162, 182, 455 A.2d 833 (1983) (statute of limitations for conversion is three-year period set forth in Conn. Gen. Stat. § 52-577); *DeCorso v. Watchtower Bible and Tract Society of NY*, 46 Conn. Supp. 386, 752 A.2d 102 (2000) (actions sounding in breach of fiduciary duty or breach of trust are governed by three-year statute of limitations and begin to run from acts complained of); *Kent v. AVCO Corp.*, 849 F. Supp.

17

833 (D. Conn. 1994) (claims involving duty of good faith are treated as torts and are governed by three-year statute of limitations).

Connecticut General Statute § 52-577 is an occurrence statute of limitations, as opposed to an accrual statute of limitations; that is, the three-year period runs from the act or omission underlying the claim, rather than a subsequent discovery of it. See *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212 (1988) (occurrence, not discovery, governs the application of the three-year statute of limitations).

"Conversion occurs when one, without authorization, assumes and exercises the right of ownership over property belonging to another, to the exclusion of the owner's rights... [T]here are two general classes of conversion: (1) that in which possession of the allegedly converted goods is wrongful from the outset; and (2) that in which the conversion arises subsequent to an initial rightful possession." *Luciani v. Stop & Shop Cos.*, 15 Conn. App. 407, 409-19, 544 A.2d 1238, cert. denied, 209 Conn. 809, 548 A.2d 437 (1988).

Where possession of the allegedly converted goods is wrongful from the outset, the date upon which a party becomes aware of the facts alleged to constitute a conversion is irrelevant, since the statute of limitations begins to run from the initial wrongful conduct. See *Armetta v. Wheelabrator Technologies, Inc.*, 2001 WL 822434 at *7-9 (Conn. Super. June 26, 2001) (granting summary judgment dismissing conversion and breach of fiduciary duty claims concerning defendant's removal of sand and gravel from plaintiff's property) (Exhibit 1 hereto).

Where there is an initial rightful possession, the conversion arises when the conduct becomes wrongful. "To establish a prima facie case of conversion under the second prong of the approved test set forth in *Luciani v. Stop & Shop, supra,* a plaintiff must demonstrate (1) that the property at issue belongs to him; (2) that the defendants deprived the plaintiff of his property for an indefinite period of time; (3) that the defendants' conduct was unauthorized; and (4) that the defendants' conduct harmed the plaintiff." *Zanoni v. Hudon,* 48 Conn. App. 32, 38-39, 708 A.2d 222 (1998) (citation omitted), cert. denied, 244 Conn. 928, 711 A.2d 730 (1998).

And, when so much time has lapsed from both an initial wrongful possession and the defendant's subsequent awareness of the unauthorized possession, there can be no question that the defendant's claim is time barred. See *Cablevision of Connecticut, L.P. v. Sollitto*, 109 F. Supp.2d 84, 85 (D. Conn. 2000) (granting defendant summary judgment on conversion claim concerning cable descramblers where defendant purchased those items nine years before suit and plaintiff had access to documents that would have disclosed defendant's possession more than three years before suit; plaintiff not entitled to additional time to review documents and actually learn of defendant's possession).

Under Connecticut's choice of law rules, the Defendants' counterclaims are barred because Connecticut's choice of law rules require application of Connecticut statutes of limitations for claims that existed at common law. See *Baxter v. Sturm, Ruger and Co., Inc.*, 230 Conn. 335, 345-47, 644 A.2d 1297 (1994) (characterization of statute of limitation or statute of repose depends on nature of underlying right; if right existed at common law, it is properly characterized as procedural and Connecticut's statute applies), answer to certified question conformed to, 32 F.3d 48 (2d Cir. 1994) (Oregon's statute of repose concerning product liability claim was procedural, therefore, Connecticut's statute applied); *Feldt v. Sturm, Ruger & Co., Inc.*, 721 F. Supp. 403, 406 (D. Conn. 1989) (Georgia products liability statute of repose was substantive because it "created a strict liability unknown at common law").

Common law torts include claims based on conversion and breach of fiduciary duty theories. See *D'Occhio v. Connecticut Real Estate Commission*, 189 Conn. 162, 182, 455 A.2d 833 (1983) (conversion is "common law" claim); *In re Colonial Ltd. Partnership Litigation,* 854 F. Supp. 64, 90 (D. Conn. 1994) ("All common law tort claims, including claims for fraud, negligent misrepresentation, and breach of fiduciary duty, are subject to a three-year statute of limitations, which

19

runs from the date of the act or omission complained of.").[6]  The Defendants do not assert any statutorily created claim against Plaintiffs.

Plaintiffs are entitled to a judgment declaring that the Stuart family is the owner of the Paintings pursuant to the Declaratory Judgment Act. See 28 U.S.C. § 2201 (Declaratory Judgment Act provides procedure for relief in cases in which federal courts possess diversity or federal questions jurisdiction); *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992) ("a court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding") (citing *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969), cert. denied, 397 U.S. 1064 (1970)); see also *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287-88 (1995) (court should exercise discretion to decline to adjudicate declaratory judgment action only if it would serve no useful purpose).

## C.    The Law As Applied To This Case

The material facts are not in dispute, just their legal significance.  Rockwell created the Paintings between 1948 and 1953. The Stuart family has possessed and controlled the Paintings to the exclusion of the Defendants since at least 1962, when Mr. Stuart Sr. left the *Post*.   There are no material facts in dispute regarding Mr. Stuart Sr.'s intentions at the time he left the *Post* in 1962.

---

[6] Even if Pennsylvania law were theoretically applicable based on conduct that occurred there a half-century ago, it would not change the analysis since conversion and breach of fiduciary duty claims existed at common law and are essentially uniform among jurisdictions. *See Baram v. Farugia*, 606 F.2d 42, 43-44 and n.2 (3d Cir. 1979) (claim of conversion existed at common law in Pennsylvania; citing Restatement (Second) of Torts § 233 (1965) and earliest recorded Pennsylvania conversion decision, dated 1766); *Federal Ins. Co. v. Ayers*, 772 F. Supp. 1503, 1509-10 (E.D. Pa. 1991) (conversion is common law tort under Pennsylvania law); *Shonberger v. Oswell*, 365 Pa. Super. 481, 484-85, 530 A.2d 112 (1987) ("Conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification," is "an action at law, and is, therefore, subject to the two-year statute of limitations"); *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 252-54, 602 A.2d 1277, 1282-83 (1992) (discussing "common law principles of fiduciary duty"); *Dubern v. Girard Trust Bank*, 454 F.2d 565, 568-70 (3d Cir. 1972) (discussing common law duties of agent to principal, collected and articulated in Restatement); *City of Harrisburg v. Bradford Trust Co.*, 621 F. Supp. 463, 473-74 (M.D. Pa. 1985) (discussing common law claims based on fiduciary relationship).

Even assuming, for purposes of this motion, that the Defendants owned the Paintings when Rockwell gave them to Mr. Stuart Sr. in the 1950's or when Mr. Stuart Sr. left the Post in 1962, Connecticut's three-year statute of limitations would bar the Defendants' claim to the Paintings since 1965.

And, if a discovery rule were applied to the Defendants' claim, their claim would be barred, at the latest, three years after they admittedly knew, in 1985, that Mr. Stuart Sr. possessed *Saying Grace* and other Rockwells at his home in Connecticut and believed that such possession was unauthorized. Under any possible circumstances, the Defendants' claims were barred three years after they directly contacted Mr. Stuart Sr. at his home in 1986 regarding original Rockwell artwork, specifically identifying one of the Paintings, and were promptly informed in writing that Mr. Stuart Sr. was the owner, and in possession, of *Saying Grace*, and were referred to the numerous books published concerning Rockwell works for a compilation of Rockwell works owned by Mr. Stuart Sr.[7]

As demonstrated below, Plaintiffs are entitled to a judgment on their claim that the Stuart family should be declared the owner of the Paintings, and that the Defendants' counterclaims should be denied, which are barred by the statute of limitations and the doctrine of laches.

**1.    Plaintiffs' Claim For A Judgment Declaring That It Is The Owner Of The Paintings**

As previously noted, the Stuart family has possessed and controlled the Paintings to the exclusion of the Defendants' purported rights for more than four decades. The Stuarts have held themselves out, and repeatedly have been publicly identified, as the owners of the Paintings. As a result of the longstanding public recognition of the Stuarts' ownership of the Paintings, the Defendants and their predecessors in interest have had constructive knowledge of the Stuart family's claim to the Paintings for a considerable period of time.

---

[7] As noted above in Footnote 5, even if Defendants' recent claim that they never received the responsive letter from Attorney Abelman is believed, their failure to act on their knowledge that Mr. Stuart Sr. possessed *Saying Grace* is inexcusable.

In addition, since no later than 1985, the Defendants have had, at the very least, actual knowledge that Mr. Stuart Sr. possessed *Saying Grace* in his home and believed such possession was unauthorized. In 1986, the Defendants wrote directly to Mr. Stuart Sr. at his Connecticut home and explicitly sought information concerning his possession of *Saying Grace* and other original Rockwell paintings. Counsel to Mr. Stuart Sr. replied to the Defendants' letter in writing and confirmed that Mr. Stuart Sr. was "the owner and in possession of the original Norman Rockwell painting entitled "Saying Grace" and other original Rockwell paintings." That same year the two-volume *Definitive Catalogue* was published, the hour-long commercial Videotape was released, and the Defendants were represented by counsel and even engaged in Rockwell-related litigation.[8]   Nevertheless, the Defendants failed to do anything in response to the Stuart family's continued possession and repeated assertions of ownership of the Paintings, perhaps knowing full well by 1985 and 1986 that the statute of limitations had already passed.

The Stuarts have cared for and maintained the Paintings for decades. Since 1994, the Paintings have been on loan to the Rockwell Museum. The Paintings are identified as belonging to the "Collection of Ken and Katharine Stuart." Millions of people have viewed them, and the Stuart family's ownership declaration, since that time. Furthermore, the Paintings were featured in a national tour, to which the Defendants lent their "most gracious ... support." (See Exh. AA to Akoury Decl.)

---

[8] The Defendants' inaction toward the Stuarts is contrasted with their litigious conduct toward others. In 1985, Curtis Publishing and the *Post* sued a former licensee for breach of contract for continuing to manufacture porcelain dolls derived from illustrations created by Rockwell and published in the *Post. See Saturday Evening Post Co. and Curtis Publishing Co. v. Rumbleseat Press, Inc.,* 816 F.2d 1191 (7th Cir. 1987) (confirming arbitration award based on breach of licensing agreement that, among other things, prohibited licensee to contest licensor's copyright). The fact that Curtis Publishing and the *Post* demanded arbitration against Rumbleseat in 1984 and then litigated the dispute from 1985 through 1987 demonstrates that the Defendants were perfectly capable of commencing a lawsuit against the Stuarts in 1986. In fact, the Defendants used the very same lawyer, Gene Leeuw, in the Rumbleseat litigation, to obtain the sworn admissions from Mr. Strubing in 1985, as well as to assist in the defense of this action filed in 2001. The *Rumbleseat* decision also sheds some light on the lack of merit to the Defendants' position in this case. In *Rumbleseat,* Circuit Judge Posner stated "the Post had copyrighted each of the magazines in which the illustrations appeared, but had not copyrighted the illustrations" *(id. at 1193),* the Post may have failed "to perfect copyright in its derivative works — the photographs, printed in the magazine, of Rockwell's illustrations" *(id. at 1201),* and the Rockwell family "owns the copyrights on the original illustrations." *(Id.)*

It was not until the summer of 2001 that the Defendants suddenly objected to the Stuart family's ownership of the Paintings, belatedly asserting that they were the owner.

Obviously, because the Stuart family possessed and controlled the Paintings for decades without objection by the Defendants, the Stuarts never needed to commence litigation in connection with their chosen use of the Paintings, whether they were placed at the Stuarts' home, in museums, or elsewhere of their choice. However, now that the Defendants have asserted this claim, there is a cloud on the title to the Paintings. Plaintiffs has been forced to pursue this action in order to confirm the Stuart family's right to the Paintings as against the Defendants.

In accordance with the case law and statutes discussed in Section II above, Plaintiffs respectfully request that the Court resolve the controversy between Plaintiffs and Defendants by declaring that the Stuart family owns the Paintings based on the parties' respective conduct over the last half-century.

### 2.    The Defendants' Counterclaims

The Defendants, in an attempt to circumvent the clear statute of limitations bar to their untimely claims, have masked their first counterclaim as one that seeks a "declaratory judgment" as to title to the Paintings, rather than candidly asserting that their counterclaim sounds in conversion.

Conversion is a common law cause of action that has been defined as an "unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." *Clark v. Auto Recovery Bureau Conn., Inc.,* 889 F. Supp. 543, 548 (D. Conn. 1994) (quoting *Moore v. Waterbury Tool Co.,* 124 Conn. 201, 209, 199 A. 97 (1938), and citing *Aetna Life and Casualty Co. v. Union Trust Co.,* 230 Conn. 779, 790-91, 646 A.2d 799 (1994)). (As previously noted, Pennsylvania law is equivalent.)

Once the Defendants' "declaratory judgment" cloak is removed, the substance of their claim is revealed and the statute of limitations bar is obvious. Courts have routinely seen through such opportunistic pleading. See *Town of Orangetown v. Gorsuch,* 718 F.2d 29, 42 (2d Cir. 1983) (if "a

claim for declaratory relief could have been resolved through another form of action which has a specific limitations period, the specific period of time will govern"), cert. denied, 465 U.S. 1099 (1984); see also *Gilbert v. City of Cambridge*, 932 F.2d 51, 57 (1st Cir. 1991), cert. denied, 502 U.S. 866 (1991). To prevent plaintiffs from making a mockery of the statute of limitations by the simple expedient of creative labeling — styling an action as one for declaratory relief rather than for damages — the Court must necessarily focus upon the substance of an asserted claim as opposed to its form. It is settled, therefore, that where legal and equitable claims coexist, equitable remedies will be withheld if an applicable statute of limitations bars the concurrent legal remedy. (*Id.*)

The Defendants' second counterclaim seeks an accounting from Plaintiffs based on an alleged breach of a fiduciary duty by Mr. Stuart Sr. more than 40 years ago, while he was employed by the *Post* prior to his departure in 1962. Whether Rockwell had ownership of the Paintings, and therefore could give them to Mr. Stuart Sr., or whether Mr. Stuart Sr. could have properly accepted them is no longer relevant. Even assuming that Mr. Stuart Sr. had owed and breached such a duty, as Mr. Strubing asserted in his deposition in 1985, the resulting claim would have been time-barred over 40 years ago. And, even if the limitations period were not to have commenced until the Defendants had discovered the alleged breach, the period would have commenced no later than 1985, when Mr. Strubing gave his deposition and testified to Defendants' counsel about the purported breach. And, the Defendants had actual knowledge of Mr. Stuart Sr.'s ownership prior to that time by virtue of letters in their own archives indicating that as early as 1971, Dr. Cory SerVaas relied on *Artist and Illustrator*, in which Mr. Stuart Sr. is identified as the owner of the Paintings, in preparation for her meeting with Rockwell. (See Exh. H to Akoury Decl.) In addition, Curtis was specifically told in 1973 that Mr. Stuart Sr. owned the Paintings (see Exhs. L, M to Akoury Decl.). Furthermore, the 1979 publication of Mr. Stuart Sr.'s article in *Reader's Digest* provided, at the very least, constructive notice to the Defendants of the Stuart family's acquisition of *Saying Grace*.

Finally, the Defendants are not entitled to an accounting from the Plaintiffs because they do not owe the Defendants any fiduciary or other such duty. Any claim of breach of fiduciary duty by

24

Curtis should have been brought against Mr. Stuart Sr. within the applicable statute of limitations, and certainly within his lifetime. Now, more than 40 years after any fiduciary duty Mr. Stuart Sr. may have had at one time would necessarily have ceased due to his departure from the *Post*, and more than 10 years after Mr. Stuart Sr. died, Curtis seeks to commence a claim of breach of fiduciary duty.

Clearly, as demonstrated below, the Defendants' counterclaims are barred by the statutes of limitations.

a.  **The Statute of Limitations Bars**
    **The Defendants' Counterclaims**

The Defendants' claim to title to the Paintings is long barred by Connecticut's three-year statute of limitations, as established in the case law discussed above. The specific act or omission complained of by the Defendants is Mr. Stuart Sr.'s acceptance of the Paintings as gifts from Rockwell in the 1950's or his failure to return them to the company when he left in 1962. Therefore, at the latest, the statute of limitations would have commenced running in 1962. Whether couched as a claim for conversion or breach of fiduciary duty, the three-year statute of limitations on the Defendants' counterclaims expired in 1965, in accordance with the statutes and case law cited above. See Conn. Gen. Stat. § 52-577; *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212 (1988); *D'Occhio v. Connecticut Real Estate Commission,* 189 Conn. 162, 182, 455 A.2d 833 (1983); *DeCorso v. Watchtower Bible and Tract Society of NY*, 46 Conn. Supp. 386, 752 A.2d 102 (2000).

And, even if the Court were to apply a discovery rule to this case, the Defendants' claims still would be barred because the statute of limitations would have commenced running when the Defendants knew, or should have known, that the Stuarts claimed ownership of the Paintings. The Defendants should have known of the Stuarts' possession and ownership claim to the Paintings, if not in 1962 when Mr. Stuart Sr. left the *Post* in possession of the Paintings, then in 1970, when Harry N. Abrams, Inc. published a book entitled *Norman Rockwell, Artist and Illustrator* and publicly stated as much. (See Exh. G to Akoury Decl.) Other publications containing similar assertions of ownership

25

were issued in 1972 (see Exh. J to Akoury Decl.), 1976 (see Exh. R to Akoury Decl.), 1979 (see Exh. Q to Akoury Decl.) and 1986 (see Exhs. U and V to Akoury Decl.). By reason of these publications alone, the Defendants should have known of the Stuarts' possession and ownership claim to the Paintings between 1970 and 1986.

In addition, the Defendants' counsel for more than three decades, Philip Strubing, testified in 1985 that he first became aware "in the late fifties" that Curtis employees possessed original paintings used for *Post* issues without authorization and, specifically, that he had seen original artwork in the home of Ben Hibbs, a *Post* editor for whom Mr. Stuart Sr. worked, but did nothing about it. (See Exh. T to Akoury Decl., at 20-21; the *Definitive Catalogue* lists Mrs. Hibbs as the owner of a Rockwell painting used for a *Post* cover; see Exh. U at 160-61). Mr. Strubing also admitted he was aware that Mr. Stuart Sr. possessed *Saying Grace* "at his house, now" and that his possession of any original Rockwells "would never have been authorized." (See *id.* at 17, 18 and 21.) Indeed, Mr. Strubing stated that Mr. Stuart Sr.'s acceptance of such artwork was contrary to his duties as art editor. (*Id.* at 18; see Exhs. A and B to Akoury Decl. at ¶ 68). Mr. Strubing make these sworn admissions to Mr. Leeuw, who at the time, in 1985, was prosecuting litigation on behalf of the Defendants. Despite their knowledge, the Defendants did not sue Mr. Stuart Sr. in connection with *Saying Grace* and the other Paintings.

Under no circumstances could the Defendants' discovery of the Stuarts' ownership claim to the Paintings have occurred after 1986, the events of which are dispositive in any discovery rule analysis. It was in that year that the *Definitive Catalogue* and the one-hour commercial videotape entitled *Norman Rockwell and the Saturday Evening Post* with Ken Stuart, both of which confirm the Stuarts' possession and ownership of the Paintings, were released. More significantly, it was the year that the Defendants themselves wrote a letter to Mr. Stuart Sr. at his Connecticut home acknowledging that they were aware that Mr. Stuart Sr. possessed *Saying Grace* and specifically requested information concerning *Saying Grace* and other Rockwell paintings. It is also the year that counsel to Mr. Stuart Sr. responded to the Defendants' letter in no uncertain terms, stating that the

> painting was given to him by Mr. Norman Rockwell in 1952. The gift was given with the full knowledge of the President of Curtis Publishing Company at the time and the editors of the Saturday Evening Post. ... In as much as there are numerous books published and, no doubt, still to be published concerning the works of Norman Rockwell, there would seem to be little point in Mr. [Stuart Sr.] compiling a list of the works owned by him by Norman Rockwell. (See Exh. X to Akoury Decl.)

Rather than commencing an action in 1986, the Defendants continued to sit back without asserting any claim of ownership.

Consequently, the Defendants' claim would also be barred by the statute of limitations even if the Defendants were given the added benefit of the discovery rule. For example, in *Blue Cross of California v. SmithKline Beecham Clinical Labs., Inc.,* 108 F. Supp. 2d 116, 121-24 (D. Conn. 2000), Chief Judge Covello dismissed, on statute of limitations grounds, claims concerning defendant's alleged fraudulent billing practices because the plaintiffs knew, or should have known, of facts underlying their claims by 1993, yet failed to assert a claim until four years later in 1997. *Id.* Chief Judge Covello noted that the defendant's challenged conduct had been publicly disclosed in 1993 through various news articles and a report that aired on television. *Id.* at 116-21. Because the limitations period for a statutory claim was two years and the limitations period for a common law claim was three years, the Blue Cross Court dismissed all the claims as time barred.

> Ordinarily, the statute of limitations begins to run when the party "knows or has reason to know of the injury which is the basis of [the] action." *Williams v. Perry,* 960 F. Supp. 534, 538 (D. Conn. 1996); [citation omitted]. A plaintiff that does not have actual knowledge of the injury may nevertheless trigger the running of the statute of limitations period if the plaintiff "should have known" of the injury. *Dodds v. Cigna Securities Inc.,* 12 F.3d 346, 350 (2d Cir. 1993). "The means of knowledge are the same thing in effect as knowledge itself." *Wood v. Carpenter,* 101 U.S. 135, 143, 11 Otto 135, 25 L.Ed. 807 (1879).

*Id.* at 122. Chief Judge Covello also denied plaintiffs' request for equitable relief under the doctrine of unjust enrichment, holding that "a claim sounding in equity is barred if a plaintiff's related legal claims are time-barred." *Id.* at 124; see *Campbell v. New Milford Bd. Of Educ.,* 36 Conn. Supp. 357, 364 n.5, 423 A.2d 900, 905 (1980); *Williams v. Walsh,* 558 F.2d 667, 671 (2d Cir. 1977) (affirming summary judgment on "equitable" claim where legal claims were dismissed on limitations grounds).

Under Connecticut law, where a party seeks equitable relief pursuant to a cause of action that would also allow that party to seek legal relief, concurrent legal and equitable jurisdiction exists, and the statute of limitation that would be applicable to bar the legal claim also applies to bar the equitable claim. See *Arrigoni v. Adorno*, 129 Conn. 673, 681 (1943); *Crittendon v. Brainard*, 2 Root 485, 487 (Conn.)(1796); *Dowling v. Finley Associates, Inc.*, 49 Conn. App. 330, 335 (1998), cert. granted, 247 Conn. 907 (1998), reversed on other grounds, 248 Conn. 364 (1999).

The Stuarts' decades-long possession and publicly acknowledged ownership of the Paintings confirms that the Defendants' first counterclaim, for title to the Paintings, is barred by the three-year statute of limitations, even if the discovery rule were applied.

The Defendants' second counterclaim, for an accounting, suffers the same deficiencies as their first counterclaim. The Defendants seek an order that directs the Plaintiffs to account for any other *Post*-related painting to which the Stuart family claims a right. Clearly, the Defendants should have tried to assert against Mr. Stuart Sr. in 1962 or, conceivably, at the latest in 1986, when the parties exchanged letters on the subject. Yet, the Defendants never asserted such a claim prior to the commencement of this action. Even assuming there were a fiduciary or other basis for an accounting claim against Mr. Stuart Sr.'s heirs, the claim is barred by the three-year statute of limitations. See Conn. Gen. Stat. § 52-577; *DeCorso v. Watchtower Bible and Tract Society of NY*, 46 Conn. Supp. 386, 752 A.2d 102 (2000); *Kent v. AVCO Corp.*, 849 F. Supp. 833 (D. Conn. 1994).

In sum, the Defendants' counterclaims are barred by the three-year statute of limitations. This is so whether they sound in conversion, breach of fiduciary duty, or any other tort, and regardless of whether the Defendants are given the added benefit of the discovery rule. See Conn. Gen. Stat. § 52-577. The Defendants' much-belated claims are prime examples of why statutes of limitations exist and should be enforced.[9]

---

[9] The U.S. Supreme Court has explained that the purpose of statutes of limitation is to "stimulate activity and punish negligence" and "to promote repose by giving security and stability to human affairs." *Wood v. Carpenter*, 101 U.S. 135, 139 (1879). Such a rule is necessary since "[t]here comes a time when [a party] ought to be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations." Note,

28

For the reasons set forth above, the Plaintiffs respectfully request the Court to dismiss the Defendants' counterclaims pursuant to the statute of limitations.

**b.     The Doctrine of Laches Bars
        The Defendants' Counterclaims**

In addition to being barred by the statute of limitations, the Defendants' counterclaims are barred by the doctrine of laches because their inexcusable and extraordinary delay in asserting a claim to ownership of the Paintings has prejudiced the Plaintiffs in this action.

The Defendants' inordinate delay has prevented the Stuarts from having the benefit of testimony of the few individuals who had first-hand knowledge of the events of the 1940's, 1950's and 1960's because all such persons have died in the interim. Rockwell, Mr. Stuart Sr., Mr. Strubing, Mr. Hibbs, former editors and officers of Curtis, other representatives of the Defendants and other deceased individuals who may have had relevant information, obviously cannot be examined and cross-examined under oath in this action. Memories of other persons still alive would have faded by now. Moreover, there is no reliable dispositive documentation concerning the Defendants' assertion of ownership to these three particular Paintings. There were, as previously mentioned, a number of publications during the last three decades that specifically cited to the Stuart family's ownership of the three Paintings.

Under Connecticut law, a party seeking equitable relief is barred by the doctrine of laches if the party has engaged in an unreasonable delay and if that delay has prejudiced the party against whom

---

*Developments in the Law: Statutes of Limitation,* 63 Harv. L. Rev. 1177, 1185 (1950). The U. S. Supreme Court has also explained the policy underlying statutes of limitations. *See Riddlesbarger v. Hartford Insurance Co.,* 74 U.S. (7 Wall.) 386, 390 (1868) (the policy is to protect "parties from the prosecution of stale claims, when, by loss of evidence from death of some witnesses, the imperfect recollection of others, or the destruction of documents, it might be impossible to discover the truth"); *Order of R.R. Telegraphers v. Railway Exp. Agency,* 321 U.S. 342, 348-49 (1944) ("The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitations and that the right to be free of stale claims in time comes to prevail the right to prosecute them.")

such relief is sought. See *Papcun v. Papcun*, 181 Conn. 618, 620 (1980); *Leary v. Stylarama of New Haven, Inc.*, 174 Conn. 217 (1978).

Courts have taken a nearly uniform approach in applying the laches principles of unreasonable delay and prejudice unless purported original owners and their successors consistently make diligent efforts to locate the artwork in question, their claims will be barred. See, e.g., *Solomon R. Guggenheim Foundation v. Lubell*, 77 N.Y.2d 311, 567 N.Y.S.2d 623 (1991) (under New York law, unreasonable delay in asserting claim will bar claim under laches doctrine); *Wertheimer v. Cirker's Hayes Storage Warehouse*, Inc., 752 N.Y.S.2d 295, 2002 WL 31819634 (N.Y.A.D. 1st Dept. Dec. 17, 2002) (Exhibit 2 hereto) (unanimously affirming dismissal, on laches grounds, of grandson's action against art gallery seeking to recover painting formerly owned by grandfather that allegedly was misappropriated and sold by person to whom family entrusted it when they fled Nazi occupied France because family's lack of due diligence over decades prejudiced gallery by making it virtually impossible for it to prove that any of its predecessors in interest acquired good title to painting); see also *Walt Disney Productions v. Basmajian*, 600 F. Supp. 439, 442 (S.D.N.Y. 1984) (denying Disney preliminary injunction restraining Christies from auctioning collection of copyrighted animation studio artwork used in creating motion pictures in possession of former studio employee, finding collection had been a gift, and stating in *dicta* that laches may bar the claim since Disney had not placed great value on such works, did not retain the vast majority of them, employee openly displayed such works at his home, and Disney was on notice more than a decade ago that employee personally possessed such works at his home).

Most recently, in *Adler v. Taylor*, the U.S. District Court for the Central District of California dismissed a complaint, holding that the plaintiffs' claims were barred by the statute of limitations. In *Adler*, the plaintiff sued actress Elizabeth Taylor to recover a painting by Vincent van Gogh that Taylor purchased at auction in 1963. The painting had been seized from plaintiff's ancestor as a result of Nazi persecution in Europe. The Court found that the plaintiff, "by exercise of reasonable diligence, should have discovered Taylor's ownership in 1963. The Complaint fails to allege any

30

diligence on Plaintiffs' part, much less any reasonable diligence." *Adler*, CV-04-8472-RGK (FMOx)(C.D. Cal.)(Exhibit 3.)  Similarly, in the present action, the Defendants have failed to allege any diligence in pursuing their claims of ownership.  Accordingly, the Defendants' counterclaims should be dismissed.

There are sound policy and evidentiary reasons, as found in *Lubell*, for barring claims asserted by those who unreasonable delayed in bringing such claims.  The inordinate delay in this case, like that in *Wertheimer*, has made it exceedingly difficult, if not impossible, for Plaintiffs to prove through testimony or scraps of evidence that remain that Mr. Stuart Sr. obtained good title to the Paintings during the 1950's, 1960's, 1970's, 1980's or 1990's.  And, as explained in *Basmajian*, if the Defendants had truly valued the Paintings, as more than a means to generate images for their magazine, they would have been far more diligent with respect to them.

A recent article concerning the doctrine of laches is particularly instructive.  See Jeremy G. Epstein, *The Laches Defense in Art Theft Litigation*, N.Y.L.J., October 20, 2000, at 1 (Exhibit 4 hereto).  The author distills three due diligence components required of a party seeking to obtain title to a painting it claims was unlawfully taken from it years ago:

> These cases suggest that a showing of due diligence must have at least three components: (a) a plaintiff must publicize its loss appropriately; (b) he must regularly consult available sources of information and databases concerning lost or stolen art; (c) he must not abandon his search. (*Id.* at *6.)

Applying these minimum criteria to this case, it is obvious that the Defendants failed to act with the requisite due diligence in connection with the Paintings.  First, the Defendants certainly did not "publicize its loss appropriately."  In fact, they did not publicize their purported loss at all.  The Defendants also never reported the Paintings as missing or stolen to any law enforcement agency, such as the local police, the FBI, or Interpol.  They never reported the Paintings to their insurance carriers as missing.  With all the means available to the Defendants, their failure to publicize their loss, if it really was a loss, was inexcusable.  Without having taken any steps, much less appropriate ones, to publicize the loss concerning the Paintings, the Defendants cannot satisfy the due diligence standard.

31

Second, the Defendants did not regularly consult available sources of information and databases concerning lost or stolen art. The Defendants failed to consult with or notify the Art Loss Register, or any other organization that assists in the identification of lost, missing and stolen art, regarding the Paintings that supposedly were stolen or lost.

Third, to the extent the Defendants were making any efforts with respect to locating and reclaiming the Paintings, they abandoned such efforts no later than in 1986. As previously noted, the Defendants' counsel, Mr. Strubing, testified that he knew in the 1950's that Curtis employees possessed original paintings used for *Post* issues without authorization and, specifically, that he had seen original artwork in the home of Ben Hibbs, a *Post* editor for whom Mr. Stuart Sr. worked. (See Exh. T to Akoury Decl., at 20-21). Moreover, the Defendants failed to take any action in response to their exchange of letters with Mr. Stuart Sr. in 1986. Mr. Stuart Sr.'s lawyer expressly informed the Defendants of Mr. Stuart Sr.'s ownership and possession of *Saying Grace* and other original Rockwell works, and referred them to the numerous books published concerning Rockwell's works for a list of such works owned by Mr. Stuart Sr. The Defendants' 15 years of inaction after 1986 is dispositive.

The Defendants have not come close to satisfying the three components of due diligence set forth above. Indeed, they have failed to satisfy even one of them. The resulting prejudice to the Plaintiffs is manifest. In the face of the Defendants' complete failure to assert a claim with respect to the Paintings for half a century, persons who might have had first-hand knowledge of the events of the 1940's, 1950's and 1960's are deceased. As a result of the Defendants' prolonged and inexcusable inaction, it is impossible to obtain complete information and documentation as would have been available at the time in question, or even within a reasonable time thereafter, and when the principals were still alive. Because the Defendants failed to act, important information has been lost concerning the Paintings and the actual transfers after Rockwell created them. General information regarding Curtis's disposition of art in the regular course of its business has been lost. The Defendants' decades-long laissez-faire attitude is precisely the type of conduct the doctrine of laches is designed to address.

32

There is absolutely no valid reason for the Defendants to have sat idly by for so long. If they actually possessed the rights they now assert, they had every opportunity to, and should have, asserted claims long ago. Despite being sophisticated companies with the benefit of corporate, trademark and litigation counsel, the Defendants did not report any one of the Paintings as missing or stolen, and did not commence any action to assert their purported claim of ownership to these Paintings for half a century, even after they actually knew of the Stuart family's possession and assertion of ownership of the Paintings.

The Defendants now argue that the statute of limitations did not commence until 2001, when Stuart Jr. sought to list the Paintings for sale at auction with Sotheby's. This argument is non-sensical in view of the decades of the Stuart family's acts of dominion and control, as well as their public assertions of ownership and Curtis's actual knowledge of the Stuarts' claims. Clearly, at the time Mr. Stuart Sr. left the *Post* in 1962, he had no intention of ever returning the Paintings to Curtis. There is no evidence, either direct or circumstantial, to support any other interpretation of Mr. Stuart Sr.'s intent. Curtis's recent argument that Mr. Stuart Sr. had permission to retain the Paintings, and hold himself out to the public as owner, until he or his heirs decided to sell them is absurd, and not supported by any evidence. In fact, Curtis's new claim is completely contrary to the testimony given by their counsel, Philip Strubing, in 1985 that Mr. Stuart Sr. had unauthorized possession of the Paintings.

The Defendants' informed indifference with respect to the Stuarts' ownership of the Paintings is particularly glaring in and after 1986. Any reasonable analysis of the facts and equities in this case leads to only one conclusion — that any claim by the Defendants, assuming *arguendo* that it had merit at one time, is stale by reason of their own conduct. The Defendants' pattern of quiescence in the face of the Stuarts' conduct as owners confirms that Plaintiff should be recognized as the owner of the Paintings and the Defendants' claims should be dismissed.

In sum, the Defendants' counterclaims are barred by the statute of limitations and the doctrine of laches.

33

**V.    CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request the Court to enter judgment declaring that the Stuart family is the owner of the three Paintings at issue and dismissing the Defendants' counterclaims as barred by the statute of limitations and the doctrine of laches.

**Plaintiffs**

**William A. Stuart, M.D.**
**Jonathan Stuart**

By: _Sandra J. Akoury_
Sandra J. Akoury (ct 21279)

34

# CERTIFICATION

This is to certify that a copy of the foregoing was sent via U.S. mail, postage prepaid on this 14th day of June, 2005, to the following counsel and *pro se* parties of record:

William M. Bloss, Esq.
Koskoff, Koskoff & Bieder, P.C.
350 Fairfield Avenue
Bridgeport, CT 06604

Anthony F. LoCicero, Esq.
Karen J. Bernstein, Esq.
Amster, Rothstein & Ebenstein, LLP
90 Park Avenue
New York, NY 10016

Peter R. Stern, Esq.
McLauglin & Stern, LLP
260 Madison Avenue
New York, NY 10016

Kenneth J. Stuart Jr.
5 High Ridge Road
Wilton, CT 06897

Paul J. Pacifico, Esq.
965 Post Road East
Westport, CT 06880

Mary E. Sommer, Esq.
Sandak, Hennessey & Greco, LLP
707 Summer Street
Stamford, CT 06901

Sandra J. Akoury