Copyright 2000 New York Law Publishing Company
New York Law Journal

October 20, 2000 Friday

SECTION: OUTSIDE COUNSEL; Pg. 1

LENGTH: 3221 words

HEADLINE: The Laches Defense in Art Theft Litigation

BYLINE: By Jeremy G. Epstein; Jeremy G. Epstein is a partner with Shearman & Sterling in New York.

BODY:
   The massive displacement of art during World War II continues to stimulate litigation. Claimants continue to come forward to assert ownership rights in works that, in some cases, have been out of their family's possession for over 60 years.

   The issue of due diligence, or lack thereof, arises in almost every case. It arises because in almost all such cases, the claimants took some measures to recover their property, usually in the years immediately following the loss, but at some point those efforts diminished.

   Every court in which these issues are raised must confront the question of what constitutes due diligence, and what constitutes a laches defense sufficient to overcome an otherwise valid claim.

   Meaningful answers to these questions can now be found in The Greek Orthodox Patriarchate of Jerusalem v. Christie's Inc., No. 98 Civ. 7664 (KMW), 1999 WL 673347 (S.D.N.Y. Aug. 30, 1999) (hereinafter Patriarchate). In that case, Judge Kimba Wood of the Southern District of New York adjudicated a claim to a 10th century manuscript allegedly stolen from the plaintiff's monastery in the 1920's. Judge Wood dismissed the claim on laches grounds, and in so doing clarified the definition of laches under New York law and reconciled two apparently disparate lines of authority.

   At the time of Judge Wood's decision, two New York cases, one state, and one federal, bore on the laches defense in art theft cases. These cases did not wholly agree, but Judge Wood correctly identified their common themes.

   The first of these is DeWeerth v. Baldinger, 836 F.2d 103 (2d Cir. 1987). There, the Second Circuit dismissed as time barred a claim by a German woman (Gerda Dorothea DeWeerth) to a Monet painting allegedly taken from her collection at the end of World War II by American soldiers. In 1943, Ms. DeWeerth had entrusted the picture to her sister for safekeeping. In 1945, the sister found it missing from her castle in southern Germany shortly after the castle was occupied by American soldiers. Between 1945 and 1957, the plaintiff took some steps to locate the picture: she contacted military authorities; she communicated with her lawyer concerning insurance claims on the lost property; she consulted an art historian; and she contacted the West German federal bureau of investigation. 836 F.2d at 105. None of these efforts yielded anything, and

the plaintiff did nothing after 1957. In 1981, Ms. DeWeerth's nephew and heir located the painting in a catalogue raisonne of Monet located in a Cologne museum less than 20 miles from where the plaintiff lived. The catalogue raisonne identified galleries where the painting had been exhibited, and through litigation against one of those galleries, Ms. DeWeerth was able to identify the present owner.

The district court awarded Ms. DeWeerth custody of the painting. 658 F. Supp. 688 (S.D.N.Y. 1987). On appeal, the Second Circuit reversed and held the claim barred by the applicable New York statute of limitations (N.Y. C.P.L.R. @ 214(3)), which required that an action for the return of stolen property be brought within three years of the time the action accrued. 836 F.2d 106 (2d Cir. 1987).

The Second Circuit, sitting in diversity and applying New York law, acknowledged that under New York's "demand and refusal" rule, the statute of limitations did not begin to run in a replevin action until a demand was made for the chattel and that demand is refused. 836 F.2d at 106.

Although the complaint was filed well within the three year statutory period following demand and refusal, the Second Circuit concluded that the inquiry did not end there. It also cited a principle of New York law that demand could not be unreasonably delayed; the open question, however, was whether the doctrine of "unreasonable delay" applied to a demand by a complainant who did not know the identity of the possessor of the chattel. 836 F.2d at 107-08.

The Second Circuit concluded that it did, and found that Ms. DeWeerth had unreasonably delayed her demand. The court concluded that because she had stopped all efforts in 1957, DeWeerth had failed to conduct a "continuous and diligent search." Moreover, she had failed to make use of the various mechanisms available after World War II for the reclamation of stolen art, and she took no steps to publicize her loss. 836 F.2d at 111.

The court also found "particularly inexcusable" the failure to consult the Monet catalogue raisonne, which, when it was finally consulted, led promptly to the identification of the painting's owner. The court was also troubled by the erosion of proof caused by the passage of time: witnesses had died, memories had faded, and key documents had been lost. 836 F.2d at 112.

Having found the claim time barred, the Second Circuit reversed the judgment in DeWeerth's favor. It noted, in a footnote, that it was unnecessary to reach the equitable defense of laches because it had based its decision on the New York statute of limitations. 836 F.2d at 112-13, n.7.

'Guggenheim'

The next major decision came shortly thereafter, in Solomon R. Guggenheim Foundation v. Lubell, 77 N.Y.2d 311, 569 N.E.2d 426, 567 N.Y.S.2d 623 (1991). In Guggenheim, the New York Court of Appeals concluded that the Second Circuit had erred in predicting that New York courts would apply a due diligence requirement to the demand and refusal rule.

At issue in Guggenheim was a claim by the Guggenheim Museum to a Chagall gouache allegedly stolen from the museum's premises in the 1960's and located in the possession of a private collector in 1986. The private collector who had

purchased the work from a dealer in 1967 defended his claim on the grounds, among others, that because the museum had done nothing to locate the work in the 20 years during which it had been missing, its claim was barred by laches and the New York statute of limitations.

The Court of Appeals dismissed the statute of limitations defense, thereby disagreeing with DeWeerth. 77 N.Y.2d at 318. The differences between the two courts, however, may have been more a matter of form than of substance; the Court of Appeals proceeded to note that although the statute of limitations did not bar the claim, the laches defense remained available. 77 N.Y.2d at 321. The Court explained that the burden of a laches defense was greater than that imposed by the statute of limitations; whereas a statute of limitations defense only required a showing of unreasonable delay, the laches defense required both a showing of unreasonable delay and prejudice to the defendant flowing from that delay. Id. Because the factual record underlying a laches defense had not been developed, the court remanded for consideration of that defense. The case was settled without further litigation.

By preserving the laches defense but failing to apply it, the Court of Appeals left many questions unanswered. Some believed that Guggenheim had impaired defenses based on a plaintiff's lack of due diligence, but it was not clear by how much. Moreover, after Guggenheim, no one knew quite what was sufficient to constitute a laches defense. Guggenheim had not discussed the contours of such a defense. It was also not clear how much, if anything, remained of the DeWeerth case. In Patriarchate, Judge Wood reconciled the apparent inconsistencies between DeWeerth and Guggenheim and provided the first extensive post-Guggenheim analysis of a laches defense.

'Patriarchate'

As in most cases of this sort, the background facts in Patriarchate are complicated and intriguing. The work at issue was a 10th century manuscript known as the "Archimedes Palimpsest." (A palimpsest is a document from which the original writing has been erased or partially removed and the original text written over.) In the 10th century, the manuscript contained two of the most important writings of Archimedes, the Greek scientist and philosopher. In the 12th or 13th century, the Archimedes text was erased and a Greek liturgical text written over it. For centuries the manuscript was stored in a monastery in Constantinople owned by the Greek Orthodox Patriarchate of Jerusalem, an order of monks. A French businessman bought the manuscript in the 1920s, and it descended through his family, whose name was Guersan, until it was offered for sale at Christie's in 1998. 1999 WL 673347 at *2. The Patriarchate claimed the work was stolen, but could offer no proof of theft. The Guersan family could not prove a legitimate transfer of title through bill of sale or other means. Id.

Judge Wood, applying French law, decided that the family had good title to the work through the doctrine of "prescriptive possession," which conferred good title on an owner who enjoys open and uninterrupted possession of a chattel for 30 years. Id. at *6.

Judge Wood did not, however, stop there. She also concluded that even if U.S. law applied - and that meant New York law - the Patriarchate's claim would be barred by the doctrine of laches. Id. at *7. Judge Wood also harmonized the apparently disparate views of the Court of Appeals and the Second Circuit by noting that "both courts have explicitly ruled that the claimant's reasonable

diligence in locating the lost property is highly relevant to a laches defense." Id. She further noted that "[although] the Second Circuit rested its decision on the statute of limitations issue, and specifically refrained from addressing the laches defense [citation omitted], the New York Court of Appeals ruled in Lubell that the DeWeerth I decision should have been based on the principle of laches." Id. at *8. Judge Wood thus recognized that although the Guggenheim court explicitly rejected the Second Circuit's conclusion in DeWeerth that the statute of limitations incorporated a due diligence requirement, it had offered no criticism of the DeWeerth court's analysis of the plaintiff's diligence.

Judge Wood then applied the DeWeerth due diligence standard to the laches defense in the case before her. In so doing, she recognized that the basic criteria for a laches defense already existed, and that they could be found in the DeWeerth case. Following DeWeerth, Judge Wood concluded that the plaintiffs were guilty of laches. Id. at *10. She noted several similarities in the two cases.

In DeWeerth, the plaintiff had done nothing for 24 years; the plaintiffs in Patriarchate had done nothing for over 60 years. When the Patriarchate claimed that as a religious institution, it was poorly equipped to search for lost property, Judge Wood pointed out that it could have hired others to do so. Id. The Second Circuit had made the same point regarding Ms. DeWeerth, who claimed that as an individual she was incapable of looking for her lost painting. 836 F.2d at 112.

Finally, in response to the Patriarchate's argument that the family could not demonstrate good faith acquisition, the court observed that "[as] the Palimpsest was acquired so long ago, however, it is not unreasonable that the Guersan family no longer has such documents. The Patriarchate's seventy-year delay in coming forward to claim ownership ... renders it virtually impossible for the Guersans to prove ownership." 1999 WL 673347 at *10. The court noted, again relying on DeWeerth, that because of the delay, "the critical witness [] is deceased, memories have faded, and key documents, assuming they existed at all, are missing." Id.

The Patriarchate decision has immense significance for the resolution of art theft disputes. Such disputes are invariably fact intensive, but Judge Wood's decision, incorporating elements of both Guggenheim and DeWeerth, provides a framework against which facts can be analyzed. Whereas Guggenheim left the laches defense completely undefined, Patriarchate defines it by importing the due diligence standards used in the DeWeerth decision. Both DeWeerth and Patriarchate can hereafter be cited as guides to a proper due diligence analysis.

These cases suggest that a showing of due diligence must have at least three components: (a) a plaintiff must publicize its loss appropriately; (b) he must regularly consult available sources of information and databases concerning lost or stolen art; (c) he must not abandon his search. The DeWeerth court observed that the plaintiff had failed all three tests: she failed "to take advantage of several mechanisms specifically set up to locate art lost during World War II" (836 F.2d at 111); she failed to "publicize her loss of the Monet in any one of several available listings designed to keep museums, galleries, and collectors vigilant for stolen art" (id.); she failed "to conduct any search for 24 years from 1957 to 1981" (id. at 112).

New York Law Journal, October 20, 2000

Earlier Cases

These criteria appear not only in DeWeerth, but in the New York cases that precede it. In those cases, the plaintiffs prevailed in their claims to stolen works and, in each such case, demonstrated due diligence.

In Kuntzsammlungen Zu Weimar v. Elicofon, 678 F.2d 1150 (2d Cir. 1982), affirming 536 F. Supp. 829 (E.D.N.Y. 1981), the plaintiff, a German museum seeking to recover two paintings by Albrecht Durer, had published the loss of these paintings in two books. The publication of the second of these, Verlorene Werk Der Malerei ("lost paintings") led directly to the discovery of the stolen works.

In Menzel v. List, 22 A.D.2d 647, 253 N.Y.S.2d 43 (1st Dep't 1964) and 49 Misc.2d 300, 267 N.Y.S.2d 804 (Sup. Ct. N.Y. Co.1966), the plaintiff sought to recover a painting by Marc Chagall left in her apartment in Brussels when she and her husband fled from the Nazis.

In both Elicofon and Menzel, the plaintiffs were found to have conducted continuous searches: "[search] has been made by Mr. and Mrs. Menzel ever since the end of the war..." (Menzel, 49 Misc2d at 301, 267 NYS2d at 807); "in view of insurmountable impediments, the activities reflect a continuance and diligent search." Elicofon, 536 F.Supp. at 852.

Both Patriarchate and DeWeerth also analyze the level of prejudice necessary to sustain a laches defense. Both cases cite the erosion of evidence by the passage of time as a significant source of prejudice. Although Judge Wood apparently deemed that showing sufficient in itself (1999 WL 673347 at *10-11), other arguments are clearly available in cases where the lapse of time is a matter of decades.

First, prejudice can be demonstrated in the appreciation in the value of the work of art itself. Given the enormous appreciation in the value of, for example, Impressionist paintings in the latter half of the 20th century, a work sold in the 1950s for a modest sum (the case of Ms. DeWeerth's Monet, it was $30,900), can be worth millions decades later.

Second, an owner claiming prejudice may also be able to demonstrate the lack of any recourse against a third party dealer. Although many well-established art dealers have survived for over a century, many others do not extend beyond the lines of their principals. This leaves an owner faced with a stolen art claim unable to proceed against his seller for breach of warranty.

A third argument is available to those who buy at auction. If an owner buys a work after it appears in the catalogue of a major auction house, he is entitled to argue that he would not have purchased but for the claimant's lack of diligence in notifying the auctioneer prior to sale. If due diligence requires consulting major sources of information concerning works of art, such sources surely include auction house catalogues, which are extensively circulated throughout the art world.

Present Owner's Burden

Judge Wood's opinion also helps to address another difficulty created by Guggenheim. At the end of its opinion, the Guggenheim court noted, in what was

New York Law Journal, October 20, 2000

almost a throw-away paragraph, that "the burden of proving that the painting was not stolen properly rests with [the present owner]." 77 N.Y.2d at 321. That statement, largely if not wholly irrelevant to the case at bar, has always been especially puzzling.

Did the Court of Appeals really mean to place the burden of disproving theft on a bona fide purchaser sitting in New York 50 or 60 years after such a theft was claimed to have occurred?

Judge Wood suggests an answer: "[because] the Patriarchate's delay in bringing this action renders the defendants' case much more difficult to prove, the doctrine of laches bars this action." 1999 WL 673347 at *9-10. A defendant who delays unduly cannot rely on the Guggenheim doctrine regarding burden of proof to save the day. If anyone is to suffer from the absence of proof caused by the lapse of time, it should be the party whose conduct brought about this lapse.

The issue of who bears the burden of proof of theft is more than a mere technicality. Most owners confronted with stolen art claims are good faith purchasers; a good faith purchaser acquires good title unless a theft has occurred earlier in the chain of title. See Menzel v. List, supra, 49 Misc.2d at 315; N.Y. U.C.C. @ 2-403(1).

In the event of an earlier theft, a good faith purchaser's title is invalid, and a theft victim will prevail in a replevin action. Decades after a work's disappearance, proof of how, why or when it disappeared is not uncommonly lacking. Indeed, such proof was absent in DeWeerth, Guggenheim and Patriachate.

The Guggenheim court's closing dictum, in which it imposed a burden of disproving theft on an owner, dramatically eased a claimant's task. Judge Wood's decision provides a necessary corrective. It eliminates the anomaly that a plaintiff could substantially enhance his chances of prevailing in court by waiting long enough until most relevant evidence was gone.

GRAPHIC: Photo, Photograph of the author.

LOAD-DATE: November 2, 2000