UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(BRIDGEPORT)

– – – – – – – – – – – – – – – – – – x

STUART & SONS, L.P., KENNETH STUART,
JR., EXECUTOR OF THE ESTATE OF
KENNETH STUART, SR.; TRUSTEE OF THE
KENNETH J. STUART TRUST; KENNETH
STUART, JR., WILLIAM STUART AND
JONATHAN STUART,

      Plaintiffs,

    - against -

THE CURTIS PUBLISHING COMPANY, INC.,
THE SATURDAY EVENING POST SOCIETY, A
DIVISION OF THE BENJAMIN FRANKLIN
LITERARY AND MEDICAL SOCIETY and THE
BENJAMIN FRANKLIN  LITERARY AND
MEDICAL SOCIETY, INC.,

      Defendants.

– – – – – – – – – – – – – – – – – – x

Case No. 301 CV 1580 (AHN)

April  28, 2006

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND SUPPLEMENTAL DOCUMENT PRODUCTION**

337494.2

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   ARGUMENT ......................................................................................... 2

   A.    Legal Standard for Summary Judgment ....................................... 2

      1.    It is an Undisputed Fact That Defendants Purchased "All
            Rights" to the Paintings From Mr. Rockwell and Own the
            Original Artwork he Created on Defendants' Behalf ....................... 3

      2.    Mr. Stuart, Sr.'s Possession of the Paintings Was Rightful
            From the Outset ................................................................. 8

      3.    Plaintiffs' Laches Claim is Defective Because They Have
            Provided No Evidence of Prejudice or Delay, and Come
            Before the Court with Unclean Hands ............................... 10

      4.    The "Newly Found" Documents That Plaintiffs Have
            Submitted Add Nothing to Plaintiffs' Case ...................... 15

      5.    The Abelman, Dunker, and Rockwell Affidavits are not
            Competent Evidence Under Federal Rule 56 ................... 17

      6.    Plaintiffs Only Inherited a Possessory Interest in the
            Paintings, Not an Ownership Interest ............................. 19

      7.    Nothing Has Changed Since the Plaintiffs First Filed Their
            Motion for Judgment on the Pleadings and, Therefore,
            Plaintiffs' Motion Should be Denied Under the Doctrine of
            Law of the Case ............................................................. 21

III.  CONCLUSION .................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Casey v. United States*,
161 F. Supp. 2d 86 (D. Conn. 2001) ................................................................. 22, 23

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988) ........................................................................................... 22, 23

*Coleman v. Francis*,
102 Conn. 612, 129 A. 718 (1925) ........................................................................... 9

*Collins v. Olin Corp.*,
3:03 CV 945, 2006 U.S. Dist. LEXIS 8627 (D. Conn. Feb. 28, 2006) ................... 3

*Cumis Ins. Soc., Inc. v. Windsor Bank & Trust Co.*,
736 F. Supp. 1226 (D. Conn. 1990) ...................................................................... 23

*Dodge v. Briggs*,
27 F. 160 (C.C.S.D. Ga. 1886) .............................................................................. 20

*FLLI Moretti Cereali S.p.A. v. Continental Grain Co.*,
563 F.2d 563 (2d Cir. 1977) ..................................................................................... 2

*Galliher v. Cadwell*,
145 U.S. 368 (1892) ............................................................................................... 11

*Heyman v. Commerce and Indus. Ins. Co.*,
524 F.2d 1317 (2d Cir. 1975) ................................................................................... 2

*Hoelzer v. The City of Stamford*,
933 F.2d 1131 (2d Cir. 1991) ................................................................................. 12

*Ikelionwu v. United States*,
150 F.3d 233 (2d Cir. 1998) ................................................................................... 11

*Judge v. City of Buffalo*,
524 F.2d 1321 (2d Cir. 1975) ................................................................................... 2

## <u>TABLE OF AUTHORITIES</u>
### (cont.)

### CASES

*In re Kelly*,
311 B.R. 341 (Bankr. W.D.N.Y. 2004) ...................................................................13

*Luciani v. Stop & Shop Cos.*,
15 Conn. App. 407, 544 A.2d 1238 (1988) .................................................. 8, 10

*Maroun v. Tarro*,
35 Conn. App. 391, 646 A.2d 251 (1994)........................................................... 8

*Midwest Milk Monopolization Litig.*,
380 F. Supp. 880 (W.D. Mo. 1974)....................................................................22

*North River Ins. Co. v. Philadelphia Reinsurance Corp.*,
63 F.3d 160 (2d Cir. 1995).......................................................................... 22, 23

*In re PCH Assocs.*,
949 F.2d 585 (2d Cir. 1991)................................................................................23

*PDK Labs, Inc. v. John Ashcroft*,
338 F. Supp. 2d 1 (D.D.C. 2004) ........................................................................22

*Perkin-Elmer Corp. v. Computervision Corp.*,
732 F.2d 888 (Fed. Cir. 1984) ............................................................................22

*R.B. Ventures, Ltd. v. Shane*,
112 F.3d 54 (2d Cir. 1997)....................................................................................3

*Rodriguez v. City of N.Y.*,
72 F.3d 1051 (2d Cir. 1995) ..................................................................................2

*Rossi v. W. Haven Bd. of Educ.*,
359 F. Supp. 2d 178 (D. Conn. 2005)................................................................. 18

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*,
183 F.3d 155 (2d Cir. 1999) ............................................................................... 18

*Schwapp v. Town of Avon*,
118 F.3d 106 (2d Cir. 1997) ............................................................................... 18

## <u>TABLE OF AUTHORITIES</u>
### (cont.)

337494.2

# CASES

*Seymour Housing Auth. Tenants Assoc. v. Housing Auth. of the Town of Seymour,*
18 Conn. App. 393, 558 A.2d 1002 (1989) .......................................................................... 11

*Sologub v. City of N.Y.,*
202 F.3d 175, 178 (2d Cir. 2000) ......................................................................................... 3

*The Detroit Inst. of Arts Founders Soc'y v. Rose,*
127 F. Supp. 2d 117 (D. Conn. 2001) ........................................................................... 10, 20

*United States v. Trinidad Coal & Coking Co.,*
137 U.S. 160 (1890) ............................................................................................................ 13

*In re Universal Clearing House Co.,*
62 B.R. 118 (D. Utah 1986) ................................................................................................. 20

*Vece v. Vanacore,*
2 Conn. Cir. 325, 198 A.2d 728 (1963) .............................................................................. 10

*Virgin Atlantic Airways, Ltd. v. National Mediation Bd.,*
956 F.2d 1245 (2d Cir. 1992) .............................................................................................. 23

# STATUTES

*Conn. Gen. Stat.* § 57-431 .................................................................................................... 8

*Conn. Gen. Stat.* § 52-564 .................................................................................................. 15

Fed.R.Civ.P. 12 ...................................................................................................................... 1

Fed.R.Civ.P. 56 ............................................................................................... 1, 3, 18, 19, 24

# MISCELLANEOUS

10 A Wright, Miller & Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 2713
(2d. ed. 1998) ...................................................................................................................... 22

18 MOORE'S FEDERAL PRACTICE, § 134.22
(3d ed. 2005) ....................................................................................................................... 22

## I.    PRELIMINARY STATEMENT

By its March 1, 2006 Order the Court converted the Plaintiffs Motion for Judgment on the Pleadings (Dkt. # 57), pursuant to Fed.R.Civ.P. 12(c), to a Motion for Summary Judgment under Fed.R.Civ.P. 56 ("Plaintiffs' Motion for Summary Judgment") and granted the Defendants an opportunity to respond to that Motion, as well as Plaintiffs' Motion in Further Support of their Motion for Judgment on the Pleadings (Dkt. # 81) and the Supplemental Declaration of Sandra Akoury (Dkt. # 86) ("Suppl. Akoury Decl.").  Defendants hereby respond to the Plaintiffs' motions and supplemental production.

Under Rule 56, Plaintiffs have the burden of proving that there are no issues of material fact disputed between the parties.  Plaintiffs have failed to meet their burden. At the February 27, 2006 Hearing before the Court ("the February Hearing") Defendants discussed in detail the unresolved material disputes between the parties, including the following: (1) the "confirmation" or "purchase" order contracts prove that Defendants own ALL rights to the artwork purchased from Mr. Rockwell; (2) under Connecticut conversion law, Mr. Stuart, Sr. had rightful possession of the Paintings[1] from the outset; (3) Plaintiffs' laches claim is defective because they have offered no evidence of delay or prejudice, and come before the Court with unclean hands; (4) the "newly found" documents attached to the Suppl. Akoury Decl. add nothing to Plaintiffs case; (5) the Abelman, Dunker and Rockwell affidavits (also attached to the Suppl. Akoury Decl.) are not competent evidence under Fed.R.Civ.P. 56 and should not be considered by the Court; (6) Plaintiffs only inherited a possessory, as opposed to

---

[1] The "Paintings" are three individual pieces of artwork which are entitled "The Gossips", "Saying Grace", and "Walking to Church."

ownership, interest in the Paintings because Mr. Stuart, Sr. never owned them; and (7) Plaintiffs' Motion for Summary Judgment is the same Motion for Judgment on the Pleadings they filed in March 2003 and should be denied under the law of the case doctrine.

As will be detailed below, Defendants have provided undisputed evidence in the form of agreements, letters, affidavits, and sworn testimony which supports their claim of ownership.  At the very least, this evidence presents material issues of fact which dispute Plaintiffs' present claims.  Therefore, Defendants respectfully move the Court to deny Plaintiffs' Motion for Summary Judgment and grant the Defendants' Motion for Summary Judgment (Dkt. # 53).

## II.    ARGUMENT

### A.    Legal Standard for Summary Judgment

"Summary judgment is a harsh remedy to be granted only where there are no material issues of fact to be tried."  *FLLI Moretti Cereali S.p.A. v. Continental Grain Co.,* 563 F.2d 563, 565 (2d Cir. 1977), *quoting Judge v. City of Buffalo,* 524 F.2d 1321 (2d Cir. 1975).  In making that determination a court must "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, [citation omitted], with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute."  *Heyman v. Commerce and Indus. Ins.* Co., 524 F.2d 1317, 1320 (2d Cir. 1975); *see also Rodriguez v. City of N.Y.,* 72 F.3d 1051, 1060 (2d Cir. 1995).

"'When reasonable persons, applying the proper legal standards, could differ in their responses to the question[s]' raised on the basis of the evidence presented, the question must be left to the jury."  *Collins v. Olin Corp.,* 3:03 CV 945, 2006 U.S. Dist.

LEXIS 8627 (D. Conn. Feb. 28, 2006) (*quoting Sologub v. City of N.Y.,* 202 F.3d 175, 178 (2d Cir. 2000)); *see also R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir. 1997) ("[i]f reasonable minds could differ as to the import of the evidence ... and if ... there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment.").

In the instant case, there are still numerous issues of material fact that are disputed by the parties. Further, Defendants have put before the Court undisputed evidence, discussed further *infra,* which shows that Defendants own the Paintings. Plaintiffs are not entitled to summary judgment because they have failed to meet their burden under Rule 56.

### 1. It is an Undisputed Fact That Defendants Purchased "All Rights" to the Paintings From Mr. Rockwell and Own the Original Artwork he Created on Defendants' Behalf

As fully briefed in Defendants' Reply in Support of Their Motion for Summary Judgment (*see* Dkt. # 77, pp. 7-9) Defendants have demonstrated, without dispute, that it was Mr. Rockwell's custom and practice to cash the checks issued to him by Defendants pursuant to the terms of the purchase order contracts. Defendants have produced numerous copies of these confirmation orders and each clearly states that Defendants "[bought] *all* **rights** in the art work appearing in its publications, including the right to copyright the same." *See* Bloss Decl., Exh. C (Dkt. # 55).

In addition to the numerous purchase orders Defendants have already produced, Defendants also recently retrieved the original purchase order for four paintings Defendants purchased from Mr. Rockwell known as the Four Freedoms, some of

Rockwell's most famous work.[2]   (Copy attached to the Declaration of Anthony F. Lo Cicero (the "Lo Cicero Declaration") as Exhibit A).   This document shows that in January 1943 Mr. Rockwell was paid $10,000.00 for the Four Freedoms by Curtis Publishing and that, in exchange, Curtis Publishing purchased **"all artwork ... outright ..."**   *See* Lo Cicero Decl., Exh. A.   The language of this purchase order is exactly the same as the language used on other purchase orders which Mr. Rockwell received from Defendants in the early-to-mid 1950's.   *See* Bloss Decl., Exh. C.

Plaintiffs have attempted to marginalize the value of the purchase orders, arguing instead that Rockwell sold his work to Defendants "on a handshake, pursuant to which The Post may have had the right to reproduce the art work." *See* Plaintiffs' Reply to Defendants' Motion for Summary Judgment, pg. 6, at ¶ 3 (Dkt. # 69); *see also* February 2006 Hearing Transcript, pg. 12, lines 21-25 ("... so there's no actual document that shows anything -- any sort of agreement that occurred between Curtis Publishing and Norman Rockwell back in the 40's or early 50's ...").

This argument is incredible.   First, Plaintiffs themselves have relied on the terms provided in the purchase orders in representing to the Court their own understanding of the terms of Mr. Rockwell's employment.   For example, at the February Hearing Plaintiffs' counsel made the following statements:

> THE COURT:  For example, when Mr. Rockwell made **these paintings**, supposing they were going to be reproduced, let's say for a calendar, who would have to give permission to do that, Mr. Rockwell or Curtis?
>
> MS. AKOURY:  It depended on the situation, Your Honor. **My understanding is that for books, Norman Rockwell had the right to reproduce them.**  For other

---

[2] The "Four Freedoms" are referred to individually as "Painting for Freedom of Worship", "Painting for Freedom of Speech", "Painting for Freedom From Fear", and "Painting for Freedom From Want."

items, such as calendars or other things that were produced, that Curtis Publishing did give permission for that, **and Curtis Publishing owned those publishing rights,** but I have not researched that. **It's just my understanding from the documents that I have read.**

THE COURT: So who -- The **revenue generated by an reproductions would have gone to Curtis,** not to Mr. Rockwell?

MS. AKOURY: **Unless, it was a book.** The revenues generated by the books, my understanding, went to Norman Rockwell.

(February 2006 Hearing Transcript, at pg. 15 line 24 to pg. 16 line 17). The only basis for Plaintiffs' counsel's representations are the terms of the purchase order contracts, every one of which contains explicit language regarding book and calendar rights. *See, e.g.,* Lo Cicero Decl., Exh. A ("[t]he Curtis Publishing Company will, **on request** reassign to the artist the American **book rights** ... [...] [a]rt work may be used on **calendars** only when the calendar is an 'art calendar' ..."); Bloss Decl., Exhs. C and D.

Second, the Court's question was specifically directed to "these paintings" at issue in this litigation. In her response Ms. Akoury stated that Mr. Rockwell had the right to use the Paintings in books. If in fact, as Plaintiffs argue, Mr. Rockwell created the Paintings pursuant to a "handshake" with Defendants, and nothing else, then Plaintiffs' counsel would have no basis to represent that Mr. Rockwell maintained "book rights," and there would be no "documents" for her to base her understanding on. The confirmation purchase orders are the **only** documents produced in this litigation which spell out the specific contractual terms of Mr. Rockwell's work for Defendants. Where Ms. Akoury refers to her own "understanding from the documents" she in fact was referring to her understanding based on her review of the purchase order contracts.

Even the documents attached to the Suppl. Akoury Decl. acknowledge that the purchase orders were the standard and only agreement between Mr. Rockwell and Defendants.  For example, Exhibit F to the Suppl. Akoury Decl. is an August 2, 1978 letter from Mr. Abelman (Mr. Rockwell and Mr. Stuart, Sr.'s attorney) to Mr. Thomas Rockwell which explains that "[o]ur old files **do not include anything with respect to Curtis other than the form agreement** [*i.e.,* the purchase orders] which was used by the magazine with its artists, including your father. **That agreement provided that book rights would be assigned to the artist upon request.** [...] **All other rights in the Saturday Evening Post paintings may belong to Curtis."**  Exhibit E to the Suppl. Akoury Decl. is a June 28, 1979 letter from Mr. Abelman to Mr. Henry Williams of the Berkshire Bank & Trust Co. which further states that "[w]e discussed **the form agreement used by Curtis with respect to art in his time as Art Director.**"

These letters are particularly compelling because every purchase order is in fact a form agreement which, as previously noted, contains language stating that book rights would be granted upon request. *See* Lo Cicero Decl., Exh. A; Bloss Decl., Exhs. C and D.

Ms. Akoury's statements and the above referenced documents are just a small piece of the large body of evidence which proves that Defendants owned all rights to the work it purchased from Mr. Rockwell.  In particular, Defendants have produced not only the confirmation orders, but sworn oral testimony, a sworn affidavit, and letters from Mr. Rockwell and Mr. Stuart, Sr. which all clearly state that Defendants purchased **ALL** paintings **"outright."** *See* Lo Cicero Decl., Exh. A; Bloss Decl., Exhs. A, B, C, D, E, F, and G.  One example of this evidence is the sworn affidavit of Mr. Stuart, Sr. (*see* Bloss Decl., Exh. D) where he testified in detail about the standard business practices between

Defendants and Mr. Rockwell.  In his sworn affidavit Mr. Stuart, Sr. stated that "[w]hen Defendants purchased artwork for publication in The Post, Defendants typically furnished Norman Rockwell with a **copy of a standard Purchase Contract** along with its payment check" and that "Defendants and Norman Rockwell understood **pursuant to such Purchase Contracts** that Defendants would purchase **all rights** ....").  *See Id.,* pg. 4 at ¶ ¶ 7, 8.

Lastly, Plaintiffs have failed to offer any alternative evidence which disputes the fact that the purchase orders were the standard business agreement between Mr. Rockwell and Defendants.  As a basic matter, Defendants could not have used the Paintings as covers for The Post without purchasing them from Mr. Rockwell and it is undisputed that all of them were used by The Post for their covers.  *See* Plaintiffs' Amended Complaint, pg. 5 at ¶ 17 (Dkt. # 41).  Specifically, "The Gossips" appeared on the cover of the March 6, 1948 issue of The Post, "Saying Grace" appeared on the cover of the November 24, 1951 issue, and "Walking to Church" appeared on the cover of the April 4, 1953 issue.  *See* Defendants' Local Rule 56(a)(1) Statement (Dkt. # 54) pp. 4-5 at ¶ ¶ 21-23.  (Copies of The Post covers for "The Gossips", "Saying Grace", and "Walking to Church", are attached to the Lo Cicero Declaration respectively as Exhs. B, C, and, D).  If Plaintiffs believe there was another contract or alternative agreement, other than the purchase order contracts, which existed between Mr. Rockwell and Defendants prior to 1954, then they should have produced evidence to support this theory.  They have not.

Therefore, the undisputed evidence shows that Defendants purchased all rights to the artwork it commissioned from Mr. Rockwell pursuant to the terms of the purchase orders, and that, as a result, Defendants are the owners of the Paintings.

### 2. Mr. Stuart, Sr.'s Possession of the Paintings Was Rightful From the Outset

Even after four years of litigation, Plaintiffs have still not made a coherent legal argument regarding conversion of the Paintings under Connecticut law. Instead, Plaintiffs have presented this Court with a flood of irrelevant facts and hearsay evidence which divine that due to the passage of time since Mr. Stuart, Sr. first possessed the Paintings, Plaintiffs now own them. This argument has no basis in fact or law under the Connecticut conversion statute or relevant case law. To the extent this is even a colorable argument it sounds, rather, in the law of adverse possession, not conversion, which Plaintiffs are expressly not relying upon.[3]

The Connecticut law of conversion under *Conn. Gen. Stat.* § 57-431 recognizes two distinct theories of conversion: (1) "possession of the allegedly converted goods is wrongful from the outset"; and (2) "the conversion arises subsequent to an initial rightful possession." *Maroun v. Tarro*, 35 Conn. App. 391, 396, 646 A.2d 251, 253 (1994) (*citing Coleman v. Francis*, 129 A. 718 (1925)); *see also Luciani v. Stop & Shop Cos.*, 15 Conn. App. 407, 410, 544 A.2d 1238, 1240 (1988).

In order for possession to be wrongful at the outset there must be a tortious taking. *See, e.g., Coleman*, 102 Conn. at 616 (Court discussed in detail the factual underpinnings of an "originally wrongful taking" based on relevant case law and stated that "[a]ll of these are instances of a tortious taking."). Although Plaintiffs have stated that this theory of conversion might apply in the instant case, they have provided no factual or legal basis for asserting that Mr. Stuart, Sr.'s initial possession of the Paintings

---

[3] During the February Hearing the Court asked if Plaintiffs had made a claim for adverse possession to which Plaintiffs' counsel responded "[n]o. I think there's some similarities but we have not raised that claim in our pleadings." *See* February Hearing Transcript, at pg. 13, lines 4-6.

stemmed from a tortious taking.  Plaintiffs have been decidedly non-committal on this

issue as evidenced by the following exchange with the Court at the February Hearing:

> THE COURT:  So you're saying that -- Well, are you saying
> that the Court could construe the defendant's claim of
> ownership as a -- as an admission that Stuart's possession of
> the paintings were wrongful from the outset, and that his
> conversion was completed when he exercised ownership
> rights over them?
>
> MS. AKOURY:  That -- **It can be construed that way, or
> it can be construed that Mr. Stuart had original
> possession, had ownership from the beginning,
> which is what our position has always been**.
>
> THE COURT:   So if the Stuarts claim that their father
> received these paintings as gifts from Mr. Rockwell, so that
> their possession was rightful, can the Court grant relief,
> because doesn't that create disputed facts concerning
> whether or not Mr. Rockwell in fact owned them?  Wouldn't
> that be an issue for a jury to determine?

(*See* February Hearing Transcript, at pg. 17, lines 6-22).  Plaintiffs' statement has no

foundation in fact or law because there is no evidence of a tortious taking.  In fact,

Plaintiffs have **expressly** alleged that Mr. Rockwell **gifted** the Paintings to Mr. Stuart,

Sr.   *See* Plaintiffs' Motion for Summary Judgment, at pg. 1 ("... the Paintings were

returned to Mr. Rockwell and he, in or about 1952 and 1953 **gave** the Paintings to

Kenneth Stuart, Sr.").  Plaintiffs cannot assert both that Mr. Rockwell made an alleged

**gift** to Mr. Stuart, Sr. **and** that Mr. Stuart, Sr.'s possession of the Paintings was

wrongful from the outset.  These positions are entirely inconsistent.  As such, where

possession of the chattel is originally rightful and then becomes wrongful, by a

"wrongful detention," under Connecticut law the conversion does not occur until (1) a

**demand** is made for the return of the chattel **and** (2) it is **refused**.  *See Luciani*, 15

Conn. App. at 410 (*quoting Coleman*, 102 Conn. at 616).

When the initial rightful possession terminated and became a wrongful detention for purposes of the accrual of the statute of limitations on the conversion is "one of fact for the trier." *Vece v. Vanacore*, 2 Conn. Cir. 325, 328, 198 A.2d 728, 730 (1963). Here, it is Defendants' position that the statute of limitations did not begin to accrue until after the Plaintiffs' contacted Sotheby's to auction the Paintings in 2001, as discussed below. Plaintiffs have failed to make a contrary factual or legal argument which disputes Defendants' position or supports their Motion for Summary Judgment.

### 3.    Plaintiffs' Laches Claim is Defective Because They Have Provided No Evidence of Prejudice or Delay, and Come Before the Court with Unclean Hands

The doctrine of laches is an equitable defense which requires Plaintiffs prove not only that Defendants unreasonably delayed but that they were somehow prejudiced by Defendants' unreasonable delay in bringing suit. *See The Detroit Inst. of Arts Founders Soc'y v. Rose*, 127 F. Supp. 2d 117, 137 (D. Conn. 2001) (finding no laches since bailee "produced no evidence indicating that any delay by the [bailor] was prejudicial to them").

In order to assert this defense, a party must establish that: (1) plaintiff (*i.e.,* the moving party) knew of the defendants' alleged misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay. *See Ikelionwu v. United States,* 150 F.3d 233, 237 (2d Cir. 1998) (citation omitted). Further, the "principal element in applying the doctrine of laches is the resulting prejudice to a defendant, rather than the delay itself." *Seymour Housing Auth. Tenants Assoc. v. Housing Auth. of the Town of Seymour*, 18 Conn. App. 393, 405-06, 558 A.2d 1002, 1009 (1989) (citation omitted). Laches is "principally a question of the inequity of permitting the claim to be enforced -- an inequity founded upon some change in the

condition or relations of the property or the parties." *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892).

First, there is no evidence in the record before the Court that Plaintiffs have been prejudiced. [4]  During the February Hearing, Plaintiffs admitted that they have failed to provide the Court with any evidence which shows they were prejudiced:

> MS. AKOURY:  [...] Our clients, through their father's estate, paid significant estate taxes on these paintings and on the value of them, so there was detrimental reliance that goes to the latches argument.
>
> THE COURT:  **Is that part of the record**?
>
> MS. AKOURY:  Yes, it is.  It was actually in the original motion.
>
> THE COURT:  I mean, the - -
>
> MS. AKOURY:  **The actual estate taxes?  No** --
>
> THE COURT:  **The evidence with respect to how much they paid and** --
>
> MS AKOURY:  **No, we have not submitted that into the record,** [...]

(*See* February Hearing  Transcript, at pg. 74, lines 17-25) (emphasis supplied).  Thus, there is no evidence in the record that they were harmed.

Second, there has been no delay.  Although Plaintiffs suggest that Defendants should have asked for return of the Paintings earlier, they have failed to provide a legal basis for this claim, or even explain why it is relevant.  Under Connecticut conversion

---

[4] It is important to note that Defendants requested that Plaintiffs produce documents regarding their laches claims in several specific document requests in July 2004 but never received responsive documents from Plaintiffs. (*See* Defendants First Set of Requests for the Production of Documents, <u>Request No. 3</u>: "All documents supporting the Stuart & Sons' claims asserted in its Complaint that monies paid to maintain and insure the Paintings as well as to satisfy tax obligations arising out of the alleged ownership of the Paintings."  <u>Request No. 4</u>:  "All documents supporting the Stuart & Sons' claims asserted in its Complaint that in the last 20 or so years of his life, Stuart, Sr. and his family did financial planning and took other actions based upon their alleged ownership of the paintings.").

law there is no duty of reasonable due diligence on the rightful owners of a chattel with respect to the statute of limitations on conversion. *See, e.g., Hoelzer v. The City of Stamford,* 933 F.2d 1131, 1137 (2d Cir. 1991). This is especially true in this case because Defendants had no "reason to believe [their] possessory interest [in the Paintings] was ever in jeopardy." *Id.* Defendants knew where the Paintings were located and that Mr. Stuart, Sr. had possession of them. Plaintiffs did not demand return of the Paintings until 2001, after Plaintiffs contacted Sotheby's in an attempt to auction the Paintings. Specifically, Plaintiffs' stated in their Motion in Further Support for Judgment on the Pleadings (Dkt. # 81) that Defendants never "submit[ted] their 'demand' letter to the Court to support" their "claim that they made no demand for return of the Paintings until August 2001," because the 1986 letter and the August 2001 letters "**merely [sought] *documentation* and neither request[ed] return of the Paintings.**" (Plaintiffs' Motion in Further Support of Judgment on the Pleadings, pgs. 2, 3).

Plaintiffs' concession that the letters were only requests for documentation further creates disputed issues of material fact meriting denial of their Motion for Summary Judgment. Moreover, because Plaintiffs concede that the 1986 and 2001 letters were not formal demands for return of the Paintings, it is undisputed that Defendants demanded the return of the Paintings and Plaintiffs refused to return them in October, 2001. Specifically, Defendants have represented throughout this litigation that it became *aware* of Plaintiffs' attempted conversion of the Paintings in July and August, 2001. The demand for the Paintings and the refusal to return them came in the form of allegations and denials contained in Defendants' Counterclaims and Plaintiffs' Reply to Defendants' Counterclaims. (*See* Plaintiffs' Reply, at pgs. 2, 3; *see also* Dkt. #6,

at ¶ 18 & "Wherefore" clause (Answer to Complaint and Counterclaim by Defendants against Stuart & Sons, L.P., dated Sept. 12, 2001); Dkt. #7, at ¶ 18 & "Wherefore" clause (Plaintiffs' Reply to Defendants' Counterclaims, dated October 2, 2001). Thus, there was no delay.

Third, Plaintiffs' claim for laches is barred because they come before this Court with unclean hands. Laches is an equitable doctrine which requires that the moving party come before the Court with clean hands. *See In re Kelly,* 311 B.R. 341, 344 (Bankr. W.D.N.Y. 2004) ("[a]s an equitable doctrine, laches must fulfill the principles of equity. Fundamental among these principles is the precept that one who seeks equity must do equity.") (*citing United States v. Trinidad Coal & Coking Co.,* 137 U.S. 160 (1890)). Plaintiffs, however, fall far short of this standard. Specifically, in June 2004 Judge Adams of the Superior Court for the State of Connecticut (Stamford/Norwalk Judicial District) issued a scathing decision in *Stuart v. Stuart,* No. CV 02 0193031[5] which documented numerous instances of misconduct and abuse on the part of Ken Stuart, Jr., and his management of Stuart & Sons, L.P., including the following:

> (1)     Ken Stuart, Sr. was not mentally competent to execute the papers which transferred his assets (including any interest he may have had in the Rockwell paintings at issue here) to Stuart & Sons, L.P. (*see Stuart v. Stuart,* No. CV 02 0193031, at pg. 19);
>
> (2)     Ken Stuart, Jr. exerted "**undue influence** over his father" in conducting his financial planning and creating Stuart & Sons, L.P., and **breached** his fiduciary duty to his brothers through the co-mingling of funds and assets and other acts (*see Id.,* at pgs. 25-33, "[t]he plaintiff's' expert ... found that the lack of record keeping was notable and that he had never seen a case where the books were so **incomplete**

---

[5] As the Court is already well aware, in *Stuart v. Stuart,* No. CV 02 0193031 Kenneth Stuart, Jr.'s brothers sued Kenneth Stuart, Jr. for, *inter alia,* breach of his fiduciary duty in connection with his alleged mismanagement of Stuart & Sons, L.P. The case is still pending. An appeal was filed by Ken Stuart, Jr. on July 19, 2004.

and funds so **co-mingled**."); (*see Id.,* at pg. 34 "... the evidence shows that from 1993 on [Ken Stuart, Jr.] used Stuart & Sons, and to a lesser extent the Trust, as his personal bankers.  [...] the use of partnership funds for his personal benefit is **staggering**.");

(3)    The creation of Stuart & Sons, L.P. was "null and void."  All assets and liabilities of Stuart & Sons, L.P. are to be transferred to the Estate of Kenneth Stuart, Sr. at a time to be set by the Court.  Plaintiffs were granted a constructive trust over an undivided two-thirds of the partnership's assets and liabilities (*see Id.,* at pg. 73); and

(4)    Judgment was awarded against Ken Stuart, Jr. in the amount of over $2,300,000.

Judge Adams also noted in his decision the key role that Ken Stuart, Jr. has taken in this litigation, stating that "[t]here is presently pending in the United States District Court of Connecticut an action challenging [Ken] Stuart, Sr.'s ownership of the Rockwell Art.  This Court has no information about the merits of the claim.  However, **[Ken] Stuart, Jr. has taken the lead** in developing and marshaling the evidence, as well as obtaining legal representation to defend against the claim."  *Id.,* at pg. 52, footnote 14.

Plaintiffs cannot argue for equitable relief where, at the very least, Ken Stuart, Jr. and Stuart & Sons, L.P. (both of which have an alleged interest in the Paintings) come before this Court with unclean hands.  Ken Stuart, Jr. has taken a "lead" role (as noted by Judge Adams) in managing this litigation for Plaintiffs, and he has been found liable for several counts of fraud including, among others, Statutory Theft under *Conn. Gen. Stat.* § 52-564, for various forms of misconduct in managing Mr. Stuart, Sr.'s estate and the financial affairs of Stuart & Sons, L.P., all of which relate to and affect the Plaintiffs' alleged ownership interests in the Paintings.  As such, Plaintiffs come before this Court with unclean hands and their claim of laches should be denied.

### 4. The "Newly Found" Documents That Plaintiffs Have Submitted Add Nothing to Plaintiffs' Case

Most of the documents attached to the Suppl. Akoury Decl. are cumulative and/or irrelevant and do nothing to further Plaintiffs' case. For example, the June 2, 1986 letter from Attorney Abelman to Beurt SerVaas (with the mailing receipt) (*see* Suppl. Akoury Decl., Exh. A) had already been produced. The only addition is the mailing receipt. However, Plaintiffs, as they pointed out at the February Hearing, could have simply argued the mail box rule[6] in order to confirm receipt and/or relied on the affidavit of Mr. Abelman (as they did in any event) where he states (in paragraphs 13 and 14) that he sent the letter -- two of the very few statements in the Abelman affidavit which are based on his own personal knowledge. (*See* Suppl. Akoury Decl. Exh. B.)

Further, a number of the documents actually support Defendants' position not Plaintiffs. As already discussed, Exhs. E and F to the Suppl. Akoury Decl., which are letters from Mr. Ableman, both explain that the confirmation purchase orders were not only the **standard** contract used by Mr. Rockwell and Defendants to memorialize their business dealings, but the **only** one. Exh. H to the Suppl. Akoury Decl. is a September 24, 1962 letter ("the 1962 letter") from Mr. Dunker (Mr. Rockwell's attorney at the time) to Mr. Rockwell which makes a number of critical admissions, and proves that Mr. Rockwell and Mr. Dunker knew that Defendants owned the rights to the original artwork.

First, the 1962 letter explains that Mr. Rockwell was concerned about ownership of the original artwork. Specifically, Mr. Dunker points out that the September 9, 1955 letter ("the 1955 letter") from Mr. Stuart, Sr. "may be disregarded in respect of the question of ownership of the originals [because] [i]t does not discuss the critical issue,

---

[6] *See* February Hearing Transcript, at pg. 72, lines 21-24.

viz., the understanding that existed between you and The Post; it contains merely a legal assertion of ownership on the part of The Post."   Thus, Mr. Dunker knew that Ken Stuart, Sr., acting in his capacity as Art Director on behalf of The Post, had taken the position that The Post owned the original artwork it commissioned from Mr. Rockwell as explained in Mr. Stuart, Sr.'s letter to Mr. Rockwell.   Mr. Dunker knew this because in the 1955 letter (which is discussed in detail in Defendants' Motion for Summary Judgment and is attached as Exhibit A to Defendants' Amended Answer and Counterclaims (*See* Dkt. # 50)) Mr. Stuart, Sr., acting in his capacity as Art Director of The Post at that time, explicitly stated that Defendants owned all rights to Mr. Rockwell's work, including the original artwork:

> "[o]ur company [*e.g.,* The Post] **owns all rights to Norman's paintings, including ownership of the originals**, as you point out. [...] Norman mentioned to me in the fall of 1954 that he would like any originals of his which we did [The Post] did not intend to keep made available to his heirs [...] **I told him at that time we couldn't go back to the paintings he made for us in the past**, but those he was working on could be grouped and kept available for his heirs if they ever asked for them."

(Dkt. # 50, Exh. A).

Next, Mr. Dunker further admits that the 1955 letter from Mr. Stuart, Sr. "might furnish The Post with legal grounds for the defense of the statute of limitations with respect to the originals submitted **prior to 1954**," *e.g.*, originals like the Paintings at issue.   He also opines that the 1955 letter "could be used to establish that [Norman Rockwell] [was] entitled to the return of at least some of [the paintings] ... submitted prior to 1954, **but which ones would be up to The Post**" -- evidencing that The Post would decide which original paintings it wanted to return to Mr. Rockwell.

Finally, Mr. Dunker explained to Mr. Rockwell that use of Mr. Stuart, Sr.'s letter "would be strictly an approach to fall back on because its use would **contradict [Norman Rockwell's] position that [he] retained ownership of all paintings submitted since** [...]" 1955.  This particular statement is undisputed and proves that Mr. Rockwell's attorney himself believed that The Post owned the Paintings created by Norman Rockwell for The Post before 1955.

Thus, the 1962 Letter proves that Mr. Rockwell and his attorney were concerned about his ownership of the Paintings and knew that The Post controlled and owned them.

### 5.    The Abelman, Dunker, and Rockwell Affidavits are not Competent Evidence Under Federal Rule 56

All three of the affidavits Plaintiffs submitted with the Suppl. Akoury Decl. (as Defendants pointed out in their Motion to Preclude (*See* Dkt.# 87)) are incompetent and/or irrelevant and should not be considered as evidence in favor of Plaintiff's' Motion for Summary Judgment or in opposition to Defendants' Motion for Summary Judgment.

Specifically, under Federal Rule of Civil Procedure 56(e) opposing affidavits must be made on "personal knowledge," set forth facts "admissible as evidence" and show the "affiant is competent to testify to the matters stated therein."  *See* Fed.R.Civ.P. 56(e)  Further, hearsay statements which are not competent evidence and would not be admissible at trial carry no weight as evidence for or against a motion for summary judgment.  *See, e.g., Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir. 1999)(Court held that affiant's assertion that he or she "was told" something was hearsay and not competent material for a Rule 56 affidavit.); *Schwapp v. Town of*

*Avon,* 118 F.3d 106, 111 (2d Cir. 1997)(Court held that bald assertions that were not based on personal knowledge were properly ignored by court in granting summary judgment); *Rossi v. W. Haven Bd. of Educ.,* 359 F. Supp. 2d 178, 181-82 (D. Conn. 2005)(Court held that inadmissible hearsay evidence was not admissible at trial and would not be considered in opposition to motion for summary judgment).

The Abelman, Dunker, and Rockwell affidavits are not based on personal information and are replete with hearsay statements such as "I was told ..." that are not admissible evidence.  For example, Mr. Abelman's affidavit contains twenty individual paragraphs of which paragraphs 8, 9, 10, 15, 16, and 17 begin with either the wording "Mr. Rockwell told me ..." or "Mr. Stuart told me ..."  Paragraphs 19 and 20 of the affidavit vaguely state that Mr. Abelman is "aware" of several occasions, entities, and individuals who own and/or have sold Rockwell original artwork, but provides no details which identify who these entities or individuals are or when the alleged occasions took place.  Paragraph 18 actually contains a double hearsay statement where Mr. Abelman purports to show the truth of the matter that he had a conversation with a Mr. Gardiner in a letter to a different person, Mr. Williams.

In sum, paragraphs 8, 9, 10, 15, 16, 17, 18, 19, and 20 of the Abelman affidavit are either hearsay, double hearsay, or vague statements which lack any specific details or information.  None of the these statements/paragraphs are admissible evidence under Federal Rule 56 and should not be considered by the Court in either opposing Defendants' Motion for Summary Judgment or supporting Plaintiffs' Motion for Summary Judgment.

With respect to the Dunker and Rockwell affidavits, it is entirely unclear why Plaintiffs proffered these affidavits as neither is based on their own personal knowledge.

Further, Mr. Dunker's affidavit mentions his September 24, 1962 letter (which as already discussed supports Defendants' position) and the Rockwell affidavit is irrelevant to the issues in this litigation.

### 6. Plaintiffs Only Inherited a Possessory Interest in the Paintings, Not an Ownership Interest

Plaintiffs did not inherit an ownership interest in the Paintings because Defendants *gave* Mr. Stuart, Sr. possession of the Paintings. As a bailee, Mr. Stuart, Sr. had a possessory interest in the Paintings and Plaintiffs inherited the same possessory interest that he enjoyed. *See, e.g., The Detroit Inst. of Arts Founders Soc'y v. Rose*, 127 F. Supp. 2d 117 (D. Conn. 2001) (Court held that defendant-former NBC employee's attempt to sell the famous Howdy Doody puppet prompted suit, which resulted in the court's determination that the defendant-heirs of the original bailee were not the rightful owners and that mere possession did not entitle defendants to sell the original Howdy-Doody puppet because there was a bailor-bailee relationship between the original parties).

The same situation as the *Rose* case is presented here. Mr. Stuart, Sr., a former employee of Defendants, had possession of the Paintings. He displayed them, enjoyed them, and then passed them on to his heirs. When Plaintiffs inherited the Paintings from Mr. Stuart, Sr. they inherited the same rights held by Mr. Stuart, Sr. -- *possession* of the Paintings. *See Id.*, at 134-135; *see also Dodge v. Briggs,* 27 F. 160, 167 (C.C.S.D. Ga. 1886) ("[t]he heir inherits that property only to which his ancestor was entitled, and it follows, therefore, that a conveyance ... to lands to which the ancestor had no title, is no better than a deed from a perfect stranger."); *In re Universal Clearing House Co.*, 62

B.R. 118, 124 (D. Utah 1986) ("... one cannot transfer better title to a chattel than he possess.").

Although Plaintiffs have alleged that Mr. Rockwell gifted the Paintings to Mr. Stuart, Sr., there is no evidence that Mr. Rockwell ever owned or even possessed them. In particular, Plaintiffs have asserted that the Paintings were "returned" to Mr. Rockwell who then gifted them to Mr. Stuart, Sr. "in or about 1952 and 1953" (*see* Plaintiffs' Motion for Summary Judgment, at pg. 1). But there is no evidence that the Paintings were ever physically returned to Mr. Rockwell at the time he, supposedly, gave them to Mr. Stuart, Sr. In fact, this version of events seems highly unlikely given that the Paintings themselves, all large physical works, were located at The Post's headquarters in Mr. Stuart Sr.'s office while he was Art Director of The Post. The more likely story is that the Paintings never left The Post and were never returned to Mr. Rockwell. Thus, at the time when the alleged gift took place in 1952-53, Mr. Rockwell not only did not own the Paintings (as evidenced by the purchase orders, affidavits, sworn testimony of Mr. Stuart, Sr., and even the letters of Mr. Abelman - Exhs. E and F of the Suppl. Akoury Decl.) he did not even have possession of them because the Paintings were never returned to him.

In all events, Plaintiffs have failed to prove that there are no material issues of fact regarding their alleged ownership interest in the Paintings and their Motion for Summary Judgment should be denied.

337494.2

-20-

**7.    Nothing Has Changed Since the Plaintiffs First Filed Their Motion for Judgment on the Pleadings and, Therefore, Plaintiffs' Motion Should be Denied Under the Doctrine of Law of the Case**

Plaintiffs Motion for Summary Judgment is the same Motion for Judgment on the Pleadings they filed in March 2003 (Dkt. # 27) and therefore should be denied under the law of the case doctrine. *See, e.g., PDK Labs, Inc. v. John Ashcroft*, 338 F. Supp. 2d 1, 7 (D.D.C. 2004) ("[A] summary judgment motion 'may not be made on the same grounds and with the same showing that led to the denial of a previous motion to dismiss'."), *quoting* 10A Wright, Miller & Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 2713 at 233 (2d. ed. 1998); *see also, Midwest Milk Monopolization Litig.*, 380 F. Supp. 880, 883 (W.D. Mo. 1974) ("[a]lthough AMPI's arguments in support of its pending motion for partial summary judgment may be stated in a bit different language, we believe it is apparent that [it] must have relied generally upon the same legal theories to support its earlier motion to dismiss.").

The purpose of the law of the case doctrine is to prevent parties from re-litigating already decided issues as Plaintiffs are attempting to do here. *See, e.g., Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888 (Fed. Cir. 1984) (citation omitted) (This "doctrine ensures judicial efficiency and prevents endless litigation. Its elementary logic is matched by elementary fairness -- a litigant given one good bite at the apple should not have a second."). Thus, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); *North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995); *Casey v. United States*, 161 F. Supp. 2d 86, 91 (D. Conn. 2001) (Fitzsimmons, Mag.). Indeed,

337494.2

-21-

decisions made by the district court during the course of litigation constitute the law of the case. *See Christianson*, 486 U.S. at 816 ("the [law of the case] doctrine applies ... to a court's own decisions"); 18 MOORE'S FEDERAL PRACTICE, § 134.22[1][a] (3d ed. 2005) ("[d]ecisions made by the district court during the course of litigation establish the law of the case"); *cf. Cumis Ins. Soc., Inc. v. Windsor Bank & Trust Co.*, 736 F. Supp. 1226 (D. Conn. 1990) (Nevas, J.).

Though the application of the doctrine of law of the case is discretionary in nature, a court should be "loathe" to reconsider its prior decisions in the absence of "extraordinary circumstances." *North River Ins.*, 63 F.3d at 165 (*quoting Christianson*, 486 U.S. at 817); *Casey*, 161 F. Supp. 2d at 91. *See also Virgin Atlantic Airways, Ltd. v. National Mediation Bd.s*, 956 F.2d 1245, 1255 (2d Cir. 1992); *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991). Such "extraordinary circumstances" include: (1) an intervening change of controlling law; (2) the availability of new evidence; and (3) the need to correct a clear error of law or to prevent manifest injustice. *See Virgin Atlantic*, 956 F.2d at 1255; *Casey*, 161 F. Supp. 2d at 91–92 (*citing DiLaura v. Power Auth. of State of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992) (Fitzsimmons, J.)).

Plaintiffs have not alleged any new facts or raised any new law in their Motion for Summary Judgment meriting reconsideration of the prior Motion for Judgment on the Pleadings. Further, Plaintiffs have failed to establish that the Court must correct a clear error of law or that there are extraordinary circumstances. Instead, Plaintiffs simply filed a motion with the same arguments they made years earlier, based on the very same evidence, which was denied by the Court. The present motion should be denied as well.

## III.    CONCLUSION

Defendants have listed numerous issues of material fact which are still disputed, and, therefore, Plaintiffs have failed to meet their burden pursuant to Federal Rule 56. As such, Defendants respectfully request that the Court hereby deny Plaintiffs' Motion for Summary Judgment.  Defendants also hereby respectfully request that the Court grant their Motion for Summary Judgment based on the undisputed evidence which proves their ownership in the Paintings.

Respectfully submitted,

Anthony F. Lo Cicero (CT 04670)
AMSTER, ROTHSTEIN & EBENSTEIN LLP
90 Park Avenue
New York, NY 10016
Tel: (212) 336-8000

William M. Bloss (CT 01008)
KOSKOFF KOSKOFF & BIEDER P.C.
350 Fairfield Avenue
Bridgeport, CT 06604
Tel: (203) 336-4421

ATTORNEYS FOR DEFENDANTS

Dated:   April 28, 2006

By: _____
      William M. Bloss (CT01008)

Of Counsel:

Gene R. Leeuw (#08754-49)
John M. Mead (#17459-49)
LEEUW OBERLIES & CAMPBELL
320 North Meridian Street
Suite 1006
Indianapolis, IN 46204
Tel: (317) 684-6960

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(BRIDGEPORT)

– – – – – – – – – – – – – – – – – – – x

|  |  |
|---|---|
| STUART & SONS, L.P., KENNETH STUART, JR., EXECUTOR OF THE ESTATE OF KENNETH STUART, SR.; TRUSTEE OF THE KENNETH J. STUART TRUST; KENNETH STUART, JR., WILLIAM STUART AND JONATHAN STUART, | **DECLARATION OF ANTHONY F. LO CICERO IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND SUPPLEMENTAL DOCUMENT PRODUCTION** |

Plaintiffs,

-against-

Case No. 301 CV 1580 (AHN)

THE CURTIS PUBLISHING COMPANY, INC., THE SATURDAY EVENING POST SOCIETY, A DIVISION OF THE BENJAMIN FRANKLIN LITERARY AND MEDICAL SOCIETY and THE BENJAMIN FRANKLIN LITERARY AND MEDICAL SOCIETY, INC.,

Defendants.

– – – – – – – – – – – – – – – – – – – x

I, ANTHONY F. LO CICERO, declare as follows:

**IV.     I am an attorney admitted in the Southern District of New York and the State of New York and a partner with the law firm of Amster, Rothstein & Ebenstein LLP, the attorneys for Defendants The Curtis Publishing Company, Inc., The Saturday Evening Post Society, a Division of The Benjamin Franklin Literary and Medical Society and The Benjamin Franklin Literary and Medical Society, Inc. (collectively, "Defendants").  By Order filed March 1, 2002, I was admitted *pro hac vice* in this matter.**

-24-

**V.**    Attached hereto as Exhibit A is a true and correct copy of a standard "confirmation" or "purchase" order dated January 4, 1943 for four pieces of artwork which Defendants purchased from Mr. Norman Rockwell individually entitled "Painting for Freedom of Worship," "Painting for Freedom of Speech," "Painting for Freedom From Fear," and "Painting for Freedom From Want" (collectively referred to as the "Four Freedoms").

**VI.**    Attached hereto as Exhibit B is a true and correct copy of the March 6, 1948 cover of the Saturday Evening Post.

**VII.**    Attached hereto as Exhibit C is a true and correct copy of the November 24, 1951 cover of the Saturday Evening Post.

**VIII.**    Attached hereto as Exhibit D is a true and correct copy of the April 4, 1953 cover of the Saturday Evening Post.

Under penalty of perjury, I hereby declare the foregoing statements to be true and correct to the best of my knowledge.

New York, New York
April ____, 2006

_____
Anthony F. Lo Cicero

337494.2

-25-

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that he is one of the attorneys for Defendants in the above-captioned action and that on the date which appears below, served copies of the foregoing DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND SUPPLEMENTAL DOCUMENT PRODUCTION by causing copies thereof to be served as follows:

### <u>*By Hand Delivery*</u>

Peter R. Stern, Esq.
McLaughlin & Stern LLP
260 Madison Avenue
New York, NY 10016
Fax No.:  (212) 448-0066

### <u>*via Federal Express*</u>

Sandra Akoury, Esq.
426 Danbury Road
Wilton, Connecticut 06897
Fax No.:  (203) 762-9826

Paul Pacifico, Esq.
Pacifico & Filan
965 Post Road East
Westport, Connecticut 06880
Fax No.:  (203) 221-8068

Mary Sommer, Esq.
Sandak Friedman Hennesse & Greco LLP
970 Summer Street
Stamford, CT 06905
Fax No.:  (203) 325-8608

Mr. Kenneth Stuart, Jr.
5 High Ridge Road
Wilton, CT 06897
Fax No.:  (203) 431-8236

_____
William M. Bloss

337494.2

-26-