UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
STUART & SONS, L.P.,               :
THE ESTATE OF KENNETH J. STUART,   :
THE KENNETH J. STUART LIVING TRUST, :
KENNETH J. STUART, JR.,            :
WILLIAM A. STUART, M.D.,           :
and JONATHAN STUART,               :
                                   :
          Plaintiffs,              :
                                   :
v.                                 : No. 3:01-CV-01580 (AHN)
                                   :
THE CURTIS PUBLISHING COMPANY, INC.,:
THE SATURDAY EVENING POST SOCIETY, :
A DIVISION OF THE BENJAMIN FRANKLIN :
LITERARY AND MEDICAL SOCIETY, and  :
THE BENJAMIN FRANKLIN LITERARY AND :
MEDICAL SOCIETY, INC.,             :
                                   :
          Defendants.              :
```

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Stuart and Sons, Ltd. Partnership, et al. (collectively, "the Stuarts")[1] bring this action for declaratory and other relief against the Curtis Publishing Co., ("Curtis"), the Saturday Evening Post Society ("Post Society"), and the Benjamin Franklin Literary & Medical Society, Inc. ("Franklin Society") (collectively, "the Defendants").  The case involves the ownership of three original oil paintings created by Norman

---

[1] "The Stuarts" are comprised of the sons of the late Kenneth Stuart, Sr., who was the Art Director for The Saturday Evening Post from 1944 to 1962, as well as Stuart, Sr.'s estate and living trust.

Rockwell ("Rockwell")[2]: "The Gossips;" "Saying Grace;" and "Walking to Church" a/k/a "Silver Slipper Grill" (collectively, "the Paintings").  These Paintings, which are familiar to many Americans, particularly to those generations of the 1940s, '50s, and '60s, were created by Rockwell to appear on covers of the Saturday Evening Post magazine (the "Post") in 1948, 1951 and 1953, respectively.

Pending before the court are the Stuarts' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) [doc. # 57], which was converted by the court into a motion for summary judgment[3], and the Defendants' motion for summary judgment [doc. # 53].  The Stuarts seek a declaration confirming their ownership of the Paintings and judgment on the Defendants' counterclaims which, they allege, are barred by the statute of limitations and laches.  The Defendants have asserted two counterclaims.  One seeks a declaratory judgment that they have clear title to the Paintings.  The other seeks an accounting of any other original artwork that was created for Curtis that the Stuarts now have in their possession, that may be in the possession of others, or

---

[2] Norman Rockwell (1894-1978) first became famous for his illustrations on the covers of The Saturday Evening Post. Rockwell is considered to be one of the greatest American artists of the twentieth century.

[3] The court gave the Defendants notice and additional time to file a supplemental brief when the court decided to convert the motion.  The Defendants subsequently filed a supplemental brief.

that was previously in their possession.  The Defendants have moved for summary judgment on their counterclaim for declaratory relief.

For the following reasons, the Stuarts' motion for summary judgment is GRANTED and the Defendants' motion for summary judgment is DENIED.

FACTS

The following facts are, at this point in the case, no longer in dispute.[4]  Kenneth Stuart, Sr. ("Stuart, Sr.") was the art director of the Post from 1944 to 1962.  Between 1916 and 1963, Rockwell created more than 300 original paintings that were used to create Post covers.  Rockwell and Stuart, Sr. collaborated on cover illustrations and had a positive working relationship and friendship.  Curtis published the Post until 1969.  Curtis registered Rockwell's artwork with the copyright

---

[4] The parties have changed their positions on some of the facts during the course of this litigation.  The undisputed facts as recited here are those established at the time of this ruling.

3

office as composite works.[5]  Since 1970, the SerVaas family
("SerVaas") has had a controlling interest in Curtis.

At some point in the early 1950's, Stuart, Sr. came to
possess the Paintings that are now the subject of this lawsuit.[6]
Stuart, Sr. displayed the Paintings in his office at the Post
while he worked there.  After he left the Post, he hung the
Paintings in his home in Connecticut.  After Stuart, Sr. left the
Post, neither Curtis nor any other defendant ever objected to
Stuart, Sr.'s possession, display or assertions of ownership of
the Paintings.  Indeed, the Defendants did not assert any claim
of ownership of the Paintings, or even object to Stuart, Sr.'s
assertions that he owned them, until 2001.

Since at least 1962, Stuart, Sr. held himself out, and was
publicly recognized as the owner of the Paintings in numerous

_____

[5] There is no dispute that the Defendants own the copyrights
to the images of the Paintings. Ownership of a copyright,
however, is distinct from ownership of any material in which the
copyrighted material is embodied.  See Gener-Villar v. AdCom
Group, Inc., 417 F.3d 201 (1st Cir. 2005).  The difference
between owning an image itself and owning the copyright is
essentially the difference between owning the physical object and
owning the intellectual property rights underlying it. See id. at
203, n.1.  "For example, a collector who buys a painting from an
artist may hang it in his house or sell it to a third party.
However, the collector does not acquire, solely by buying the
painting, the right to make and distribute prints of it." Id.

[6] This court declines to address whether Stuart owned the
Paintings before or at the time he left the Post for the reasons
set forth below. See Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248 (1986)("[o]nly disputes over facts that might affect the
outcome of the suit under the governing law will properly
preclude the entry of summary judgment.").

publications, including books about Rockwell and gallery and museum catalogues.[7]  The first time Curtis directly inquired about Stuart, Sr.'s possession of the Paintings was on May 13, 1986, when SerVaas wrote to Stuart, Sr.  In that letter, SerVaas stated that they were attempting to locate original Rockwell artwork, including "Saying Grace," and requested that Stuart, Sr. provide a list of all such works he possessed.  Stuart, Sr.'s attorney responded by letter and stated that Stuart, Sr. was the owner and was in possession of "Saying Grace," which he said had been given to Stuart, Sr. by Rockwell in 1952, with the full knowledge of the president of Curtis and the editors of the Post. He further stated, "[i]n as much as there are numerous books published and, no doubt, still to be published concerning the works of Norman Rockwell, there would seem to be little point in Mr. [Stuart, Sr.] compiling a list of works owned by him by Norman Rockwell, especially since certain of these works have nothing whatever to do with either Curtis or the Saturday Evening Post."  The Defendants did not respond to this letter or take any

---

[7] For example, Stuart's exhibits show ownership attribution of the Paintings to Stuart, Sr. in the following publications: (1) THOMAS S. BUECHNER, NORMAN ROCKWELL, ARTIST AND ILLUSTRATOR (1970); (2) NORMAN ROCKWELL, A SIXTY YEAR RETROSPECTIVE (Thomas S. Buechner ed., Harry N. Abrams, Inc. 1972); (3) CHRISTOPHER FINCH, NORMAN ROCKWELL'S AMERICA (1976); (4) Kenneth Stuart, Unforgettable Norman Rockwell, READER'S DIGEST, July 1979, at 107-08; (5) LAURIE NORTON MOFFATT, NORMAN ROCKWELL: A DEFINITIVE CATALOGUE (1986); (6) Norman Rockwell and the Saturday Evening Post with Ken Stuart (1986) (commercial videotape); (7) NORMAN ROCKWELL, PICTURES FOR THE AMERICAN PEOPLE: HIGH MUSEUM OF ART EXHIBIT (1999).

action to recover the Paintings from the Stuarts for fifteen
years thereafter.

In 1994, the Stuarts loaned the Paintings to the Norman
Rockwell Museum in Stockbridge, Massachusetts ("the Museum").
The Museum has always identified the Paintings as the property of
the Stuart family, both at the Museum and on its web site.  For a
number of years, including the time the Paintings were on loan to
the Museum, a member of the SerVaas family was on the Museum's
Board of Directors.

In the summer of 2001, the Stuarts were negotiating with
Sotheby's, a New York auction house, to sell the Paintings.  At
that time, Sotheby's contacted Curtis for information about the
Paintings for its sale catalogue.  In response, the Defendants
wrote to Sotheby's claiming to own the Paintings.  Sotheby's then
cancelled the sale of the Paintings and the Stuarts commenced
this action.

<u>STANDARD</u>

Summary judgment should be granted if the record
demonstrates that there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as a
matter of law.  <u>See</u> <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29,
36 (2d Cir. 1994); Fed. R. Civ. P. 56(c).  The burden of
demonstrating the absence of any genuine issue of material fact
rests on the moving party, <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 323 (1986), and all ambiguities and inferences that may reasonably be drawn from the facts must be viewed in the light most favorable to the nonmoving party, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Whether a fact is material depends on the substantive law of the claim and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.  A disputed issue is not created by a mere allegation in the pleadings, see Applegate v. Top Assoc., Inc., 425 F.2d 92, 96 (2d Cir. 1970), or by surmise or conjecture, see Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).  Conclusory assertions also do not create a genuine factual issue.  See Delaware & Hudson Ry. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).  Where affidavits are submitted on summary judgment they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).  Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the nonmoving party's case." Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998).

"The movant's burden does not shift when cross-motions for summary judgment are before the court; rather, each motion must be judged on its own merits." Lillbask *ex rel.* Mauclaire v. Sergi, 117 F. Supp. 2d 182, 186 (D. Conn. 2000); see Schwabenbauer v. Board of Educ., 667 F.2d 305, 313-14 (2d Cir. 1981). Indeed, "[c]ross motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified. . . ." Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1978).

## DISCUSSION

The Stuarts maintain that they are entitled to a declaration of ownership of the Paintings and that the Defendants' counterclaim for a declaration of ownership of the Paintings is actually a claim for conversion and, as such, is barred by the statute of limitations. In the alternative, the Stuarts maintain that the Defendants' counterclaim is barred by the doctrine of laches. The Defendants assert that they own the Paintings and that the statute of limitations did not begin to run on their claim until they made a demand for the return of the Paintings in

8

2001.[8]

I.    Opportunistic Pleading

The Defendants label their counterclaim as one for a declaratory judgment that they are the rightful owners of the Paintings.  Despite this label, the Defendants allege that "[t]he attempted consignment of the Paintings constituted conversion of the same."  The Stuarts say that by labeling the claim as one for declaratory judgment the Defendants are attempting to circumvent the statute of limitations.  They say that whatever label the Defendants put on their claims, the action they describe is one for conversion.  The court agrees.

To prevent a party from making a mockery of the statute of limitations through creative labeling in cases where, as here, legal and equitable claims co-exist, the court will focus on the substance of the claim as opposed to its form, and an equitable remedy will be withheld if an applicable statute of limitations bars the concurrent legal remedy.  See Gilbert v. City of Cambridge, 932 F.2d 51, 57 (1st Cir. 1991); see also Town of Orangetown v. Gorsuch, 718 F.2d 29, 42 (2d Cir. 1983) (noting that if a claim for declaratory relief can be resolved through

_____

[8] In addition to the arguments addressed in this ruling, the Defendants also assert that the Stuarts' motion should be denied under the law of the case doctrine and because of their alleged litigation misconduct.  These claims are baseless and are non-case-dispositive.  Hence, they will not be addressed by this court.

another form of action that has a specific limitations period,
the specific period will govern).  Accordingly, although the
Defendants' counterclaim is labeled as one seeking declaratory
relief, in substance it is a claim for conversion and will be
construed as such.

II.  Statute of Limitations

     Because jurisdiction in this case is based on diversity of
citizenship, the court must apply the forum state's substantive
law, including its choice of law rules.  See AroChem, Int'l, Inc.
v. Buirkle, 968 F.2d 266, 269-70 (2d Cir. 1992).  Under
Connecticut's choice of law rules, if the underlying claim
existed at common law, the statute of limitations is considered
procedural.  See Slekis v. Nat'l R.R. Passenger Corp., 56 F.
Supp. 2d 202, 204 (D. Conn. 1999).  The underlying claim here is
conversion, a claim that existed at common law, see D'Occhio v.
Connecticut Real Estate Comm'n, 189 Conn. 162, 182 (1983), and
thus Connecticut's three-year common-law tort statute of
limitations, Conn. Gen. Stat. § 52-577, applies.

     Connecticut's general tort statute of limitations is an
occurrence, as opposed to an accrual, statute that runs from "the
date of the act or omission complained of."  Fichera v. Mine Hill
Corp., 207 Conn. 204, 212 (1988).  As the Connecticut Supreme
Court concluded, "the history of that legislative choice of
language [in § 52-577] precludes any construction thereof

10

delaying the start of the limitations period until the cause of action has accrued or the injury has occurred." Id. (citing Prokolkin v. General Motors Corp., 170 Conn. 289, 294-97 (1976)). Hence, Connecticut's three-year statute of limitations applies to the conversion claim at issue here.

III.  Conversion

Conversion occurs when one, without authorization, assumes and exercises a right of ownership of property belonging to another to the exclusion of the owner's rights.  See Aetna Life & Cas. Co. v. Union Trust Co., 230 Conn. 779 (1994); Luciano v. Stop & Shop Cos., 15 Conn. App. 407 (1988); Epstein v. Automatic Enterp., Inc., 6 Conn. App. 484, 488 (1986).  In a conversion action, "[t]he essence of the wrong is that the property rights of the [original owner] have been dealt with in a manner adverse to him, inconsistent with his right of dominion, and to his harm." Coleman v. Francis, 102 Conn. 612, 615 (1925); see also Restatement (Second) of Torts § 222A.  There are two classes of conversion.  See Coleman, 102 Conn. at 615.  Thus, in order to determine whether the Defendants' conversion claim is barred by the statute of limitations, the court must first decide which of those two types of conversion is alleged.

In the first class of conversion the possession is wrongful from the outset.  See Epstein, 6 Conn. App. at 488.  Proof of the wrongful taking establishes the conversion; thus there is no need

11

for a demand and a refusal for return of the property to establish the tort. See id. The statute of limitations for this type of conversion begins to run on the date the property was wrongfully taken. See Sterniak v. Mullins, No. CV020516931S, 2003 WL 22480570, at *2 (Conn. Super. Ct., Sept. 18, 2003) (citing Hefferman v. Marine Midland Bank, N.A., 727 N.Y.S.2d 60, 62 (N.Y. App. 2001)).

The second class of conversion occurs when the possession is originally rightful, but becomes wrongful as a result of: (1) a wrongful detention; (2) a wrongful use of the property; or (3) the exercise of an unauthorized dominion over the property. See Epstein, 6 Conn. App. at 488. With regard to the first instance, where the original possession is authorized, but becomes wrongful when the property is detained without authorization, a conversion does not occur until the possessor refuses to return the property on demand. See id. "Demand is only required in the 'detention' scenario because by definition, a rightful possession cannot become a 'detention' until a possessor fails to comply with a request to quit possession made by the rightful owner." Luciani, 15 Conn. App. at 410. In this type of conversion, the statute of limitations begins to run when the demand is refused. See id.

In the other two instances in the second class of conversion, either the wrongful use or the unauthorized dominion constitute the conversion and no demand for the return of the

property is necessary.  Thus, the statute of limitations in either case begins to run when a party, publicly or outwardly, exhibits wrongful use or unauthorized dominion over the property. See id.; see also Songbyrd, Inc. v. Grossman, 206 F.3d 172, 183 (2d Cir. 2000) (stating that when a rightful possessor of property uses it as his own, the "character" of possession changes and a conversion occurs).  Whether the rightful owner had actual knowledge of the conversion is of no consequence for purposes of the statute of limitations.  See Cablevision of Connecticut v. Sollitto, 109 F. Supp. 2d 84, 85 (D. Conn. 2000); see also Fichera v. Mine Hill Corp., 207 Conn. 204, 212-13 (1988) ("The three year limitation period of § 52-577 begins with the date of the act or omission complained of, not the date when the plaintiff first discovers an injury.").

Here, the Defendants initially asserted that they had always owned the Paintings and that Stuart, Sr.'s possession of the Paintings was wrongful from the outset.  The Defendants now, however, agree with the Stuarts that Stuart, Sr.'s possession of the Paintings was originally rightful.  According to the Defendants, Stuart, Sr. originally and continuously possessed the Paintings as a bailee, but his possession, or "bailment," became wrongful, and the statute of limitations only began to run, when the Stuarts refused their demand to return the Paintings in 2001. In contrast, the Stuarts argue that Stuart, Sr.'s original

rightful possession would have become wrongful, and thus an act of conversion occurred, at the very latest, in 1986, when Stuart, Sr.'s attorney, in response to SerVaas's letter inquiring into the whereabouts of "Saying Grace" and other Rockwell artwork, asserted that Stuart, Sr. was the owner of "Saying Grace" and other Rockwell paintings.

As noted, the Defendants first asserted that Stuart, Sr. either wrongfully (1) accepted the Paintings as gifts from Rockwell (who they claim did not own them or have the right to give them away) and in so doing breached his fiduciary duty as an employee of Curtis and the Post; or (2) took the paintings without authorization or permission when he left the Post in the 1960s and thereafter exercised a right of ownership of them to the exclusion of Curtis. Both of these allegations bring their claim within the first class of conversion, and as such the statute of limitations began to run at the time Stuart, Sr. wrongfully took the Paintings. Thus, if Stuart, Sr. wrongfully accepted the Paintings from Rockwell, the statute of limitations would have begun to run immediately -- i.e., no later than 1953. If Stuart, Sr. wrongfully took the Paintings when he left the Post in the early 1960s, the statute of limitations would have begun to run at that time. In either scenario, there was no need for Curtis or the Post to make a demand on Stuart, Sr. to return the Paintings in order for the three-year statute of limitations to begin to run. Thus, based on the Defendants' initial

14

argument, their conversion claim was time-barred, at the latest, by the mid-1960s.

Now, according to the Defendants' allegations in their answer to the Stuarts' second amended complaint[9], they assert, as do the Stuarts, that Stuart, Sr.'s initial possession of the Paintings was rightful.[10]  The Defendants now maintain that they were fully aware that Stuart, Sr. possessed the Paintings and were content to allow him to do so without interference for the better part of four decades.  They assert, however, that this time lapse is irrelevant because they did not make a demand for return of the Paintings until 2001.  Only when their demand was refused, they say, did the conversion occur, in the form of a "wrongful detention."  And because they made their demand in 2001[11] - in the form of a counterclaim in this action - within three years of the act of

---

[9] In their answer to the Stuarts' second amended complaint, Defendants ". . . affirmatively state that Ken Stuart, Jr. [sic] never had ownership, as opposed to possession of the Paintings." In their memorandum in response to the Stuarts' motion for summary judgment, the Defendants assert that they "knew where the Paintings were located and that Mr. Stuart, Sr. had possession of them."

[10] The Defendants disagree, however, with the Stuarts' claim that Stuart, Sr. always owned the Paintings.  But, as noted, see supra n.6, whether Stuart, Sr. ever owned the Paintings need not be decided to resolve this action.

[11] The Defendants maintain that Count One of their counterclaim, which reads, "[t]he attempted consignment of the Paintings constituted conversion of the same," constitutes the necessary demand.  Because the court finds that the conversion at issue is one that does not require a demand, there is no need to determine whether this language would be sufficient.

conversion, they maintain their claim is not time-barred.[12]

The flaw in the Defendants' argument is that no demand was required to constitute a conversion under the undisputed facts of this case. As these undisputed facts establish, Stuart, Sr., and/or his family, repeatedly, and for the better part of the four decades in which they possessed the Paintings, publicly asserted that they were "owned" by Stuart, Sr., or were "the property of," or belonged to "the collection of" Stuart, Sr. and his wife, Katherine. Most of those assertions of Stuart, Sr.'s ownership were either in magazine articles or in museum catalogues, and at least one was directly connected to the SerVaas family.[13] If, as the Defendants assert, Stuart, Sr. was only a bailee or a mere possessor of the Paintings with their permission, such acts of ownership by Stuart, Sr. would amount to unauthorized dominion and control over the Paintings and constitute a conversion of the second class. See Epstein, 6 Conn. App. at 489 (noting that exercising rights of ownership supports a finding that a conversion occurred). As such, the statute of limitations began to run on the date that Stuart, Sr. first publicly

---

[12]Indeed, the fact that Stuart, not Curtis, was the first party to file a lawsuit to determine ownership of the Paintings is telling. If the Defendants truly were concerned about their ownership rights in the Paintings in the forty-plus years before the Stuarts attempted to sell the Paintings, that fact cannot be discerned from the record.

[13]See supra n.7. A member of the SerVaas family has been on the Board of Directors of the Norman Rockwell Museum for many years.

asserted his ownership of the Paintings.  See Grossman, 206 F.3d at 183.  According to the record evidence, Stuart, Sr.'s first public assertion of ownership or exercise of dominion or control of the Paintings occurred in 1970, in Thomas Buechner's widely disseminated book, Norman Rockwell: Artist and Illustrator.  There, Stuart, Sr. is listed as the owner of "Saying Grace" and "Walking to Church."[14]  Although under Connecticut law the Defendants' knowledge of the conversion is unnecessary for the statute to begin to run, see Sollitto, 109 F. Supp. 2d at 85 (holding that where documents were available that proved a conversion occurred but the party did not review the documents to discover that fact, the statute of limitations ran on its claim despite its failure to discover the conversion), it is notable that Dr. Cory SerVaas relied on that book for a meeting she had with Rockwell in the early 1970s.

There is no factual support for the Defendants' assertion that the conversion did not occur until 2001, when they filed the counterclaim that ostensibly constituted a demand for the return of the Paintings.  Indeed, this claim is against the weight of the evidence, even when construed in the Defendants' favor.  The most

---

[14] The record evidence does not, however, establish that Stuart, Sr. asserted ownership of "The Gossips" prior to the commercially produced videotape entitled "Norman Rockwell and the Saturday Evening Post with Ken Stuart," which debuted in 1986. But this is immaterial because, as stated above, the Defendants' notice of the conversion is not required for the statute of limitations to begin to run.  Moreover, even if such notice were required, more than three years have passed since 1986, and thus a conversion claim relating to "The Gossips" is time-barred.

persuasive evidence in this regard is the 1986 letter from Stuart, Sr.'s attorney to Beurt SerVaas, in which Stuart, Sr.'s attorney asserted not just that Stuart, Sr. had mere possession, but that he owned "Saying Grace" and other original Rockwell artwork.[15]  As noted above, while Connecticut does not adhere to the discovery rule to determine when the statute of limitations begins to run, this letter gave the Defendants actual notice of the fact that Stuart, Sr. was doing more than exercising "unauthorized dominion" over the Paintings - he was asserting actual ownership.  As such, even if he had not been holding himself out publicly as owner of the Paintings for sixteen years before Stuart, Sr. sent this letter to SerVaas, when the Defendants received it they had actual notice that a conversion occurred.  Yet they took no action for almost fifteen more years.

Because Connecticut law does not require demand and refusal for a conversion to occur when a possessor exercises a right of ownership to the exclusion of the rightful owner, see Coleman, 102 Conn. at 616, the Defendants, if they were intent on protecting their rights, real or imagined, were required to bring an action to recover their property within three years from the time Stuart, Sr. exercised unauthorized dominion or control of the Paintings, and the fact that the Defendants did not make a demand for the return of the

---

[15] In light of the fact that the Stuarts have located and produced the original return receipt for this certified letter, the Defendants no longer dispute that they received it.

Paintings until 2001 is irrelevant.  The determinative facts establish that the conversion occurred, and the statute of limitations ran, long before that demand was made.[16]  Accordingly, the Defendants' claim for return of the Paintings is time-barred. The Stuarts are entitled to a declaratory judgment that they now, even if they did not originally, own the Paintings.

IV.  <u>Laches</u>

Even if the court had not construed the Defendants' counterclaim as a conversion claim and determined that it was time-barred, the court would be compelled to reach the same conclusion under the equitable doctrine of laches.  This is so despite the Defendants' claim that the Stuarts have failed to allege that they have been prejudiced by any delay and that they have "unclean hands" which precludes their assertion of this equitable defense.[17]

Under Connecticut law, a party seeking equitable relief is barred by laches if it has engaged in unreasonable delay and if the

---

[16] <u>See</u> <u>Songbyrd, Inc. v. Grossman</u>, 206 F.3d 172, 183 (2d Cir. 2000)(stating that the statute of limitations began to run when the property was first used as though the possessor owned it); <u>see also</u> <u>Cablevision of Connecticut v. Sollitto</u>, 109 F. Supp. 2d 84, 85 (D. Conn. 2000).

[17] The Defendants' claim that the Stuarts come before the court with unclean hands is based on the fact that an action is pending in the Superior Court of Connecticut involving matters relating to the administration of Stuart, Sr.'s estate.  Because that action is not before this court, and does not deal with the same or similar issues as this action, the fact that the heirs of Stuart, Sr. are involved in a separate and distinct lawsuit does not support the Defendants' assertion of unclean hands.

delay has prejudiced the party against whom such relief is sought. Papcun v. Papcun, 181 Conn. 618, 620 (1980).  A party's delay is unreasonable if the party "discovers or by the exercise of reasonable diligence cold have discovered the wrong of which he complains." I-291 Why? Ass'n v. Burns, 372 F. Supp. 223, 239 (D. Conn. 1974).  Normally, the determination of whether a party is guilty of laches is a question for the trier of fact, but this is not the case where "the subordinate facts found make such a conclusion inevitable as a matter of law."  See Papcun, 181 Conn. at 621; see also Kunstsammlungen zu Weimar v. Elicofon, 536 F. Supp. 829, 849-52 (E.D.N.Y. 1981) (holding that summary judgment is proper on the issue of laches when there is no genuine dispute as to the facts supporting the elements).  Here, based on the evidence before the court, there is no genuine issue of material fact as to the Defendants' prejudicial and unreasonable delay that supports the Stuarts' defense of laches.

A party's delay in bringing a claim results in prejudice to the opposing party if "it would be inequitable, in light of a change in [a party's] position, to allow [the] claim to proceed or because the delay makes it difficult to garner evidence to vindicate his or her rights."  Robins Island Pres. Fund v. Southold Dev. Corp., 959 F.2d 409, 423 (2d Cir. 1992).

An instructive case on the issue of prejudicial delay is Greek Orthodox Patriarchate v. Christie's, Inc., No. 98-CIV-7664, 1999 WL

673347 (S.D.N.Y. Aug. 30, 1999).  This case involved the ownership
rights of an ancient manuscript called the Palimpsest, purportedly
written by Archimedes.  See id. at *1.  After the Frenchman who
acquired the manuscript from a monastery in Istanbul died in 1956,
his family consigned it to Christie's auction house in New York for
sale.  The Patriarchate filed suit against the family and Christie's
the day before the Palimpsest was scheduled for auction, claiming it
was the rightful owner.  See id. at *3.  In defense of the
Patriarchate's claim that they had no documentation to prove their
ownership, the family asserted laches.  The court agreed, stating
that:

> As the Palimpsest was acquired so long ago . . . it is not
> unreasonable that the Guersan family no longer has such
> documents. The Patriarchate's seventy-year delay in coming
> forward to claim ownership of the Patriarchate [sic] renders it
> virtually impossible for the Guersans to prove ownership . . .
> . [T]he critical witness . . . is deceased, memories have
> faded, and key documents, assuming they existed at all, are
> missing. Thus 'it is impossible for [the family] to obtain
> witnesses or marshal evidence.' Because the Patriarchate's
> delay in bringing this action renders defendants' case much
> more difficult to prove, the doctrine of laches bars this
> action.

Id. at *10 (citing Robins Island Pres. Fund v. Southold Dev. Corp.,
959 F.2d 409 (2d Cir. 1992); DeWeerth v. Baldinger, 836 F.2d 103 (2d
Cir. 1987)).

Just as in Patriarchate, the passage of time has rendered the
Stuarts' claim that Rockwell owned the original artwork (as opposed
to the copyrights the images that he sold to the Post) and gave
the Paintings to Stuart, Sr. in the early 1950s much more difficult,

if not impossible, to prove.  Neither the Stuarts nor the Defendants
have any documentary evidence that establish such original ownership
rights.  The two most important witnesses, Stuart, Sr. and Rockwell,
have been deceased for many years.[18]  Much of the evidence submitted
by the parties in support of their claims is cobbled together from
snippets of old letters that concerned other issues, unrelated
documents found in long-closed attorney files, and documents that
purport to be "contracts" relating to other Rockwell art that was
used in Curtis's publications.  None of these items establish
definitive ownership rights.

Further, the Defendants' delay in pursuing their claim of
ownership is not only prejudicial, it is also unreasonable.  In
contrast to the majority of cases involving stolen or missing
artwork, the undisputed facts here show that the Defendants have
known for many years, at the very latest since Stuart, Sr.'s
attorney wrote to SerVaas in 1986, that Stuart, Sr. possessed and
was asserting ownership of "Saying Grace" and other original
Rockwell artwork.[19]  But even in 1976, ten years before that letter
was written, the Post actually published an article written by
Stuart, Sr., that described the circumstances surrounding Rockwell's
gift to him of "Saying Grace."  That same article was republished

---

[18] Stuart, Sr. died in 1993, and Rockwell in 1978.

[19] Indeed, in 1986, and for three years thereafter, one of
the central witnesses, namely Stuart, Sr., was still alive.

three years later in Reader's Digest.[20]  In addition, there are at least seven different art catalogues and books that date from 1970 to 1999 that list Stuart, Sr. or the Stuarts as owners of the Paintings.[21]  One of those catalogues was published by the Norman Rockwell Museum, where the SerVaas family maintains a seat on the Board of Directors.  Despite having such constructive, and indeed actual notice, of the facts supporting their conversion claim, the Defendants made no attempt to secure the Paintings or assert their ownership rights until 2001.  Because the Defendants knew, or with reasonable diligence, should have known for at least fifteen years before this action was commenced that the Stuarts were asserting ownership of the Paintings, and that they had a claim for conversion that they could have raised against the Stuarts, the fact that they failed to take any action to protect their alleged ownership rights until 2001 renders their delay unreasonable.

While the Defendants did not delay asserting their claim of ownership for two hundred years as in Robins Island, or even seventy years as in Patriarchate, the passage of time in this case has

---

[20] In the article, Stuart, Sr. stated: "Norman often gave away paintings to friends who admired his work.  'Don't you want one?' he [Rockwell] asked [Stuart, Sr.] reproachfully.  I said, 'Yes, I'd love to have one.'  'Which?' Norman asked.  I was flustered by his directness. Since 'Saying Grace' was on the wall, I said 'How about this one?'  So he gave it to me as casually as another might bestow a cigar."  Kenneth Stuart, Unforgettable Norman Rockwell, READER'S DIGEST, July 1979, at 107-08.

[21] See supra n.7.

caused the same type of prejudice to the Stuarts as the delay caused in those cases. Further, even though the Defendants have had actual knowledge of the facts supporting their claim for approximately fifteen years before this action was commenced, they failed to do anything to regain possession or establish their ownership of the Paintings during that time. The undisputed facts establish that the Defendants' delay in pursuing their claim of ownership of the Paintings is unreasonable and because that delay caused undue prejudice to the Stuarts, the doctrine of laches applies and bars the Defendants' claim for declaratory relief.[22]

## CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment [doc. # 53] is DENIED. The Stuarts' motion for summary judgment [doc. # 57] is GRANTED. Because all of the claims asserted by the Stuarts have not been resolved by this ruling, judgment

---

[22] In Count Two of their counterclaim, Defendants seek an accounting of other original paintings that the Stuarts possess that are attributed to certain illustrators, including Rockwell, who created artwork for the Post. The Stuarts addressed this counterclaim in their motion for summary judgment, but the Defendants failed to respond to their assertion that any such claim would also be time-barred, because it is subject to a three-year statute of limitations. The court concludes, therefore, that Count Two of the Defendants' counterclaim, which sounds in breach of fiduciary duty, is time-barred by the applicable statute of limitations, or in the alternative, the Defendants have abandoned their counterclaim because they failed to address the Stuarts' statute of limitations argument in their summary judgment briefs. See Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (holding that where one party addresses an adverse party's claims, the adverse party must rebut those arguments or its claims are deemed to be abandoned).

cannot enter in their favor.  Accordingly, if the Stuarts intend to pursue their claim of tortious interference with business expectancies, they must so inform the court and opposing counsel of that intention within thirty days of the issuance of this ruling or the claim will be deemed abandoned and final judgment will enter.

SO ORDERED this _____ day of September, 2006 at Bridgeport, Connecticut.

_____
        Alan H. Nevas
United States District Judge